1    ROBBINS GELLER RUDMAN
        & DOWD LLP
2    SHAWN A. WILLIAMS (213113)
     JASON C. DAVIS (253370)
3    Post Montgomery Center
     One Montgomery Street, Suite 1800
4    San Francisco, CA  94104
     Telephone:  415/288-4545
5    shawnw@rgrdlaw.com
     jdavis@rgrdlaw.com
6        – and –
     SPENCER A. BURKHOLZ (147029)
7    655 West Broadway, Suite 1900
     San Diego, CA  92101
8    Telephone:  619/231-1058
     spenceb@rgrdlaw.com
9
     Lead Counsel for Lead Plaintiff
10
     [Additional counsel appear on signature page.]
11

12                    UNITED STATES DISTRICT COURT

13                  NORTHERN DISTRICT OF CALIFORNIA

14                          OAKLAND DIVISION

15

16   MICHAEL BARKASI, Individually and on    )   Case No. 4:24-cv-02431-YGR
     Behalf of All Others Similarly Situated,  )
17                                            )   CLASS ACTION
                                 Plaintiff,    )
18                                            )   AMENDED CLASS ACTION COMPLAINT
           vs.                                )   FOR VIOLATIONS OF THE FEDERAL
19                                            )   SECURITIES LAWS
     AUTODESK, INC., et al.,                  )
20                                            )
                                Defendants.   )
21   _____ )   DEMAND FOR JURY TRIAL

22

23

24

25

26

27

28

4889-2661-0907.v2

**TABLE OF CONTENTS**

**Page**

I.      INTRODUCTION ..........................................................................................1

II.     JURISDICTION AND VENUE ...................................................................6

III.    PARTIES ......................................................................................................7

        A.      Lead Plaintiff ....................................................................................7

        B.      Defendants ........................................................................................7

IV.     SUBSTANTIVE ALLEGATIONS ..............................................................7

        A.      The Company's Background and Sales Channels ..............................7

                1.      The Direct Sales Channel..........................................................8

                2.      The Indirect Sales Channel .......................................................9

        B.      The Company's Two Billing Models Had Dramatically Different Impacts
                on Its Reported Free Cash Flow – a Critical Metric ........................9

        C.      The Company Announces the End of Its Upfront Billing Model .........12

                1.      The Company Says Upfront EBA Deals Were a Paltry 1% and a
                        Thing of the Past ...................................................................12

                2.      The Company Announces Ending Upfront Deals in the Indirect
                        Channel but Notes a Longer Timeframe....................................13

                3.      The Company Reassures Investors that All EBA Deals Had
                        Annual Payment Terms and that Only 1% Had Been Upfront .................15

                4.      The Company Says It Would "Flush Out" Indirect Upfront Deals
                        "This Very Minute" if It Could.................................................16

V.      THE CLASS PERIOD STARTS: DEFENDANTS REPORT INFLATED CASH
        FLOW FROM SECRET RETURN TO EBA UPFRONT BILLING MODEL
        AND OTHER MANIPULATIVE PRACTICES.............................................18

        A.      February 23, 2023: The Company Announces Its 4Q23 and FY23 Results..........18

                1.      The Company's Reported Free Cash Flow Numbers Were
                        Artificially Boosted by the Secret Restart of EBA Upfront Billings .........18

                2.      The Company's Statements Regarding FY23 Free Cash Flow Were
                        Materially False and Misleading Because the Company's
                        Manipulated Free Cash Flow Did Not Provide Transparency...................21

**Page**

B.      The Company's February 23, 2023 Free Cash Flow Guidance for FY24 –
        Already Underway - Was Materially False and Misleading ..............................22

C.      March 14, 2023: The Company Reiterates the Misleading FY23 Free Cash
        Flow Numbers and Further Declares FY23 to Be "Typical" ...............................24

D.      March 22, 2023: The Company Reiterates the End of Product (Indirect)
        Upfront Deals ...............................................................................................27

E.      1Q24: The Company Announces Record Free Cash Flow ...................................29

F.      Second Quarter of FY24 ("2Q24") ....................................................................31

VI.    THE TRUTH BEGINS TO EMERGE, BUT DEFENDANTS CONTINUE TO
       MISLEAD INVESTORS .............................................................................................32

A.      November 21, 2023: Scraping the Bottom of Free Cash Flow, the
        Company Admits a $200 Million Adjustment in Free Cash Flow Is
        Necessary ......................................................................................................32

B.      4Q24: The Company Repeats Its Artificially Inflated FY23 Free Cash
        Flow Metrics ..................................................................................................34

VII.   AUTODESK'S AUDIT COMMITTEE DISCOVERS DEFENDANTS
       ARTIFICIALLY INFLATED FREE CASH FLOW ....................................................36

A.      April 1, 2024: The Company Announces It Must Delay the Filing of Its
        Annual Report to Complete an Internal Investigation into Free Cash Flow .........36

B.      April 16, 2024: The Investigation Continues, Delaying Public Filings ................36

VIII.  POST-CLASS PERIOD EVENTS CONFIRM THE AUDIT COMMITTEE'S
       DISCOVERY THAT MANAGEMENT HAD MANIPULATED FREE CASH
       FLOW TO ARTIFICIALLY INFLATE ITS NUMBERS .................................................37

IX.    ADDITIONAL SCIENTER ALLEGATIONS .............................................................41

A.      The Audit Committee Indicated the Company's Actions Taken to
        Artificially Boost Free Cash Flow Were Intentional ...........................................41

B.      Anagnost and Clifford's Own Statements Show They Had Access to Facts
        that Rendered Their Public Statements Materially False and Misleading .............44

X.     LOSS CAUSATION ....................................................................................................45

XI.    APPLICABILITY OF PRESUMPTION OF RELIANCE: FRAUD-ON-THE-
       MARKET DOCTRINE ................................................................................................46

XII.   NO SAFE HARBOR ...................................................................................................47

1
2                                                                                              **Page**
3
XIII.    THE INDIVIDUAL DEFENDANTS ARE CONTROL PERSONS ...............................48

XIV.    CLASS ACTION ALLEGATIONS ................................................................49

COUNT I ...............................................................................................51

COUNT II ..............................................................................................51

COUNT III .............................................................................................53

XV.    PRAYER FOR RELIEF ....................................................................53

XVI.    JURY DEMAND .........................................................................54

4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Lead Plaintiff Canadian Elevator Industry Pension Trust Fund and Canadian Elevator Industry Life and Health Trust Fund (formerly known as Canadian Elevator Industry Welfare Fund) (collectively, "Lead Plaintiff" or "Plaintiff"), by and through Plaintiff's undersigned attorneys, on behalf of itself and all others similarly situated, alleges the following against Defendants Autodesk, Inc. ("Autodesk" or the "Company"), Andrew Anagnost ("Anagnost"), and Deborah L. Clifford ("Clifford")[1] upon personal knowledge as to Plaintiff, and upon information and belief as to all other matters, based on the investigation conducted by Plaintiff's counsel, which included, among other things: (i) review and analysis of public filings made by Autodesk with the U.S. Securities and Exchange Commission ("SEC"); (ii) review and analysis of press releases and other publications disseminated by certain Defendants and other related non-parties; (iii) review of news articles, securities analyst reports, and shareholder communications; (iv) review of other publicly available information concerning Defendants; (v) investigation of factual sources; and (vi) information readily obtainable on the internet.  Plaintiff believes substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## I.   INTRODUCTION

1.      This is a securities class action on behalf of all persons who purchased or otherwise acquired Autodesk securities between February 23, 2023 and April 16, 2024, inclusive (the "Class Period"), seeking to pursue remedies and recover damages caused by Defendants' violations of §§10(b) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. §§78j(b) and 78t(a), and SEC Rule 10b-5 promulgated thereunder, 17 C.F.R. §240.10b-5.

2.      Autodesk is a software design company that generates the vast majority of its revenue through the sale of software subscriptions.  The size and nature of the Company's subscriptions vary to address the specific needs of its customers, which hail from a variety of industries.  The Company's most expansive subscription offerings are its Enterprise Business Arrangements ("EBAs"), which provide "token-based access to a broad pool of Autodesk products."  EBAs are sold ***directly*** by Autodesk to large customers, representing its largest deals. The Company separately

---

[1]    Anagnost and Clifford are collectively referred to herein as the "Individual Defendants" and, together with Autodesk, as "Defendants."

offers customers the ability to purchase subscriptions for individual products or for smaller groups of products, to which it typically refers as its product subscriptions. The Company's product subscriptions are sold *indirectly* through distributors and resellers.

3. The Company has historically sold many of its enterprise and product subscriptions through multiyear contracts with three-year terms. The Company told investors its EBA deals were typically billed on an annual basis, but its product agreements were billed "upfront" – at the start of a three-year term – rather than annually. The Company's annual and upfront billing models had very different impacts on the Company's free cash flow metric – a critical financial metric for Autodesk. Defendants emphasized and encouraged investors to place great weight on free cash flow in evaluating the Company's performance. Financial analysts also stressed the importance of the Company's free cash flow, using it in their financial modeling.

4. However, the Company's upfront billing model presented difficulties for Autodesk. First, it required the Company to offer discounts to induce the large upfront payments, reducing overall revenue and profitability. Second, it created inconsistency in the Company's cash flow on a year-to-year basis because the Company received free cash flow from a multiyear contract *only* in the year it was collected. The upfront billing model thus created more volatility in the Company's cash flow and less clarity in its financial forecasting.

5. Accordingly, prior to the start of the Class Period, the Company told the investing community it would transition almost entirely to the annual billing model, which was better for Autodesk's long-term success. First, at the Company's earnings call for the second quarter of fiscal year 2022 ("2Q22") on August 25, 2021, Defendants announced they would transition the small remaining group of EBA customers that still had upfront deals to the annual billing model – a change that would be completed within a few months – by the start of fiscal year 2023 ("FY23") (starting February 1, 2022).[2] Defendants stated the impact of this change would be "modest" – around 1%

---

[2] Throughout the relevant period, the Company used a financial reporting structure in which each fiscal year ended on January 31 of the corresponding calendar year; for example, FY23 ended on January 31, 2023. Likewise, 1Q23 ended on April 30, 2022, 2Q23 ended on July 31, 2022, and 3Q23 ended on October 31, 2022. As a result of this structure, most of a given fiscal year occurs in the preceding calendar year: for example, 11 months of FY23 occurred in calendar year 2022.

1   impact of total billings for fiscal year 2022 ("FY22") – which analysts estimated as approximately

2   $50 million.  Defendants' representations led the market to believe that, after February 1, 2022 (the

3   start of FY23), all of its EBA customers would be on annual billing terms, causing no more

4   headwind to free cash flow in future years.

5        6.     A week later, at the Company's FY22 investor day, Defendants announced that, after

6   the EBA transition, they would transition product subscriptions to the annual billing model.

7   Defendants explained that the product subscription transition would take place on a slower timeline

8   because it would take time to bring reseller partners on board and to develop the back-office

9   functionality needed to handle the increased volume of annual billing.  Defendants later told

10   investors the go-live date for this transition would be March 27, 2023, at which point the vast

11   majority of its customers would be on the annual billing model.

12        7.     Through the remainder of FY22 and during FY23, Defendants continued to update

13   the market on the progress of its product billing model transition and emphasize the import of this

14   change to its business.  Defendants repeatedly told investors they wanted this product transition done

15   as quickly as possible and emphasized switching to the annual billing model would provide more

16   predictable cash flow and more profitable pricing.  However, unbeknownst to investors, as the

17   Company discussed the transition of *product* customers to annual billing, the Company reversed

18   course on its announcement about transitioning all *EBA* customers to annual billing.  Instead of

19   ending EBA upfront deals and associated discounting, in FY23 the Company actively pursued and

20   incentivized customers to accept *upfront* EBA deals with discounts in quantities that *substantially*

21   *exceeded historical levels* to help the Company *meet its free cash flow target*, as the Company later

22   *admitted*.

23        8.     On February 23, 2023, the first day of the Class Period, Defendants reported the

24   Company's financial results for the fourth quarter of 2023 ("4Q23") and FY23.  The Company

25   announced free cash flow had increased to $2.03 billion, which supposedly beat the lower end of its

26   guidance and also provided guidance for fiscal year 2024 ("FY24"), but these statements were

27   misleading.  Defendants failed to disclose that the FY23 free cash flow and FY24 cash flow

28

1  guidance were inflated by these upfront EBA deals, which would necessarily cause a larger hole in

2  future cash flow than the market had been led to believe.

3         9.     On May 25, 2023, the Company announced its results for the first quarter of FY24

4  ("1Q24"), stating it had "***record*** first quarter free cash flow," representing 60% of the cash flow it

5  had told the market to expect for FY24.  Defendants told the market the Company's "record" results

6  were due in part to "cash collections from the last month of billings" in FY23 but failed to disclose

7  that they included $200 million in upfront deals that would not recur in future years, which masked

8  the material negative impact the FY23 EBA upfront deals had on FY24 free cash flow.  Moreover,

9  Defendants concealed that the Company's supposedly record results contained EBA upfront free

10 cash flow, despite having told investors such deals were retired.

11        10.    Defendants continued to provide misleading cash flow guidance and misrepresent the

12 true nature of the Company's EBA agreements and the state of its billing model transition.

13 Defendants' deceptive statements and omissions had the intended effect of inflating the Company's

14 stock price throughout the Class Period.

15        11.    The truth regarding Defendants' fraud began to emerge on November 21, 2023, when

16 the Company announced its results for the third quarter of FY24 ("3Q24"), reporting its ***lowest***

17 ***quarterly free cash flow*** in ***more than five years***, and shocked investors by telling them to remove

18 $200 million as they modeled free cash flow in the following year caused by upfront deals that

19 would not recur.  As a result of this news, the Company's analysts viewed the Company's stock

20 value with substantially less optimism, and Autodesk's stock price plummeted by almost 7% on

21 November 22, 2023.

22        12.    On April 1, 2024, after the market closed, investors continued to learn the true extent

23 of Defendants' fraud when the Company announced it had to delay the filing of its annual report on

24 Form 10-K – an SEC-mandated filing – due to a previously undisclosed internal investigation by the

25 Company's Audit Committee regarding the Company's free cash flow and non-operating GAAP

26

27

28

1   margins.³  This again surprised the market, causing Autodesk's stock price to decline by over 4% the

2   following day.

3          13.     Thereafter, on April 16, 2024, the Company announced it expected to receive a

4   delinquency notice from Nasdaq regarding the delayed filing of its annual report and needed

5   additional time to complete its investigation, raising further concern about the Company's business

6   and causing the stock price to fall again by almost 6%.

7          14.     Following the close of the Class Period, on May 31, 2024, the Company finally

8   announced the findings of its Audit Committee investigation, which it buttressed with optimistic

9   projected numbers for the future to blunt the impact of the findings.  The Company also disclosed

10   that its Chief Financial Officer ("CFO"), Clifford, who had served at the financial helm of Autodesk

11   during the fraud, had been demoted to a role that had no responsibility for the Company's financial

12   reporting.

13          15.     The audit committee's findings included key ***admissions*** that made clear Defendants

14   had ***intentionally*** engaged in practices to inflate free cash flow in FY23, including, but not limited

15   to:

- "During fiscal year 2022, the Company announced that it had begun to shift enterprise customers to contracts billed annually, and that it had assumed fiscal 2023 enterprise contracts would be billed annually";

- Despite that announcement, "[t]he Company subsequently determined . . . to pursue multiyear upfront contracts with enterprise customers to help meet its fiscal year 2023 free cash flow goal";

- As a result, "[u]pfront billings of enterprise customers in fiscal year 2023 ***substantially exceeded historical levels***, helping the Company to ***meet its lowered annual free cash flow target***"; and

- The Company also made "decisions regarding discretionary spending, collections, and accounts payable [that] were ***informed by their anticipated effects on the Company's external free cash flow and/or non-GAAP operating margin targets***."

---

³   Generally Accepted Accounting Principles ("GAAP") are a set of accounting rules, standards, and procedures issued and frequently revised by the Financial Accounting Standards Board and the Governmental Accounting Standards Board.

16.     As Autodesk investor Starboard Value LP ("Starboard"), an investor that owned $500 million in Autodesk stock, stated in a public letter in the wake of these findings:

> ***This was a clear case of a company saying one thing to investors and doing something completely different***. Autodesk had an obligation to not mislead investors with its public commentary, but instead of honoring this obligation, Autodesk did the opposite – ***the Company told investors it was at the tail-end of a process to move enterprise customers to annual billings . . . . The Company continued to report these free cash flow results with multi-year, upfront billings while explicitly and implicitly leading shareholders to believe they had moved enterprise customers to annual billings***.

17.     The unraveling of Defendants' fraud caused significant declines in the Company's stock price, causing Plaintiff and other members of the Class to suffer substantial losses. At the same time, Defendants profited from their fraud through incentive compensation tied to the Company's achievement of free cash flow targets.

## II.     JURISDICTION AND VENUE

18.     The claims asserted herein arise under and pursuant to §§10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§78j(b) and 78t(a), and Rule 10b-5 promulgated thereunder, 17 C.F.R. §240.10b-5.

19.     This Court has jurisdiction over the subject matter of this action pursuant to §27 of the Exchange Act, 15 U.S.C. §78aa, and 28 U.S.C. §§1331 and 1337.

20.     Venue is proper in this District pursuant to §27 of the Exchange Act, 15 U.S.C. §78aa, and 28 U.S.C. §1391(b). Many of the acts and transactions that constitute the alleged violations of law, including the dissemination to the public of untrue statements of material fact, occurred in this District. The Company's executive offices and corporate headquarters are located in this District.

21.     In connection with the acts alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

III.   **PARTIES**

    A.    **Lead Plaintiff**

    22.    Lead Plaintiff Canadian Elevator Industry Pension Trust Fund purchased Autodesk shares (identified in the certification it filed previously in this case and which is incorporated here) at artificially inflated prices during the Class Period and was damaged when the truth was revealed, as detailed herein.

    23.    Lead Plaintiff Canadian Elevator Industry Life and Health Trust Fund (formerly known as Canadian Elevator Industry Welfare Fund) purchased Autodesk shares (identified in the certification it filed previously in this case and which is incorporated here) at artificially inflated prices during the Class Period and was damaged when the truth was revealed, as detailed herein.

    B.    **Defendants**

    24.    Autodesk is incorporated in Delaware, and its principal executive offices are located at One Market Street, Suite 400, San Francisco, California 94105.  The Company's common stock trades on the Nasdaq exchange under the ticker symbol "ADSK."

    25.    Anagnost served as the Company's Chief Executive Officer ("CEO") and President throughout the Class Period.  He joined Autodesk in 1997 and became CEO in 2017.  Anagnost was also a member of Autodesk's Board of Directors (the "Board") during the Class Period.

    26.    Clifford served as the Company's CFO and Executive Vice President throughout the Class Period.  Prior to the Class Period, Clifford worked for the accounting firm Ernst & Young; spent 13 years in financial leadership roles at Autodesk; and was the CFO of another public company, SurveyMonkey.  She became Autodesk's CFO on April 19, 2021, approximately four months before announcing the Company's decision to end upfront EBA deals.  Clifford was demoted from CFO to the newly created position of Chief Strategy Officer, effective May 31, 2024, in connection with the Audit Committee's findings in the internal investigation.

IV.   **SUBSTANTIVE ALLEGATIONS**

    A.    **The Company's Background and Sales Channels**

    27.    Autodesk provides a wide range of software tools to meet the varied needs of its customers in a host of industries, including architecture, engineering, construction, product design,

manufacturing, media, and entertainment.  The Company generates the vast majority of its revenue through its sale of subscriptions to its software products.  The size and nature of the subscriptions the Company offers vary based on the specific needs of its customers.  The Company offers EBAs that provide "token-based access to a **broad pool** of Autodesk products."  The Company separately offers customers the ability to purchase subscriptions for **individual** products or for **smaller** groups of products, to which it typically refers as its product subscriptions.

28.     The Company's subscriptions often have three-year terms, resulting in the formation of groups of deals that renewed at the same time, known as "cohorts."  For example, a group of deals renewed in fiscal year 2020 that would be up for renewal again in FY23 would be a "cohort."

29.     The Company sells its subscriptions through two channels: direct and indirect.

### 1.     The Direct Sales Channel

30.     The "direct" sales channel consists of large customers that enter into EBAs with the Company.  EBAs are "direct" because Autodesk personnel communicate directly with EBA customers to make sales, rather than selling through intermediaries.  The Company has stated EBA deals are seasonal: "[H]istorically, we have had increased EBA sales activity in our fourth fiscal quarter . . . ."

31.     According to the Company, for EBA customers, payments were **typically** made through an annual billing model – payments due in annual installments over the contract term.

32.     To illustrate, if an EBA customer agreed to pay $300 million in December 2022 to use the Company's software for three years, with **annual** payments, the Company would receive $100 million in payments in the fourth quarter of FY23 (which ends on January 31, 2023) and two more payments of $100 million – one in the fourth quarter of FY24 ("4Q24"), and the final one in the fourth quarter ("4Q25") of fiscal year 2025 ("FY25").

33.     However, prior to the start of the Class Period, not all of the Company's EBAs were on the annual billing model.  As detailed below, according to the Company, a very small percentage – less than 1% of its billings – were EBA deals signed under the Company's "upfront billing model," where EBA customers' payment for their three-year subscription was made upfront (at year one) in

return for a discount.  This was the model used by Autodesk's product customers as discussed below.

### 2. The Indirect Sales Channel

34.  The Company sold its product subscriptions through an "indirect" channel of "partners" consisting of "approximately 1,500 resellers and distributors" that sold them to end users.

35.  The Company's billing model for the indirect sales channel differed from its annual billing model typically employed for EBAs.  The Company typically allowed the resellers to use an upfront model, charging the end customers the entire three-year cost of the three years' worth of software at the start of the subscription.  To motivate resellers' end users to pay for three years' worth of software at the inception of the term, the Company reported that it used incentive programs and promotions in its reseller channel, typically consisting of discounts of up to 10%.  The Company would collect the upfront payment from the resellers, minus some amount to compensate the resellers for their services.

36.  The Company's indirect channel partners used an upfront billing model because, unlike the large EBA customers, the Company reported its channel partners were typically not highly capitalized, meaning they do not maintain much cash on hand and liked receiving the cash infusion upfront.

### B. The Company's Two Billing Models Had Dramatically Different Impacts on Its Reported Free Cash Flow – a Critical Metric

37.  Free cash flow is a critical metric for Autodesk.  It reflects the cash the Company generates after accounting for cash outflow to support its operations and capital expenditures.  As the Company put it in reporting this number publicly, the free cash flow metric, among other non-GAAP metrics, gave investors "***greater transparency*** with respect to ***key metrics*** used by management in its financial and operational decision-making."  The Company understood its free cash flow metrics, among other non-GAAP metrics, were "***used by Autodesk's institutional investors and the analyst community*** to help them analyze the health of the Company's business." *See* ¶¶73-75.  Defendants repeatedly emphasized and encouraged investors to place great weight on free cash flow in

evaluating the Company's performance.  As detailed below, financial analysts also stressed the importance of the Company's free cash flow, using it in their financial modeling.

38.    The Company's annual and upfront billing models had very different impacts on the Company's reported free cash flow.  The Company's upfront billing model allowed for an infusion of cash when deals were inked but typically required the Company to provide a discount to customers of up to 10%, making such deals less profitable.  Additionally, upfront deals created less visibility in forecasting over time.  The Company's annual billing model did not require discounts, making it more profitable, and represented a more predictable stream of payments that allowed the market and securities analysts to better value the Company's stock.

39.    The following example illustrates the impact that "annual" and "upfront" billing models have on the Company's reported free cash flow.  A $300 million upfront deal with a 10% discount (to induce the customer to pay for three years' worth of software at its inception) would thus result in $270 million in cash collected upfront ($300 million minus $30 million discount (10%)) and reported at the time of collection but no additional payments for the next two years. Under the annual billing model, the Company would collect $300 million in cash (no discount required) paid in three annual payments of $100 million each year, and the Company would report $100 million in free cash flow for each of the three years.  This illustration shows how the two transactions have dramatically different impacts on the timing and amount of free cash flow.





40.    This illustration demonstrates that an upfront deal would appear to have a dramatically better impact on Autodesk's 4Q23 free cash flow than a corresponding annual deal, but the Company would receive no free cash flow from that deal in FY24 and FY25, to which the Company referred as "out" years.  However, an annual deal provides better cash flow in FY24 and FY25, as well as more predictable cash flow and profitability over the longer term.  Under the upfront billing model, after FY23 ends, the Company needs to find a lot more customers, make bigger deals, or both, just to report the *same* free cash flow in FY24 and FY25 as reported in FY23. An annual deal also provides more total cash flow because no discount is needed.  In short, as Anagnost put it, "upfront billing is the biggest piece of volatility in our free cash flow."

41. Throughout the Class Period, Defendants repeatedly told the market the annual billing model was better for Autodesk's long-term success. *See, e.g.*, ¶¶46, 51, 54, 59-60.

**C.   The Company Announces the End of Its Upfront Billing Model**

42. In late 2021, the Company told investors it was transitioning its customers from the upfront billing model to the annual billing model, which, as Clifford explained (*see* ¶46), was "good for [customers] and good for Autodesk," and that, under the annual billing model, "we expect . . . to drive more predictable free cash flow growth and better price realization over time, which will make Autodesk a more valuable company."

43. The Company explained it would undertake this transition in two steps: (a) eliminate remaining upfront deals with EBA customers; and (b) transition all product customers to the annual billing model.

44. *First*, in August 2021, Defendants told investors that while it had made very few upfront deals with EBA customers – amounting to just 1% of overall billings – it had decided to bring that 1% down to 0%, with that minor change being complete within months. This was easy for the Company to do because, as noted, it sold software directly to EBA customers and simply needed to stop offering any of those customers upfront deals.

45. *Second*, in September 2021, Defendants announced the Company would also end upfront deals with its indirect sales channel for product subscriptions. However, Defendants noted this transition would take more time to complete than the transition with EBA customers because the Company's indirect sales partners needed more time to transition and the Company needed to make some back-office changes to manage the scale of moving all its product resellers to annual billing.

**1.   The Company Says Upfront EBA Deals Were a Paltry 1% and a Thing of the Past**

46. On August 25, 2021, the Company held an earnings call for 2Q22, during which it announced its transition of the remaining EBA customers to the annual billing model. The Company's CFO, Clifford, stated:

> Our strong start to the year means *we're also shifting more of our EBA customers from multiyear paid upfront to annual billings*, which is good for them and good for Autodesk. Our EBA customers retain price certainty with a multiyear contract term, but *annual billings give them a more predictable annual cash outlay*.

For Autodesk, ***we generate more predictable cash flow and remove the discounts to generate upfront cash collections.  While we had already assumed this change in fiscal '23, it has a modest impact on fiscal '22 billings and free cash flow.*** However, ***we expect it to drive more predictable free cash flow growth and better price realization over time, which will make Autodesk a more valuable company.***

47.     Here, Defendants conveyed to investors that the Company was already ending upfront deals for EBA customers and there would be no more upfront EBA deals as of February 1, 2022, which was the start of FY23.

48.     Moreover, given that most of the Company's EBA customers were already on the annual billing model, Clifford explained the transition of EBA contracts to this model ***would not*** have a significant impact on the Company's billing guidance, stating: "[T]he impact to our billings guidance is also pretty small.  It's around ***1 percentage point of impact*** to the total billings."  On August 26, 2021, based on Clifford's statement, analysts who followed the Company, including Berenberg Equity Research and Deutsche Bank Securities Inc., estimated remaining EBA deals comprised $50 million of the Company's billings.

49.     The Company's announcement that the transition of remaining EBA upfront deals to the annual billing model would only have 1% point of impact to total billings had special significance.  It conveyed to the market that the vast majority of EBA deals were ***always*** on the annual billing model and that only a tiny quantity of EBA deals remained on upfront terms, which would be transitioned by February 1, 2022; thus EBA upfront deals would no longer result in a headwind to future cash flow.

### 2.    The Company Announces Ending Upfront Deals in the Indirect Channel but Notes a Longer Timeframe

50.     The following week, on September 1, 2021, Autodesk held an investor day call, on which it continued to discuss its movement away from the upfront billing model.  There, Clifford reiterated Autodesk's continued movement of EBA customers to an annual billing model, stating: "[A]t our earnings call ***last week*** we discussed the ***ongoing shift*** of more of our [EBA] enterprise customers to an annual billing cycle."

51.     Clifford also made a new announcement that the Company planned to transition its indirect product subscription multiyear contracts to an upfront billing model: "Today, we'll discuss

1   our intent to make the same shift for product subscription multiyear contracts starting in fiscal '24,"

2   referring to FY24, beginning February 1, 2023.  She acknowledged that "this shift will result in a

3   predictable initial decline in fiscal '24 as we transition" and "drive some short-term volatility" but

4   reassured investors that "these kind[s] of transition[s] are worth it in the long run" and would "make

5   Autodesk a more valuable company."

6      52.    The timing for transitioning product subscriptions differed from the Company's stated

7   timeline for moving all EBA customers to an annual model – the EBA transition would be complete

8   by the start of FY23 (February 1, 2022), a full year prior to the start of the transition for product

9   subscription customers.

10     53.    In response to this announcement, a securities analyst asked whether the product

11  subscription transition might start before FY24.  Clifford explained that transitioning multiyear

12  product subscriptions to the annual billing model would take longer than it did for EBA customers

13  because it involved channel partner resellers: "So for our base **product subscription** multiyear

14  contracts, we have 2 other factors on the table that we have to consider."  The first was that the

15  Company wanted to "ensure a smooth transition with our **channel partners**," which was "**different**

16  **than our EBAs** because it's largely indirect," referring to the fact that sales through channel partners

17  are "indirect" in the sense that the Company does not deal directly with end customers, as it does

18  with EBA customers.  The second factor Clifford referenced was that the Company needed to build

19  "back office" systems to "better manage a high volume of multiyear contracts with annual billings at

20  scale," which would not be ready until "the back half of . . . fiscal '23."

21     54.    In an accompanying slide presentation, the Company illustrated how moving from

22  upfront to the annual billing model would impact its product subscriptions (emphasis added in red):

23

24

25

26

27

28

55.   Notably, the Company's presentation slide did not refer to its EBA (direct) sales channel.  Less than two weeks later, however, the Company reiterated to investors that all EBA customers would be billed annually as of February 1, 2022.

**3.   The Company Reassures Investors that All EBA Deals Had Annual Payment Terms and that Only 1% Had Been Upfront**

56.   On September 14, 2021, at an investor conference, the Company reassured investors that the days of any upfront EBA deals were over.  There, Clifford reiterated:

> So a lot of ***our EBAs were already on*** annual billing terms.  And at the beginning of our fiscal '23 [starting February 1, 2022], we had already assumed that ***all of them*** would be on annual billing terms.  We ***just decided to expedite that because, again, it's a change that we think is better for our customers and better for Autodesk and will help us make Autodesk a more valuable company over time***.

57.   Clifford ***again*** reassured investors that the Company was going to stop making upfront EBA deals.  She also noted: "I'd point out just on the guidance piece is that even though we did reduce our billings guidance, the adjustment was only about 1 percentage point of our total billings guidance.  So it ***wasn't huge***."

### 4. The Company Says It Would "Flush Out" Indirect Upfront Deals "This Very Minute" if It Could

58. The Company repeatedly told investors it wanted to get rid of all the product upfront deals as quickly as possible. Toward the end of FY22, for example, Anagnost told investors it was "full steam ahead" in ending upfront billing but that the Company could not "rip off the Band-Aid" as to product customers because its partners (who sold to product customers) needed time to make the change.

59. For example, on November 23, 2021, the Company held its earnings call for the third quarter of FY22, during which Anagnost engaged in the following question and answer with a securities analyst:

[Analyst:] . . . And maybe just as a quick follow-up. Obviously, at **Analyst Day** [on September 1, 2021], we talked about some changes around billing terms, and you referenced it a little bit earlier in the call. Just curious how kind of early receptivity has been with customers as you kind of explain to them to changes that are coming?

[Anagnost:] Yes. So look, our moves with regards to changing billing terms and smoothing out our free cash flow trajectory over multiple years are unchanged by any of this. *We believe those are right for the business. We believe it's right for our customers. Customers are generally positive around these things because they prefer annual billings for – in most cases, they don't want to have to pay upfront if they don't have to*. Also, a lot of these things we've been talking about with regards to supply chain pressures, our viewed as pretty transient by us. These are not going to be persistent types of things. So customers view these fairly well. Our partners are getting themselves around some of these activities right now. But **those plans are completely unchanged** relative to anything we're seeing right now, and it's **all full steam ahead** on that transition.

60. Similarly, at an investor conference on November 30, 2021, a moderator asked Anagnost to address his "favorite topic, billing cycles." Anagnost responded:

Yes. So frankly, if I could do it **right now** at this moment, I would just – I would *flush out all of the upfront multiyear from our business right this very minute*, okay, and take *whatever free cash flow hit we take next year* because it – *that upfront billing is the biggest piece of volatility in our free cash flow*, all right? And it's one of the reasons why people discount the free cash flow [as they go out in the year]. *I want to eliminate that, clean up the business. And it's what our customers want too. Everybody wants to – wants the protection of a multiyear contract, but they want to pay for it annually, all right? Now why don't we just pull off, rip off the Band-Aid and do it, okay? There's 2 reasons why we don't rip off the Band-Aid. One is our partners, okay? Our partners are cash flow sensitive. They love multiyear billings upfront*. A matter of fact, they – some of them will even add to our discount from – with – from their margins to kind of pull the deal in, all right? So we need to give our partners a 2-year runway, which is basically what we're giving them. We told them last year and we're ending – basically ending the discounts next year. So we're giving them a runway to transition. So we're going to

work with them to make sure that they're paying attention and they have time to adjust their cash flow.  Otherwise, we'd seriously damage some of our partners' business. ***The other thing, to be perfectly frank, is that our back-office systems are not set up to do multiyear billed annually at scale***.  They will be next year.  It's one of those long-tail things in the digitization transformation that I was doing for the back ends – back office of the company.  That will get ***completed next summer***, so we'll be able to do it, but if I could, ***I'd pull that lever right now***.

61.     Accordingly, Anagnost made clear to investors that Autodesk wanted to end its upfront billing model immediately to end the volatility it caused in Autodesk's cash flow but needed to give its channel partners more time to transition because of the impact of the change on the partners' cash flows and also because the Company needed to make back-office preparations to handle multiyear annual billings at scale, which Anagnost said he expected to complete in summer 2022.

62.     The Company provided updates to the market on its progress in moving its channel partners to its annual billing model over the course of the next year.  For example, on the Company's February 24, 2022 earnings call for the fourth quarter of FY22 ("4Q22") and FY22, Clifford noted the Company was moving "***as quickly as possible***," but "we have customer, partner and operational constraints that we're working through as we navigate the transition."  Clifford also reiterated: "we are upgrading ***our systems***," and "***our partners*** are . . . very important to our growth, very important to – in our ability to drive breadth and depth across the globe and engaging with customers," and they needed time to adjust to the elimination of the upfront billing model.

63.     On the Company's first quarter of FY23 ("1Q23") earnings call held on May 26, 2022, Anagnost again reiterated: "***[n]one of us want***" upfront billing over annualized billing, but "***our partners can't get there fast enough***."  In addition, on the Company's second quarter of FY23 ("2Q23") earnings call held on August 24, 2022, Clifford updated investors, again explaining the Company was still working on "***a partner transition plan [and] back-office system upgrades*** *" but were going "as quickly as possible*."

64.     Thereafter, on the Company's third quarter of FY23 ("3Q23") earnings call held on November 22, 2022, analysts questioned the Company's progress in making back-office changes and transitioning Autodesk's partners away from the upfront billing model.  One analyst had questions about the financial impacts for FY24.  Clifford explained: "We continue to be focused on executing

on that transition *as fast as possible* because while the change is good for us, and it's good for our customers, from a financial standpoint, *we really want the noise behind us*."

65.    As she had on September 1, 2021, Clifford also noted that as soon the Company eliminated its upfront billing model with its partners, the Company's free cash flow would fall.  As detailed above (*see* ¶¶39-40), this is because, under the new annual billing model for product subscriptions, the Company would collect less cash immediately upon the signing of the multiyear contracts than it previously had collected under the upfront billing model but would collect more cash over time because of the annual ratable payments.

## V.    THE CLASS PERIOD STARTS: DEFENDANTS REPORT INFLATED CASH FLOW FROM SECRET RETURN TO EBA UPFRONT BILLING MODEL AND OTHER MANIPULATIVE PRACTICES

### A.    February 23, 2023: The Company Announces Its 4Q23 and FY23 Results

#### 1.    The Company's Reported Free Cash Flow Numbers Were Artificially Boosted by the Secret Restart of EBA Upfront Billings

66.    At the start of the Class Period, on February 23, 2023, the Company filed a current report on Form 8-K with the SEC, which attached and incorporated by reference a press release reporting results from 4Q23 and FY23, which ended January 31, 2023.  The press release quotes Anagnost and Clifford, showing they were ultimately responsible for the contents of the press release and Form 8-K used to file the press release.  Anagnost and Clifford touted the Company's 4Q23 results and *how* the Company reached those results.  Clifford stated: "Overall, *the demand* environment in Q4 remained consistent with Q3 *with the approaching transition from up-front to annual billings for multi-year contracts, and a large renewal cohort, providing a tailwind* to billings *and free cash flow*."[4]  Those specific factors supposedly explained how the Company achieved its free cash flow results, also reported in the same press release: (1) for 4Q23, "[f]ree cash flow was *$903 million*, an increase of $187 million compared to the fourth quarter last year"; and (2) for FY23, "[f]ree cash flow increased to *$2.03 billion*, compared to $1.48 billion in fiscal 2022."

---

[4]    Because the press release quotes Clifford and Anagnost, the statements in the press release and Form 8-K are attributable to each of them and also show that each authorized the distribution of all of the statements at issue.

67.     The February 23, 2023 press release also reported the $2.03 billion figure in tabular format, as the following excerpt and related statements from the filing show:

**Autodesk, Inc.**
**Condensed Consolidated Statements of Cash Flows**
(In millions) (1)

| | Fiscal Year Ended January 31, | |
| --- | --- | --- |
| | 2023 | 2022 |
| | (Unaudited) | |
| Operating activities: | | |
| Net income | $      823 | $      497 |
| Adjustments to reconcile net income to net cash provided by operating activities: | | |
| Depreciation, amortization and accretion | 150 | 148 |
| Stock-based compensation expense | 657 | 555 |
| Deferred income taxes | (277) | (8) |
| Lease-related asset impairments | 34 | 104 |
| Other operating activities | (8) | 18 |
| Changes in operating assets and liabilities, net of business combinations: | | |
| Accounts receivable | (247) | (66) |
| Prepaid expenses and other assets | (3) | (134) |
| Accounts payable and other liabilities | (5) | 10 |
| Deferred revenue | 798 | 419 |
| Accrued income taxes | 149 | (12) |
| Net cash provided by operating activities | 2,071 | 1,531 |
| Investing activities: | | |
| Purchases of marketable securities | (397) | (311) |
| Sales of marketable securities | 152 | 12 |
| Maturities of marketable securities | 298 | 26 |
| Purchases of intangible assets (2) | (6) | (11) |
| Business combinations, net of cash acquired | (96) | (1,250) |
| Capital expenditures | (40) | (56) |

68.     The Company included a note accompanying the above table that defined "Free Cash Flow" in this way: "Cash flow from operating activities minus capital expenditures." Thus, "Free Cash Flow" was $2.071 billion minus $40 million, or $2.03 billion. As noted above, the press release purported to cite the particular factors that drove the $2.03 billion free cash flow result.

69.     The Company's representations about **_how_** the Company achieved the $2.03 billion free cash flow results for FY23 gave the misleading impression that the Company's results had, **_in the manner presented, beat_** the lower end of the $2.0 billion-$2.08 billion free cash flow target or "guidance" the Company had previously reported to the market.[5] Meeting this free cash flow target was important to investors; for example, securities analysts from Berenberg Capital had written in a September 2, 2021 report that the free cash flow "FY23 target is an important metric for investors. Based on our discussions with investors, we know that many investors have based their valuation work around Autodesk's ability to reach that target." Importantly, that report came after Clifford

_____
[5]   On May 26, 2022, for example, Clifford told investors: "We expect free cash flow to be between $2.0 billion and $2.08 billion" for the 2023 fiscal year.

1  told the market the Company had decided to eliminate its upfront EBA billing model because

2  customers did not like it and because the discounts associated with that model hurt the Company's

3  profitability, as detailed above.  *See, e.g.*, ¶¶46-47, 50-51.

4        70.     In this context, the Company's statements about the particular factors driving its

5  $2.03 billion FY23 free cash flow results were materially false or misleading and omitted material

6  facts.  As the Company later admitted, despite telling investors that EBA upfront deals had been

7  retired by the start of FY23, "[t]he Company **subsequently determined**, however, **to pursue**

8  **multiyear** upfront contracts with [EBA] customers to help meet its fiscal year 2023 free cash flow

9  goal.  Upfront billings of enterprise customers in fiscal year 2023 **substantially exceeded historical**

10  **levels, helping the Company to meet its lowered annual free cash flow target**."  In other words,

11  despite telling investors they had decided to end EBA upfront billings because they required

12  discounts that hurt the Company's profitability, the Company intentionally pursued more of these

13  EBA deals than it **ever** had before, just to meet its FY23 free cash flow target.

14        71.     Accordingly, the Company did not achieve the $2.03 billion free cash flow figure

15  because of the demands of customers for upfront deals that generated the related free cash flow,

16  because of the "approaching" transition of product deals to the annual billing model, or because of a

17  large "renewal" cohort.  Rather, it was the Company – not the customers – that pursued supposedly

18  retired upfront EBA deals in order to meet free cash flow targets.  While there may have been some

19  tailwind from the "approaching" product deal transition, it was misleading for Defendants to conceal

20  the secret reversion to the supposedly retired EBA upfront billing model that drove FY23 results.

21  Moreover, it was materially misleading to tout a large "renewal" cohort of EBA deals in FY23 while

22  concealing that the Company had closed those deals by reversing course on its prior commitment to

23  stop making EBA deals with upfront billing.

24        72.     The Company's reported $2.03 billion free cash flow metric and the factors

25  supposedly driving that result were materially false or misleading for additional reasons.  The

26  Company's Audit Committee admitted that, during FY23, "decisions regarding discretionary

27  spending, collections, and accounts payable were informed by their anticipated effects on the

28  Company's external free cash flow."  These actions rendered the Company's free cash flow

1  statements unreliable because accounts payable (and other expenses) are inputs to the Company's

2  free cash flow calculations.

3          **2.**      **The Company's Statements Regarding FY23 Free Cash Flow Were Materially False and Misleading Because the Company's Manipulated Free Cash Flow Did Not Provide Transparency**

4

5      73.    The Company gave written assurances to investors about the $2.03 billion free cash

6  flow figure that were also materially false or misleading.  Specifically, the February 23, 2023

7  Form 8-K stated that its incorporated press release included non-GAAP metrics (which included the

8  free cash flow figure of $2.03 billion) to allow "for greater transparency" than just GAAP figures.

9      74.    The Form 8-K further stated:

10      [The reported non-GAAP metrics] are useful to investors both because (1) they allow for ***greater transparency*** with respect to ***key metrics used by management in its***

11  ***financial and operational decision-making*** and (2) they ***are used by Autodesk's institutional investors and the analyst community*** to help them analyze the health of

12  the Company's business.  This allows investors and others to better understand and evaluate Autodesk's ***operating results and future prospects in the same manner as***

13  ***management, compare financial results across accounting periods*** and to those of peer companies, and ***to better understand the long-term performance of its core***

14  ***business***.

15      75.    These written assurances demonstrate Defendants' awareness that the Company's

16  reported free cash flow was "***used*** by Autodesk's institutional investors and the analyst community

17  to help them analyze the health of the Company's business."

18      76.    Unbeknownst to investors, however, the accompanying $2.03 billion free cash flow

19  figure (including some of its expense inputs, as well as explanation about the factors driving the

20  $2.03 billion result) did not "allow for greater transparency" or "better understand[ing of] the long-

21  term performance of its core business."  It obscured the Company's true financial condition, and how

22  the Company achieved its financial condition, as noted above.  *See, e.g.*, ¶¶69-72; *see also* ¶¶125-

23  127.  Neither were the free cash flow numbers the same as those "used by management," nor did

24  they enable investors to use free cash flow metrics "in the same manner as management."

25  Management manipulated underlying operations, accelerating and increasing EBA upfront deals to

26  make its FY23 free cash flow targets.  In other words, as the proverbial tail wagging the dog, the

27  Company used its ***forecast*** FY23 free cash flow guidance as ***the*** basis to reverse course on its billing

28  model.

77.     Nor did the FY23 free cash flow $2.03 billion figure allow investors to "compare financial results across accounting periods."  Because the free cash flow results of FY23 included EBA upfront deals at levels that the Company admitted *substantially exceeded* historical amounts, FY23 was not comparable to FY22 and would also not be comparable to future years.  Moreover, by including the secret EBA upfront deals and by gaming collections and expense inputs (such as accounts payable) that feed into the free cash flow number, Defendants made it impossible for investors to compare FY23 and FY24 results in a manner that allowed for "greater transparency."  Thus, in secretly reversing course on its underlying EBA business model to "make the numbers," the Company made it practically impossible for investors to compare financial periods in a transparent way.

**B.      The Company's February 23, 2023 Free Cash Flow Guidance for FY24 – Already Underway - Was Materially False and Misleading**

78.     In the Company's February 23, 2023 press release, the Company also gave the market guidance for FY24 free cash flow projections.  As noted, FY24 refers to the February 1, 2023 through January 31, 2024 time period.  Accordingly, at the time the Company published its free cash flow guidance on February 23, 2023, three weeks of FY24 had already transpired.

79.     As to the specifics of FY24 free cash flow guidance, the February 23, 2023 press release stated that "FY24 Guidance Metrics" included "$1,150-$1,250" million (or $1.15-1.25 billion) in free cash flow for the upcoming year.

80.     On the Company's 4Q23 and FY23 earnings call, held on February 23, 2023, Clifford stated: "[w]e expect free cash flow to be between $1.15 billion and $1.25 billion," such that the "midpoint of that range, $1.2 billion, implies *a 41% reduction in free cash flow compared to fiscal '23*" and that "the *key drivers* of that reduction are changes in long-term deferred revenue *as a result of the shift to annual billings for multiyear customers*, and a smaller multiyear renewal cohort, FX and our cash tax rate."  In other words, this FY24 $1.2 billion "midpoint" in free cash flow guidance represented a *decline of $830 million* in free cash flow relative to FY23 – *i.e.*, a decline from $2.03 billion in FY23 to $1.2 billion in FY24, or 41% year over year.

81.     This was false or misleading for two reasons.  First, it was false or misleading to state that the 41% decline in free cash flow was attributable to one of the key drivers – "the shift to annual billings for multiyear customers" (which the Company conditioned the market to believe was about the Company's reseller "product" customers) – without disclosing that a material portion of the drop was attributable to **EBA** upfront deals made in FY23 to meet free cash flow targets.[6]  While FY24 may well have included a "smaller multiyear renewal cohort" of deals and other factors, the excessive and less profitable EBA upfront deals in FY23 materially contributed to the drop.  Because the Company effectively pulled free cash flow from FY24 into FY23 from EBA upfront deals, at levels that "substantially exceeded" historical amounts, the FY24 drop in free cash flow necessarily included a material amount of free cash flow that **would** have been recorded in FY24 if the Company had **not** recorded so much free cash flow from EBA upfront deals in FY23.  In other words, the $830 million drop from: (1) FY23 free cash flow (of $2.03 billion) to (2) the FY24 midpoint guidance of $1.2 billion would have been materially smaller in the absence of the supposedly retired EBA upfront deals in FY23, which the Company told the market it was discontinuing in FY22.

82.     In addition, the Company's FY24 guidance was misleading because the $1.2 billion projection included EBA upfront deals, which, again, the Company had previously told investors had been retired.  Indeed: (1) as the Company later disclosed in FY24, the FY24 free cash flow projection included $200 million in upfront deals from 1Q24;[7] (2) next, after the end of FY24, the Company reiterated that it had made $200 million in upfront deals in FY24;[8] (3) after the Company's

---

[6]   Upfront EBA deals in FY23 materially lowered free cash flow in FY24 and FY25 because: (1) as the Company had previously explained, upfront deals necessarily result in lowered free cash flow in "out" years, *i.e.*, the second and third years of a three-year deal; (2) as the Company later admitted, "[u]pfront billings of [EBA] customers in fiscal year 2023 substantially exceeded historical levels"; and (3) the substantial upfront deals closed in FY23 would be in "out" years in FY24 and FY25, the period during which the Company drastically lowered its free cash flow guidance.

[7]   For example, on a November 21, 2023 conference call, Clifford stated: "And second, the transition to annual billings means that about **$200 million** of free cash flow in **Q1 fiscal '24** that came from multiyear contracts built [sic] upfront will not recur in fiscal '25."

[8]   For example, on a February 24, 2024 conference call, Clifford stated: "*Excluding $200 million from fiscal '24 free cash flow from multiyear upfront billings, which are now billed annually*, in fiscal '25, we expect free cash flow growth of about 35% at the midpoint of our guidance.  We expect faster free cash flow growth in fiscal '26 because of the return of our largest multiyear

Audit Committee completed its investigation, the Company admitted it had continued to make EBA upfront deals in FY24;[9] and, finally, (4) *Bloomberg* reported that "previously unreported internal documents" showed "[e]mployees warned executives about the strategic risk in early 2022, but the company continued to book such deals at least until the fiscal year ending in January 2024."[10]  In combination, these facts permit an inference that the $200 million in upfront deals in 1Q24 included EBA deals the Company had supposedly retired well before FY24.  This further demonstrates that Defendants' statements about the particular factors driving FY24 free cash flow guidance were materially false and misleading at the time, as detailed above.

**C.   March 14, 2023: The Company Reiterates the Misleading FY23 Free Cash Flow Numbers and Further Declares FY23 to Be "Typical"**

83.   On March 14, 2023, the Company filed its annual report on Form 10-K with the SEC for FY23.  Among other things, the report defined "Free Cash Flow" as: "[c]ash flow from operating activities minus capital expenditures."  The Company reported free cash flow in a tabular format that compared FY23 (ending January 31, 2023) with FY22 (ending January 31, 2022) and FY21 (ending January 31, 2021).  The following excerpt shows these results:

---

renewal cohort, the mechanical stacking of multiyear contracts billed annually and a larger EBA cohort."

[9]   On May 31, 2024, the Company issued a press release that included this information: "The Company separately notes that multiyear ***upfront billings of enterprise customers in fiscal year 2024*** was substantially lower than fiscal years 2022 and 2023."

[10]   Brody Ford, *Autodesk Executives Ignored Accounting Risks, Documents Show*, Bloomberg (Aug. 16, 2024).

**AUTODESK, INC.**
**CONSOLIDATED STATEMENTS OF CASH FLOWS**
(In millions)

| | Fiscal year ended January 31, | | |
| --- | --- | --- | --- |
| | 2023 | 2022 | 2021 |
| Operating activities: | | | |
| Net income | $        823 | $        497 | $     1,208 |
| Adjustments to reconcile net income to net cash provided by operating activities: | | | |
| Depreciation, amortization, and accretion | 150 | 148 | 124 |
| Stock-based compensation expense | 657 | 555 | 398 |
| Deferred income taxes | (277) | (8) | (779) |
| Lease-related asset impairments | 34 | 104 | — |
| Other operating activities | (8) | 18 | 39 |
| Changes in operating assets and liabilities, net of business combinations: | | | |
| Accounts receivable | (247) | (66) | 13 |
| Prepaid expenses and other assets | (3) | (134) | (56) |
| Accounts payable and other liabilities | (5) | 10 | 130 |
| Deferred revenue | 798 | 419 | 344 |
| Accrued income taxes | 149 | (12) | 16 |
| Net cash provided by operating activities | 2,071 | 1,531 | 1,437 |
| Investing activities: | | | |
| Purchases of marketable securities | (397) | (311) | (21) |
| Sales of marketable securities | 152 | 12 | — |
| Maturities of marketable securities | 298 | 26 | 17 |
| Purchases of intangible assets | (6) | (11) | (5) |
| Business combinations, net of cash acquired | (96) | (1,250) | (246) |
| Capital expenditures | (40) | (56) | (91) |

84.     These figures correspond to the free cash flow numbers the Company reported in the February 23, 2023 press release.  For example, in accordance with the definition of "Free Cash Flow," $2.07 billion in operating cash minus $40 million in capital expenditures results in the $2.03 billion annual free cash flow.

85.     Moreover, the annual report stated:

> ***Payments for product subscriptions***, industry collections, cloud subscriptions, and maintenance subscriptions are ***typically due up front*** with payment terms of 30 to 45 days.  ***Payments on EBAs are typically due in annual installments*** over the contract term, with payment terms of 30 to 60 days.

86.     The March 14, 2023 annual report attached certifications by Anagnost and Clifford. The certifications included substantive assurances about the report: that it "does not contain ***any untrue statement of a material fact or omit to state a material fact*** necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report"; and that the "the financial statements, and other financial information included in this report, ***fairly present in all material respects*** the financial condition, ***results of operations and cash flows*** of the registrant as of, and for, the periods presented in this report."

87. The certifications also addressed how the Company derived the reported information: specifically, that Anagnost and Clifford "are responsible for establishing and maintaining disclosure controls and procedures," including "internal control[s] over financial reporting." They further certified that *each had disclosed to "the audit committee* of the registrant's board of directors (or persons performing the equivalent functions)" all "significant deficiencies and *material weaknesses* in the design *or operation* of internal control over financial reporting which *are reasonably likely* to adversely affect the registrant's ability to record, process, *summarize and report* financial information."

88. As Clifford and Anagnost knew or should have known at the time, all of their statements – in ¶¶83-84 – about how, why, and how much free cash flow the Company generated and reported in FY23 were materially false and misleading at the time for substantially the same reasons Clifford and Anagnost's corresponding statements of February 23, 2023, discussed above, were materially false and misleading. *See, e.g.*, ¶¶69-72; *see also* ¶¶125-127.

89. In addition, the statement that the Company "*typically*" only did annual payment deals with EBA customers was materially false or misleading because, as the Company later admitted, the Company's EBA upfront billings "*substantially exceeded historical levels*" in FY23. As a result, the Company's FY23 $2.03 billion figure was materially false and misleading because the Company did not achieve that result following its "typical[]" EBA annual payment business model.

90. Finally, Anagnost's and Clifford's certifications that they had reported to the Company's Audit Committee all material weaknesses in the operation of internal financial controls that were "reasonably likely" to adversely affect the Company's ability to "summarize and report" financial information was materially false or misleading, as they knew or should have known at the time. The Company's Audit Committee did not know about the secret change in the Company's EBA billing model that resulted in free cash flow in FY23 from EBA upfront deals that "substantially exceeded historical levels." Nor did the Audit Committee know about the manipulation of collections, spending, and accounts payable that further undermined the reliability of the Company's FY23 free cash flow numbers at the time Anagnost and Clifford made the above

certifications on March 14, 2023.  Instead, the Audit Committee stated it had learned these facts in 2024, which led to the Audit Committee's investigation into these subjects and its eventual admission that the Company had to make changes: "reviewing certain processes around financial communications and disclosures; assessing certain Company organizational functions and responsibilities; and adopting and enhancing policies, processes, and controls related to the matters investigated."

91.     The fact that Anagnost and Clifford both knew or should have known about the FY23 free cash flow gamesmanship but withheld those facts from the Company's own Audit Committee as of March 14, 2023, despite written recognition that they had an obligation to do so, also supports an inference of scienter.

**D.      March 22, 2023: The Company Reiterates the End of Product (Indirect) Upfront Deals**

92.     On March 22, 2023, the Company held an investor day call, during which it referred investors to its discussion on its previous FY22 investor day (September 1, 2021), regarding the tiered transition of the EBA (direct) and products (indirect) channels to its annual billing model and its elimination of the upfront billing model.  Clifford explained: "Since then we've been working hard to prepare our back office to handle this change in an automated customer-friendly way and to work with ***our channel partners*** to ensure their readiness for the transition.  I'm pleased to announce that ***we're going live next week***."

93.     Clifford's slide presentation reiterated points made at the prior investor day (emphasis added in red):



94.     On the same call, Clifford further stated:

> As we've highlighted before, the switch from upfront to annual billings for most multiyear customers creates a **_significant_** headwind for free cash flow in fiscal '24 and a **_smaller_** headwind in fiscal '25.  Change in deferred revenue increased fiscal '23 free cash flow by $790 million, but **_will reduce fiscal '24 free cash flow by approximately $300 million_**.

95.     With respect to the impact of the billing model change on free cash flow, Clifford again referred investors to the Company's statements on the September 1, 2021 investor day call: "We set out the net effect of all this **_at our last Investor Day_** and the trajectory remains broadly **_the same_**."  Thus, Clifford reaffirmed her previous September 1, 2021 statements that Autodesk planned to transition away from upfront billing because the annual billing model was better for the Company. *See* ¶¶50-54.

96.     These statements, which Clifford incorporated by reference into her March 22, 2023 investor day statements, were materially false and misleading.  Far from following a "trajectory [that] remains broadly **_the same_**" as the business model presented at the prior investor day presentation, the Company dramatically reversed course and intentionally pursued more of these EBA deals than it ever had before, just to barely meet its FY23 free cash flow target.  As it would later admit, the Company secretly pursued EBA upfront deals in order to meet its free cash flow

1  target for the year ending January 31, 2023 (FY23) in amounts that "substantially exceeded historical

2  levels."

3        97.    Clifford's March 22, 2023 statements with respect to transitioning product customers

4  to annual billing "***will reduce fiscal '24 free cash flow by approximately $300 million***" were also

5  materially false and misleading because they failed to disclose that the $300 million reduction also

6  reflected the large boost in EBA upfront deals in FY23, which, unbeknownst to investors, materially

7  contributed to lower free cash flow in FY24.

8        **E.**     **1Q24: The Company Announces Record Free Cash Flow**

9        98.    About two months after Clifford told investors to expect a decline in FY24 free cash

10  flow due to moving product customers into the annual billing model, something surprising

11  happened.

12        99.    First, on May 25, 2023, the Company filed a current report with the SEC on

13  Form 8-K attaching and incorporating by reference a press release announcing the Company's 1Q24

14  financial results.  Clifford and Anagnost were both quoted in the press release,[11] which stated, in

15  pertinent part: "free cash flow was $714 million" for the quarter.  It also reiterated the FY24 free

16  cash flow guidance of "$1,150-$1,250" million.  The press release quoted Clifford: "'Autodesk

17  started the year strongly ***with rising renewal rates, robust free cash flow generation***, and revenue

18  toward the ***top end of our guidance*** range when adjusted for upfront revenue co-termed to later in

19  the year,'" and with "'normal seasonality, peak second quarter currency and Russia headwinds, and

20  ***a strong second-half pipeline of enterprise agreements*** last renewed three years ago in the

21  immediate aftermath of the onset of the pandemic, we remain on track to achieve ***our full-year***

22  ***financial goals***.'"  Here, Clifford purportedly flagged "renewal rates" as driving up free cash flow in

23  1Q24 and "enterprise agreements" in the second part of the year as factors driving FY24 guidance.

24  These statements were materially false and misleading as detailed below.

25

26

27  ---
[11]   Because the press release quotes Clifford and Anagnost, the statements in the press release and
Form 8-K are attributable to each of them as with the February 23, 2023 press release and Form 8-K,
28  discussed above.

100.     Later that same day, the Company held its 1Q24 earnings call.  After Anagnost had touted the Company's "*record* first quarter free cash flow," Clifford stated: "Free cash flow was $714 million in the first quarter, up 69% year-over-year."  Clifford reiterated the Company still "expect[ed] free cash flow to be between $1.15 billion and $1.25 billion," with the "midpoint of that range" being $1.2 billion.  The Company somehow collected almost *60%* of the cash flow it expected to collect for the *entire fiscal year* in the first three months alone.  This raised questions among market participants.

101.     For example, an analyst from Barclays Bank noted that the first quarter free cash flow results were well ahead of expected results.  The analyst asked Clifford what accounted for these results, in the context of FY24 being a low cash flow year, due to the supposed transition of product customers to the annual billing model.  As the analyst put it:

> ***Great to see the cash flow strength this quarter, well ahead of what we were expecting***.  I was just wondering if you could just zoom into ***what drove that***, and maybe just looking forward, how you're sort of thinking about the shape of cash flow this year, particularly where we trough here in fiscal '24.  Does that make sense?

Clifford responded in relevant part:

> Yes, yes.  So ***Q1 free cash flow*** was strong for a couple of reasons.  First, ***cash collections from the last month of billings in fiscal '23 [i.e., January 1-31, 2023] were strong***.  Second, we also saw favorable linearity and early renewals in Q1 that were driven by the end of multiyear billed upfront.  And then third, as I mentioned on the call, after the winter storms in California, we received a federal tax payment extension for the third quarter.

102.     These statements and the related statements in the press release and Form 8-K of the same day (detailed above) were materially false and misleading.  Unbeknownst to investors, Defendants' stated factors driving 1Q24 reported "record free cash flow" of $714 million (*i.e.*, "renewal rates") and FY24 free cash flow projections of $1.2 billion (*i.e.*, EBA deals in the second half of the year) were materially misleading.  The 1Q24 free cash flow results and FY24 free cash flow guidance included a one-time bump of $200 million in upfront deals that would not recur in FY25; this, in turn, concealed the full impact the FY23 EBA upfront deals had on FY24 free cash flow.  In addition, the 1Q24 free cash flow results and FY24 free cash flow guidance included EBA upfront free cash flow.  *See* ¶82.  Including upfront free cash flow from EBA customers in 1Q24 results and guidance (while pointing to other factors driving those metrics) was materially false or

1   misleading because the corresponding EBA upfront billing model (which generated some of the

2   $714 million free cash flow in 1Q24 that fed into the FY24 guidance) had supposedly been retired a

3   full year prior.

4         103.    On June 1, 2023, the Company filed its 1Q24 quarterly report with the SEC.  Among

5   other things, the 1Q24 quarterly report reiterated the quarter's free cash flow of $714 million, which

6   was materially false and misleading by omission for substantially the same reasons as the May 25,

7   2023 press release and earnings call, as stated above.  Anagnost and Clifford also executed

8   certifications with respect to this report substantially similar to those they made with respect to the

9   FY23 annual report.  These certifications were materially false and misleading for the same reasons

10   as the certifications in the FY23 annual report (*see* ¶90): namely, that they had not fairly presented

11   the Company's free cash flow and had not reported to the Company's Audit Committee all material

12   weaknesses in the operation of internal financial controls that were "reasonably likely" to adversely

13   affect the Company's ability to "summarize and report."

14       **F.**    **Second Quarter of FY24 ("2Q24")**

15         104.    On August 23, 2023, the Company filed a current report with the SEC on Form 8-K

16   that attached and incorporated by reference a press release announcing the Company's 2Q24

17   financial results, including that "free cash flow was $128 million" for the quarter.  The press release

18   quoted Clifford in pertinent part:[12]

19           "Our sustained momentum in the second quarter, and ***early expansion of***

20   ***some enterprise business agreements expected to renew later in the year***, reduce the
      likelihood of our more cautious forecast scenarios," said Debbie Clifford, CFO of
      Autodesk.  "Given that, ***we are raising the lower end of our guidance ranges***."

21

22         105.    Consistent with Clifford's comments, the press release ***raised*** the lower end of the

23   FY24 free cash flow guidance metric to "$1,170-$1,250 [million]."  Unbeknownst to investors,

24   however, this increased FY24 free cash flow guidance included free cash flow from EBA upfront

25   deals that Clifford had also included in the Company's original FY24 guidance, discussed above.

26   This revised guidance was substantially false or misleading for substantially the same reasons (*see,*

27   ───────────────────

   [12]   Because the press release quotes Clifford and Anagnost, the statements in the press release and
Form 8-K are attributable to each of them as with the February 23, 2023 press release and Form 8-K,

28   discussed above.

1    *e.g.*, ¶102) and because Clifford referenced EBA deals in the second part of the year without

2    disclosing the upfront EBA cash flow the Company collected in the first quarter of the year.

3          106.    On August 29, 2023, the Company filed with the SEC its quarterly report for 2Q24,

4    reporting $842 million in free cash flow for the first six months of FY24, which included free cash

5    flow from EBA upfront deals, as discussed above.  Accordingly, the $842 million figure was

6    materially false or misleading by omission for substantially the same reasons the corresponding

7    figure in 1Q24 was materially false or misleading.  *See, e.g.*, ¶102.  Anagnost and Clifford gave

8    certifications about the 2Q24 report substantially similar to the certifications they made with respect

9    to the FY23 annual report and the 1Q24 report.  These certifications were materially false and

10   misleading for the same reasons as the certifications in those reports (*see* ¶¶90, 103): namely, that

11   they had not fairly presented the Company's free cash flow and had not reported to the Company's

12   Audit Committee all material weaknesses in the operation of internal financial controls that were

13   "reasonably likely" to adversely affect the Company's ability to "summarize and report."

14   **VI.    THE TRUTH BEGINS TO EMERGE, BUT DEFENDANTS CONTINUE
             TO MISLEAD INVESTORS**

15       **A.    November 21, 2023: Scraping the Bottom of Free Cash Flow, the
16           Company Admits a $200 Million Adjustment in Free Cash Flow Is
             Necessary**

17         107.    On the evening of November 21, 2023, the truth about Defendants' fraud began to

18   emerge.  On that day, the Company filed a current report with the SEC on Form 8-K attaching and

19   incorporating by reference a press release announcing results for the third quarter of FY24 ("3Q24").

20   The press release quoted both Anagnost and Clifford.[13]  The press release's quote of Clifford

21   discussing 3Q24 results stated, among other things: "'Overall market conditions and the underlying

22   momentum of the business remained similar to the last few quarters.  Our ***financial performance*** in

23   the third quarter was strong with much of the outperformance ***coming from larger-than-expected***

24   ***expansions of existing EBAs***.'"   The press release further reported: "free cash flow was

27       —————————————
     [13]   Because the press release quotes Clifford and Anagnost, the statements in the press release and
     Form 8-K are attributable to each of them as with the February 23, 2023 press release and Form 8-K,
28   discussed above.

1    $13 million" for the quarter.  This was the ***lowest quarterly free cash flow the Company had***

2    ***reported in more than five years***.

3        108.    The Company held an earnings conference call with investors the same evening.

4    During the call, Clifford revealed that the Company's situation was even worse and would

5    negatively impact free cash flow in the upcoming years: the "transition to annual billings means that

6    about ***$200 million*** of free cash flow in ***Q1 fiscal '24*** that came from multiyear contracts build [sic]

7    ***upfront*** will ***not*** recur in fiscal '25," she said.  Later in the call, Clifford responded to analysts'

8    questions about how to model free cash flow into the following year, stating: "So ***take out the***

9    ***$200 million*** and then it should have a ***more reasonable*** – that will give you ***more reasonable***

10   modeling expectations as you think about modeling fiscal '25 and beyond."

11       109.    The $200 million in upfront free cash flow referenced by Clifford is ***the same***

12   $200 million in free cash flow Defendants ***included*** in their statements regarding 1Q24 and 2Q24

13   free cash flow (discussed above).  Specifically, with respect to the drop from FY23 to FY24 in free

14   cash flow (from FY23 free cash flow of $2.03 billion to the FY24 "midpoint" free cash flow

15   guidance of $1.2 billion), Defendants included some EBA upfront free cash flow in the $200 million

16   of upfront deals they used to arrive at the $1.2 billion "midpoint" of free cash flow guidance, despite

17   pointing to other factors driving the $1.2 billion guidance.  In so doing, at the FY24 investor day

18   event, Defendants made the FY23 to FY24 free cash flow drop ***appear*** less drastic than it was in fact

19   in light of the factors supposedly driving the drop; and in so doing, the Company further concealed

20   the full impact the FY23 EBA upfront deals had on FY24 free cash flow.  As particularized above,

21   the $200 million in free cash flow the Company told investors to "take out" on November 23, 2023

22   also included some FY24 free cash flow attributable to EBA upfront deals, which, of course,

23   investors did not know was a part of the FY24 free cash flow guidance because the Company had

24   supposedly eliminated all of those deals by the beginning of FY23.  *See* ¶¶46-49, 82.

25       110.    Analysts responded negatively to this news in reports issued on November 22, 2023.

26   For example, Barclays analysts wrote: "~$200M of multi-year billings in FY24 . . . needs to come

27   out of our FY25 base," and "[w]e also take this out of FY26."  Similarly, J.P. Morgan analysts

28   noted: "On cash, management reminded investors that about $200 million of free cash flow in 1Q24

that came from multi-year contracts billed upfront tied to the transition to annual billings will not recur in fiscal '25, **making the '24 base closer to $1 B**, though '24 is still expected to be the trough." Piper Sandler & Co. analysts wrote that while they had hoped FY24 would be a "trough year" with regard to free cash flow and other metrics, they were now "substantially less optimistic" about the stock's value due to the "$200M of [**free cash flow**] benefit from multiyear billings that **still** hit in FY24."  Oppenheimer & Co. Inc. likewise reported it had "encountered mostly pushback [from investors] in our conversations and inbox."

111.   On November 22, 2023, the day after the Company's earnings announcement and conference call, the Company's **stock price fell by almost 7%**, from a close of $217.67 per share on November 21, 2023 to a close of $202.66 per share on November 22, 2023.

112.   On December 4, 2023, the Company filed with the SEC its quarterly report for 3Q24 on Form 10-Q, reporting $855 million in free cash flow for the first nine months of FY24, which included free cash flow from EBA upfront deals, as discussed above.  Accordingly, the $855 million figure was materially false or misleading by omission for substantially the same reasons the corresponding figure in 1Q24 and 2Q24 was materially false or misleading.  *See* ¶102.  In addition, Anagnost and Clifford executed certifications with respect to the 3Q24 report substantially similar to the certifications they made with respect to the FY23 annual report, the 1Q24 report, and the 2Q24 report.  These certifications were materially false and misleading for the same reasons as the certifications in those reports (*see* ¶¶90, 103, 106): namely, that they had not fairly presented the Company's free cash flow and had not reported to the Company's Audit Committee all material weaknesses in the operation of internal financial controls that were "reasonably likely" to adversely affect the Company's ability to "summarize and report."

**B.   4Q24: The Company Repeats Its Artificially Inflated FY23 Free Cash Flow Metrics**

113.   On February 29, 2024, the Company filed a current report with the SEC on Form 8-K attaching and incorporating by reference a press release with quotes from Anagnost and Clifford

announcing results from 4Q24 and FY24.[14]  The press release repeated prior statements about the Company's free cash flow performance in FY23 and FY24: "Free cash flow decreased to $1.28 billion, **compared to $2.03 billion in fiscal 2023**."  This $2.03 billion figure and the comparison to prior years were materially false and misleading for substantially the same reasons the prior comparable statements were materially false and misleading throughout FY24.  *See* ¶¶69-72, 89, 125-127.

114.  Also, on the February 29, 2024, the Company held an earnings call with analysts regarding 4Q24 and FY24 results.  On that call, Clifford said the Company's "financial performance in the fourth quarter and *for the fiscal year was strong, particularly in our Enterprise business*."  As to free cash flow reported in FY24, again Clifford noted investors should be "[e]xcluding $200 million from fiscal '24 free cash flow from multiyear upfront billings, which are now billed annually."

115.  Defendants' February 29, 2024 statements in the Form 8-K and incorporated press release and earnings call were materially false and misleading because they cited EBA deals as contributing to "strong" financial performance and failed to disclose how EBA upfront deals contributed to the relative weakness in FY24 financial performance, including that: (1) the Company's FY23 free cash flow had been artificially inflated by upfront EBAs that had "substantially exceeded" historical levels; (2) this artificial inflation in FY23 resulted in materially lowered free cash flow in FY24 (*see, e.g.*, ¶81); (3) the $200 million in FY24 free cash flow attributable to upfront deals included EBAs billed upfront, despite the Company's prior representations that it would no longer use an upfront billing model for EBAs (*see* ¶82); and (4) as later admitted by the Company, Defendants made "certain decisions regarding discretionary spending, collections, and accounts payable . . . informed by their anticipated effects on the company's external free cash flow and/or non-GAAP operating margin targets," which "generally served to reduce reported free cash flow and/or lower reported margin in the current period" and

---

[14]  Because the press release quotes Clifford and Anagnost, the statements in the press release and Form 8-K are attributable to each of them as with the February 23, 2023 press release and Form 8-K, discussed above.

1  further undermined the reliability of the Company's corresponding operating margin and free cash

2  flow metrics.

3  **VII.    AUTODESK'S AUDIT COMMITTEE DISCOVERS DEFENDANTS
        ARTIFICIALLY INFLATED FREE CASH FLOW**

4

5  **A.    April 1, 2024: The Company Announces It Must Delay the Filing of
        Its Annual Report to Complete an Internal Investigation into Free
        Cash Flow**

6

7  116.    After the market closed on April 1, 2024, the Company filed Form 12b-25 with the

8  SEC – a notice of late filing of the Company's FY24 annual report.  Rule 12b-25 permits companies,

9  in certain circumstances, to file their annual reports up to 15 days late.

10  117.    The Company attributed its inability to timely file the report to a previously

11  undisclosed investigation into the Company's free cash flow and non-GAAP operating practices:

12  > Autodesk, Inc. (the "Company") is unable to file its Annual Report on
> Form 10-K for the year ended January 31, 2024 (the "Form 10-K") within the
> prescribed time period, without unreasonable effort or expense.  ***After*** the
> Company's earnings release on February 29, 2024, information was brought to the
> attention of management, which promptly informed the Audit Committee (the
> "Committee") of the Board of Directors of the Company, that caused the Committee
> to commence an internal investigation with the assistance of outside counsel and
> advisors, ***regarding the Company's free cash flow and non-GAAP operating
> margin practices***.  The Committee is comprised entirely of outside "independent
> directors" as defined by the Nasdaq Stock Market listing standards.  The
> ***investigation is ongoing*** and all parties are working diligently to complete the
> investigation.  The Company has voluntarily contacted the Securities and Exchange
> Commission (the "Commission") to advise it that an internal investigation is
> ongoing, and the Committee intends to provide additional information to the
> Commission as the investigation proceeds.  The Company needs further time to assist
> the Committee in its investigation and to review its practices in this regard.

13

14

15

16

17

18

19

20  118.    This caused the Company's stock price to decline over ***4%***, from a close of $259.44

21  on April 1, 2024 to a close of $248.71 on April 2, 2024.  Analysts from Barclays commented that

22  while the delayed filing on account of an investigation was a headline that "is never good to see,"

23  they were optimistic to "hear this is expected to be resolved within 15 days."  The investigation took

24  longer than 15 days.

25  **B.    April 16, 2024: The Investigation Continues, Delaying Public Filings**

26  119.    On April 16, 2024, the Company filed with the SEC a current report on Form 8-K,

27  stating the Company expected to receive a delinquency notice from Nasdaq regarding the

28  Company's late Form 10-K:

As previously disclosed, the filing of the Form 10-K was delayed due to the matters described in the Form 12b-25 and the Prior Press Release.  As of today, the internal investigation described in the Form 12b-25 and the Prior Press Release is ongoing and all parties continue to work diligently to complete the investigation and to file the Form 10-K as soon as practicable.  ***The subject of the internal investigation remains the same as previously disclosed***, and the Company currently does not believe that any of the matters under investigation affect any previously issued financial statements or the information in the Company's earnings release on February 29, 2024.

120.    This caused the Company's stock price to fall almost **6%** from a closing price of $228.24 per share on April 16, 2024, to a close of $214.92 per share on April 17, 2024.  As one market commentator noted at the time:

Shares of design software company Autodesk (NASDAQ:ADSK) fell 7.8% in the morning session after the company provided an update on an ongoing internal investigation, which will delay filing its annual report for the year ended January 31, 2024 within the grace period provided by the SEC (Securities and Exchange Commission).[15]

The commentator further noted that, in "a report filed with the SEC on April 1, 2024, the company revealed it was working with outside counsel and advisors regarding its free cash flow and non-GAAP operating margin practices."  The article explained: "***this update is likely to raise concerns about the business***."

## VIII.    POST-CLASS PERIOD EVENTS CONFIRM THE AUDIT COMMITTEE'S DISCOVERY THAT MANAGEMENT HAD MANIPULATED FREE CASH FLOW TO ARTIFICIALLY INFLATE ITS NUMBERS

121.    On May 31, 2024, Defendants issued a press release finally detailing the principal findings of the Audit Committee's investigation, which they buttressed with rosy statements about the Company's prospects and growth for the upcoming year.  In the press release, Anagnost made this mixed statement discussing, simultaneously, the Audit Committee's free cash flow investigation ***and*** the Company's optimistic projected numbers for the future: "We appreciate your patience as we work through this important process.  We take situations like this very seriously and are grateful to ***put the investigation behind us***," said Andrew Anagnost, Autodesk president and CEO.  "In the ***first quarter of fiscal 2025, we generated broad-based growth*** . . . in AEC and manufacturing across

---

[15]    https://finance.yahoo.com/news/why-autodesk-adsk-stock-trading-151454911.html.

1  products and regions. . . .  The new transaction model implementation is on track. . . .  ***Our strong***

2  ***start sets us up well to achieve our goals for the year***."

3  122.  The press release also touted the Company's projected ***double-digit billings growth***

4  ***of 12%-15% and projected revenue growth of 9%-11% for FY25***, which exceeded analysts'

5  expectations.  Curiously, contrary to every other press release announcing quarterly results for years,

6  the press release said nothing about free cash flow in 1Q25.

7  123.  The press release announced that "management" (which included at least Anagnost,

8  as the CEO) had decided not to make any "restatement or adjustment" to the Company's previously

9  reported non-GAAP numbers, which, of course, included free cash flow.

10  124.  The Company also announced that Clifford would be immediately replaced by an

11  interim CFO and had been shifted to a role that had nothing to do with financial reporting – a clear

12  demotion.

13  Elizabeth "Betsy" Rafael has been appointed by the Board as Interim Chief
    Financial Officer (Principal Financial Officer), effective May 31, 2024.  As Interim
14  Chief Financial Officer, she is not currently an "independent director" for purposes
    of the Nasdaq Stock Market and has stepped down from the Audit Committee.  She
15  remains a director of the company.

16  Deborah L. Clifford has been appointed as the company's Chief Strategy
    Officer, reporting to the Chief Executive Officer, effective May 31, 2024.  Her
17  responsibilities will include, among other things, corporate development, new
    vertical businesses that are outside Autodesk's existing product groups, and the
18  company's Social Impact and Sustainability efforts.

19  125.  The same press release included a "summary" of the Audit Committee's "principal

20  findings" for the investigation of FY22-FY24, which included:

21  •  The Company has historically relied on multiyear contracts with its
    enterprise and product subscription customers, billed upfront, to help meet its free
22  cash flow targets.  During the relevant period, the Company engaged in programs
    designed to incentivize customers to accept multiyear upfront billing, renew early,
23  and/or pay before the end of the fiscal year.

24  •  The Company has disclosed its practice of incentivizing customers to
    adopt multiyear upfront billing arrangements.  It has also acknowledged that
25  discounted multiyear upfront contracts reduce revenue and lower billings in out
    years.  Though ***prior to fiscal year 2024***, the Company did not quantify free cash
26  flow attributable to multiyear upfront billings, it has noted the contribution of upfront
    collections to fluctuations in the Company's quarterly reported long-term deferred
27  revenue.

28

AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES
LAWS - 4:24-cv-02431-YGR                                                                    - 38 -
4889-2661-0907.v2

1   •   During fiscal year 2022, *the Company announced that it had begun to shift enterprise customers to contracts billed annually, and that it had assumed fiscal 2023 enterprise contracts would be billed annually*.   The Company subsequently determined, however, *to pursue multiyear upfront contracts with enterprise customers to help meet its fiscal year 2023 free cash flow goal*.   Upfront billings of enterprise customers in fiscal year 2023 *substantially exceeded historical levels*, helping the Company to meet its lowered annual free cash flow target.

5   •   In addition, *during the relevant period*, certain *decisions regarding discretionary spending, collections, and accounts payable were informed by their anticipated effects on the Company's external free cash flow and/or non-GAAP operating margin targets*.   The resulting actions generally served to reduce reported free cash flow and/or lower reported margin in the current period.   [FY24].[16]

8   126.   The press release further stated: "[s]eparate from the Audit Committee's findings, the company notes that multiyear upfront billings of enterprise customers in fiscal year 2024 was substantially lower than fiscal years 2022 and 2023."

11   127.   Moreover, the Company explained its Audit Committee "proposed certain remedial measures including: reviewing certain processes around financial communications and disclosures; assessing certain Company organizational functions and responsibilities; and adopting and enhancing policies, processes, and controls related to the matters investigated."

15   128.   However, the press release sought to neutralize the impact of the Audit Committee's findings.  In addition to the announcement that "management has determined that there will be no restatement," it included the finding that "[t]hough free cash flow was one factor in the Company's executive compensation program, these decisions were not calculated to influence compensation outcomes."  However, as detailed below, this finding is directly contradicted by the Company's own compensation policies, which were designed *so that* Anagnost's and Clifford's decisions were heavily influenced by their impact on the Company's reported free cash flow.  The Audit Committee's assertion that free cash flow was "one factor" in Anagnost's and Clifford's compensation is literally true: free cash flow was "one" of "three" key elements, as discussed below.

24   129.   On June 10, 2024, the Company filed its FY24 annual report on Form 10-K.  On the first substantive page of the report, the Company provided an "EXPLANATORY NOTE" regarding the investigation explaining that, as "previously announced on April 1, 2024," the Company's Audit

---

[16]   The "current period" refers to FY24, as analyst reports noted in reviewing the Audit Committee's principal findings.

1    Committee launched an investigation into the Company's reported free cash flow.  The Audit

2    Committee had investigated FY22, FY23, and FY24, and the Audit Committee's "principal

3    findings" included the same points set forth in the Company's May 31, 2024 press release, discussed

4    above.

5        130.    Moreover, the Form 10-K further revealed the Company had been contacted by the

6    U.S. Attorney's Office for the Northern District of California in connection with the internal

7    investigation.

8        131.    On June 17, 2024, Starboard, an Autodesk investor that owned $500 million in

9    Autodesk stock, published a letter discussing the Audit Committee's discovery that the Company

10   "intentionally misled investors on its billings practices as it manipulated free cash flow":

> ***This was a clear case of a company saying one thing to investors and doing
> something completely different***.  Autodesk had an obligation to not mislead investors
> with its public commentary, but instead of honoring this obligation, Autodesk did the
> opposite – the ***Company told investors it was at the tail-end of a process to move
> enterprise customers to annual billings***.  The Company went to ***great lengths*** to
> discuss that it was better for the Company to move to annual billings to reduce
> discounts and to have more consistent cash flow, among other reasons.  Instead,
> when the Company realized it would struggle to reach its free cash flow targets
> (which were set expecting annual billings), the Company reverted to discounts for
> multi-year, upfront billings, as well as other actions, to accelerate free cash flow.
> ***The Company continued to report these free cash flow results with multi-year,
> upfront billings while explicitly and implicitly leading shareholders to believe they
> had moved enterprise customers to annual billings***.

18       132.    The same day Starboard published its letter, it commenced litigation in the Chancery

19   Court of Delaware to force a proper election of Board directors and, consequently, to ensure better

20   oversight of the Company's executives.

21       133.    Thereafter, on August 16, 2024, *Bloomberg* published an article titled, "Autodesk

22   Executives Ignored Accounting Risks, Documents Show."  The article reported that, "according to

23   previously unreported internal documents," the Company continued to pursue upfront EBA deals "in

24   an effort to meet financial targets" and "counted on the upfront payments to boost cash flow[.]"

25   Moreover, "[e]mployees warned executives about the strategic risk in early 2022, but the company

26   continued to book such deals at least until the fiscal year ending in January 2024."  The documents

27   also showed "[e]mployees considered the practice risky because the discounts and other concessions

28   reduced long-term revenue, boosted the chance of mistakes in financial modeling and made it harder

1  for salespeople to do their jobs[.]"  Finally, the article reported that, according to the documents:

2  "Some of the deals were approved by Chief Operating Officer Steve Blum[.]"

3  **IX.    ADDITIONAL SCIENTER ALLEGATIONS**

4          134.   At all relevant times, the Individual Defendants acted with scienter in making

5  materially false and misleading statements during the Class Period, as well as making material

6  omissions of fact that made Defendants' statements misleading during the Class Period.  Both of the

7  Individual Defendants had knowledge that the statements made were false and misleading when

8  made, or acted with reckless disregard for the truth or falsity of those statements when made, as

9  demonstrated by the allegations above.  The additional facts alleged below further support a strong

10  inference of scienter.

11         **A.    The Audit Committee Indicated the Company's Actions Taken to
                   Artificially Boost Free Cash Flow Were Intentional**
12
13         135.   The Audit Committee's findings indicate Defendants intentionally undertook actions

    in FY23 for the purpose of inflating free cash flow to meet lowered targets.
14
15         136.   First, the Audit Committee admits: "[d]uring fiscal year 2022, ***the [C]ompany***

16  announced that it had begun to shift enterprise customers to contracts billed annually, and that it had

17  assumed fiscal 2023 enterprise contracts would be billed annually."  The reference to the "company"

18  clearly implicates Anagnost and Clifford, the Company's most senior officers, who actually ***made***

19  ***these announcements*** regarding the end of EBA upfront deals "[d]uring ***fiscal*** year 2022" that ended

20  on January 31, 2022.  Specifically, Clifford made such announcements on August 25, 2021,

21  September 1, 2021, and September 14, 2021, as noted above.  *See, e.g.*, ¶¶46-53, 56-57.  Anagnost

    made a similar announcement on November 23, 2021, as noted above.  *See, e.g.*, ¶59.
22
23         137.   The Audit Committee's other findings regarding the "company's" intentional

24  manipulation of free cash flow and other financial metrics also point to Anagnost and Clifford, such

    as:
25
26      •   "subsequently ***determined . . . to pursue*** multiyear upfront contracts with enterprise
            customers ***to help meet its fiscal year 2023 free cash flow goal***";

27      •   "***engaged*** in programs ***designed to incentivize*** customers to accept multiyear upfront
            billing, renew early, and/or pay before the end of the fiscal year"; and
28

- "**certain decisions** regarding discretionary spending, collections, and accounts payable **were informed** by their **anticipated effects** on the Company's **external free cash flow** and/or non-GAAP operating margin **targets**."

138. Clifford's and Anagnost's connection to these admitted manipulations – including decisions around specific inputs, such as accounts payable, that influenced free cash flow – is particularly clear where Clifford, as CFO, had responsibility for the Company's financial statements, which included its cash flow statement. As the most senior officers of the Company, the Individual Defendants were solely required to and did certify that the Company's FY23 cash flow statement (as part of the Company's financial statements) was accurate, that it "fairly presented the cash flows of the registrant," and that the Company's FY23 annual report "does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report." In other words, Anagnost and Clifford certified that they were responsible for the FY23 free cash flow statement that the Audit Committee subsequently demonstrated was, in fact, misleading. These facts further support an inference that Anagnost and Clifford either directed or, at a minimum, knew of these **intentional** actions to inflate free cash flow.

139. Moreover, Defendants' scienter is further supported by the *Bloomberg* article, detailed above, which reported that, based on internal documents it reviewed, Autodesk "employees considered the practice risky because the discounts and other concessions reduced long-term revenue, **boosted the chances of mistakes in financial modeling**, and made it harder for salespeople to do their jobs, the documents said." Anagnost and Clifford were responsible for the Company's "guidance" – *i.e.*, the public targets based on "financial modeling." Moreover, the article stated: "[e]mployees **warned executives about the strategic risk in early 2022, but the company continued to book such deals at least until the fiscal year ending in January 2024**, according to the documents." According to *Bloomberg*, the same documents showed some of the deals "were approved by Chief Operating Officer Steve Blum."

140. In addition, the Audit Committee's findings with regard to executive compensation implicate Anagnost and Clifford. Most importantly, the findings suggest that whoever engaged in

the cash flow manipulation did, in fact, have free cash flow as "one" element that determines their executive compensation.  Anagnost and Clifford fit that description.  Anagnost and Clifford's stock-based compensation rested on formulae that heavily weighted revenue and free cash flow, meaning these two inputs (coupled with a third element, stock performance) accounted for the majority of Anagnost and Clifford's stock-based compensation flowing from the Company's FY23 results.  That compensation rested heavily on the Company's artificially inflated FY23 free cash flow results reported to the market.

141.   Further, as part of its findings, the Audit Committee "proposed certain remedial measures, including: *reviewing certain processes around financial communications and disclosures*; assessing certain Company organizational functions and responsibilities; and adopting and enhancing policies, processes, and *controls related to the matters investigated*."  This disclosure revealed the Company's processes around financial communications and disclosures and its internal controls related to the Company's practices around free cash flow were lacking, despite the Individual Defendants' certifications attesting they were "responsible for establishing and maintaining disclosure controls and procedures . . . and internal control over financial reporting" and that they had disclosed to the Company's auditors and Audit Committee "[a]ll significant deficiencies and material weaknesses in the design *or operation* of internal control over financial reporting which *are reasonably likely* to adversely affect the registrant's ability to record, process, summarize and report financial information."  In other words, either the Individual Defendants signed certificates they knew to be false or failed to undertake the investigation required of them, indicating they acted with scienter.

142.   In addition, the Audit Committee's findings resulted in Clifford's immediate replacement by an interim CFO and her demotion to a newly created role that had nothing to do with the Company's financial statements and public reporting.  That fact strongly supports an inference of her scienter.  Clifford rejoined Autodesk as CFO in March 2021, shortly after the start of the investigation period (spanning February 2021 through January 2024, or FY22-FY24).  In this role, she had responsibility for the Company's financial reporting, including its free cash flow statement, during the period the Audit Committee found the Company had engaged in manipulation of free cash

flow and other accounting items, such as discretionary spending, collections, and accounts payable. Clifford's sudden demotion to a non-financial role in connection with the Audit Committee's findings further demonstrates her responsibility for these manipulations.

**B.   Anagnost and Clifford's Own Statements Show They Had Access to Facts that Rendered Their Public Statements Materially False and Misleading**

143.   As detailed above, the Company's free cash flow metric was one of its critical non-GAAP metrics, which, as the Company acknowledged, "allow[ed] for greater transparency with respect to key metrics used by management in its financial and operational decision-making" and "are used by Autodesk's institutional investors and the analyst community to help them analyze the health of the Company's business." *See* ¶¶73-75.

144.   Moreover, the impact of the Company's billing model change on free cash flow was of critical importance to the Company, investors, and analysts. Indeed, the Individual Defendants frequently spoke about this transition and the impact on the Company's free cash flow and responded to analyst questions on these matters during quarterly earnings calls both before and throughout the Class Period. In particular, Defendants characterized the transition as "good for Autodesk" and provided detailed updates on the progress of the transition. *See, e.g.*, ¶¶46, 58-65, 92-95.

145.   Additionally, the Individual Defendants repeatedly made clear that the upfront to annual transition was important and that they were personally involved in executing it. For example:

- **February 22, 2022**: During the 4Q22 earnings call, in response to an analyst question about how the Company would "be phasing out the multiyear product subscriptions in fiscal '24" and "the shape of that impact on free cash flow," Clifford admitted: "*it's a big area of focus for us*," and "in terms of the decline for free cash flow, specifically in fiscal '24, *I know there's a lot of interest in both the magnitude of it and the slope of it*."

- **May 26, 2022**: During the 1Q23 earnings call, an analyst asked about what Autodesk was doing to "work with the channel to get through" the trough in "fiscal '24 cash flow." Anagnost responded, in part: "*[o]ne of the core programs here right* now is we're encouraging them [*i.e.*, channel partners] to work with us on conserving some of that upfront cash[.]"

- **August 24, 2022**: During the 2Q23 earnings call, an analyst asked Clifford to elaborate on multiyear subscriptions and how the Company "plan[ned] on phasing

that option out." Clifford responded: "*we continue to track the multiyear cohort closely*" before explaining, "the transition is going to start in early fiscal '24, and we continue to work through the programmatic and operational details to get there, things like a partner transition plan, back-office system upgrades. *But I'll say again, it's our bias to go as quickly as possible*."

- **November 22, 2022**: During the 3Q23 earnings call, an analyst asked Clifford whether there was "anything that you want us to know high level on . . . how you're thinking about fiscal '24[.]" Clifford responded, in part: "*on free cash flow*, FactSet consensus right now is a range of $1.2 billion to $1.7 billion. There's *a couple of important things to consider. The first is the rate at which our customers transition to annual billings*. And the second is the overall macroeconomic environment. *We continue to be focused on executing on that transition as fast as possible because while the change is good for us, and it's good for our customers, from a financial standpoint, we really want the noise behind us*."

- **March 22, 2023**: During an investor day call, Clifford announced that the upfront-to-annual transition for product subscriptions would go live the following week, noting: "since [the previous investor day on September 1, 2021], *we've been working hard to prepare* our back office to handle this change . . . and to work with our channel partners to ensure their readiness for the transition."

146. The facts enumerated above, among many others detailed herein, establish the Individual Defendants orchestrated, directed, executed, and were otherwise aware of the scheme to manipulate the Company's free cash flow as described herein. The fact the Company's billing model was "core" to the business further reinforces the scienter inference.

## X.    LOSS CAUSATION

147. Like other members of the Class of purchasers of the Company's securities who purchased at artificially inflated prices during the Class Period, Plaintiff suffered an economic loss, *i.e.*, damages, when the Company's securities prices declined upon the disclosures correcting the alleged misrepresentations or omissions and/or revealed the materialization of a risk that the alleged misrepresentations or omissions had previously concealed, in whole or part.

148. The facts and circumstances particularizing loss causation are detailed above in connection with the declines of the Company's stock price on November 22, 2023; April 2, 2024; and April 17, 2024. *See* ¶¶107-111, 116-120.

149. The timing and magnitude of the Company's securities price decline negates any inference that the loss suffered by Plaintiff and other Class members was caused by changed market

conditions, macroeconomic or industry factors, or Company-specific facts unrelated to Defendants' fraudulent conduct.  The economic loss, *i.e.*, damages, suffered by Plaintiff and other members of the Class was a direct result of: (a) Defendants' fraudulent scheme and misrepresentations or omissions that served to artificially inflate the Company's securities price; and (b) the subsequent significant decline in the value of the Company's securities when the true state of the Company's operations was revealed to the market, correcting the misrepresentations or omissions and/or revealing the materialization of risks that the Company's scheme or misstatements or omissions had concealed previously, in whole or part.

## XI.   APPLICABILITY OF PRESUMPTION OF RELIANCE: FRAUD-ON-THE-MARKET DOCTRINE

150.    Lead Plaintiff will rely upon the presumption of reliance established by the fraud-on-the-market doctrine in that, among other things:

(a)    Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

(b)    the omissions and misrepresentations were material;

(c)    the Company's common stock traded in an efficient market;

(d)    the misrepresentations alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and

(e)    Lead Plaintiff and other members of the Class purchased Autodesk securities between the time Defendants misrepresented or failed to disclose material facts and the time the truth was disclosed, without knowledge of the misrepresented or omitted facts.

151.    At all relevant times, the market for Autodesk securities was an efficient market for the following reasons, among others:

(a)    Autodesk securities met the requirements for listing and were listed and actively traded on Nasdaq, a highly efficient and automated market;

(b)    as a regulated issuer, Autodesk filed periodic public reports with the SEC;

(c)    Autodesk regularly communicated with public investors via established market communication mechanisms, including the regular dissemination of press releases on the

1  national circuits of major newswire services and other wide-ranging public disclosures, such as

2  communications with the financial press and other similar reporting services; and

3          (d)      Autodesk was followed by several securities analysts employed by major

4  brokerage firms, who wrote reports that were distributed to the sales force and certain customers of

5  their respective brokerage firms.  Each of these reports was publicly available and entered the public

6  marketplace.

7      152.    As a result of the foregoing, the market for Autodesk securities promptly digested

8  current information regarding Autodesk from all publicly available sources and reflected such

9  information in the price of the securities.  Under these circumstances, all purchasers of Autodesk

10 securities during the Class Period suffered similar injury through their purchase of Autodesk

11 securities at artificially inflated prices, and a presumption of reliance applies.

12     153.    A Class-wide presumption of reliance is also appropriate in this action under the

13 Supreme Court's holding in *Affiliated Ute Citizens v. United States*, 406 U.S. 128 (1972), because

14 the Class' claims are, in large part, grounded on Defendants' material misstatements and/or material

15 omissions that made Defendants' statements misleading.  Because this action involves Defendants'

16 scheme and failure to disclose material adverse information regarding the Company's business

17 operations and financial prospects – information Defendants were obligated to disclose – positive

18 proof of reliance is not a prerequisite to recovery.  All that is necessary is that the facts withheld be

19 material in the sense a reasonable investor might have considered them important in making

20 investment decisions.  Given the importance of the Class Period material misstatements and material

21 omissions that made Defendants' statements misleading set forth above, that requirement is satisfied

22 here.

23 **XII.   NO SAFE HARBOR**

24     154.    The federal statutory safe harbor providing for forward-looking statements under

25 certain circumstances does not apply to any of the allegedly false and misleading statements pled in

26 this Complaint.  Many of the statements alleged were not forward looking when made, or omitted

27 material information which made Defendants' statements misleading, and therefore are not protected

28 by the safe harbor.  Alternatively, to the extent any statements were forward looking, the safe harbor

still does not apply because they were not accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.

155.    To the extent Defendants provided risk warnings in their Class Period statements, they were mere boilerplate warnings.  As a result, the generic warnings were not narrowly tailored to the actual risks associated with investing in Autodesk stock and did not fairly and adequately warn actual and potential investors of the appropriate risks.

156.    These or other materially similar risk disclosures disseminated throughout the Class Period did not serve to adequately inform the market of the true risks and actual operational experience of the Company.  Indeed, that these stated warnings were inadequate and provided no new, meaningful information is evident from Defendants' failure to meaningfully modify the Company's risk factor language, as well as the market's reaction to the revelation of Defendants' untrue and/or misleading statements.

157.    Moreover, to the extent any statements pled herein are forward looking, Defendants are liable for them because, at the time each statement was made, the speaker knew the statement was false or misleading, and the statement was authorized and/or approved by an executive officer of Autodesk who knew the statement was false.  In addition, the forward-looking statements were contradicted by existing, undisclosed material facts required to be disclosed so the statements would not be misleading.  Finally, any purported "Safe Harbor" warnings were themselves misleading because they warned of risks that had already materialized or failed to provide meaningful disclosures of the relevant risks.

## XIII.    THE INDIVIDUAL DEFENDANTS ARE CONTROL PERSONS

158.    Each of the Individual Defendants acted and/or made the statements detailed herein in his or her capacity as an officer and/or director of Autodesk.  Each of the Individual Defendants was directly involved in the management and day-to-day operations of the Company at the highest levels and was privy to confidential proprietary information concerning the Company and its business, operations, services, and present and future business prospects.  In addition, the Individual Defendants were involved in drafting, producing, reviewing, and/or disseminating the false and

1  misleading statements and information alleged herein; were aware of or recklessly disregarded the

2  false and misleading statements being issued regarding the Company; and approved or ratified these

3  statements, all in violation of the federal securities laws.  Each of the Individual Defendants was

4  directly or indirectly involved in the oversight or implementation of the Company's internal controls.

5  159.  The Individual Defendants, because of their positions of control and authority as

6  officers and/or directors of the Company, were able to, and did, control the content of the various

7  SEC filings, press releases, and other public statements pertaining to the Company during the Class

8  Period.  Each Individual Defendant was provided with copies of the documents alleged herein to be

9  misleading before or shortly after their issuance, participated in conference calls with investors

10  during which false and misleading statements were made, and/or had the ability and/or opportunity

11  to prevent their issuance or cause them to be corrected.  Accordingly, each of the Individual

12  Defendants approved or ratified these statements and is responsible for the accuracy of the public

13  statements detailed herein and is, therefore, primarily liable for the representations and/or omissions

14  contained therein.

15  **XIV.   CLASS ACTION ALLEGATIONS**

16  160.  Plaintiff brings this action as a class action pursuant to Rule 23(a) and (b)(3) of the

17  Federal Rules of Civil Procedure on behalf of a class consisting of all persons who purchased or

18  otherwise acquired Autodesk's securities during the Class Period and who were damaged thereby as

19  alleged herein (the "Class").  Excluded from the Class are Defendants, the officers and directors of

20  the Company, members of the Individual Defendants' immediate families and their legal

21  representatives, heirs, successors, or assigns and any entity in which Defendants have or had a

22  controlling interest.

23  161.  The members of the Class are so numerous that joinder of all members is

24  impracticable.  The disposition of their claims in a class action will provide substantial benefits to

25  the parties and the Court.  Throughout the Class Period, the Company's securities were actively

26  traded on Nasdaq.  According to the Company's Form 10-Q for the period ending October 31, 2023,

27  filed on December 4, 2023, Autodesk had 213,915,325 shares of common stock outstanding as of

28  November 27, 2023.  While the exact number of Class members can only be determined by

1   appropriate discovery, Plaintiff believes that members of the Class number at least in the hundreds, if

2   not the thousands, and that they are geographically dispersed.

3       162.   There is a well-defined community of interest in the questions of law and fact

4   involved in this case.  Questions of law and fact common to the members of the Class that

5   predominate over questions that may affect individual Class members include:

6       (a)   whether Defendants violated the Exchange Act;

7       (b)   whether statements made by Defendants to the investing public

8   misrepresented material facts about Autodesk;

9       (c)   whether Defendants' statements omitted material facts necessary to make the

10   statements made, in light of the circumstances under which they were made, not misleading;

11       (d)   whether Defendants knew or recklessly disregarded that their statements were

12   false and misleading;

13       (e)   whether the prices of Autodesk securities were artificially inflated; and

14       (f)   the extent of damages sustained by Class members and the appropriate

15   measure of damages.

16       163.   Plaintiff's claims are typical of those of the Class because Plaintiff and the Class

17   sustained damages arising out of Defendants' wrongful conduct complained of herein.

18       164.   Plaintiff will adequately protect the interests of the Class and has retained counsel

19   experienced in class action securities litigation.  Plaintiff has no interests that conflict with those of

20   the Class.

21       165.   A class action is superior to all other available methods for the fair and efficient

22   adjudication of this controversy since joinder of all Class members is impracticable.  Further, as the

23   damages suffered by individual Class members may be relatively small, the expense and burden of

24   individual litigation make it impossible for members of the Class to individually redress the wrongs

25   done to them.  There will be no difficulty in the management of this action as a Class action.

26

27

28

# COUNT I

## For Violation of §10(b) of the Exchange Act and Rule 10b-5(b)
## (Against All Defendants)

166.    Plaintiff incorporates ¶¶1-165 by reference.

167.    During the Class Period, Autodesk and the Individual Defendants disseminated or approved the false statements specified above, which they knew or recklessly disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

168.    Autodesk and the Individual Defendants violated §10(b) of the Exchange Act and Rule 10b-5(b) during the Class Period in that they made untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

169.    As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the Class have suffered damages in connection with their respective purchases and sales of Autodesk securities during the Class Period, because, in reliance on the integrity of the market, they paid artificially inflated prices for Autodesk securities and experienced losses when the artificial inflation was released from Autodesk securities as a result of the partial revelations and price declines detailed herein.  Plaintiff and the Class would not have purchased Autodesk securities at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by Defendants' misleading statements.

170.    By virtue of the foregoing, Autodesk and the Individual Defendants have each violated §10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

# COUNT II

## For Violation of §10(b) of the Exchange Act and Rule 10b-5(a) and (c)
## (Against All Defendants)

171.    Plaintiff incorporates ¶¶1-165 by reference.

172.    During the Class Period, Defendants violated §10(b) of the Exchange Act and Rule 10b-5(a) and (c) in that they employed devices, schemes, and artifices to defraud and engaged

1   in acts, practices, and a course of business that operated as a fraud or deceit upon Plaintiff and others

2   similarly situated in connection with their purchases of Autodesk securities during the Class Period.

3   Defendants told the market they were going to end the Company's EBA upfront billing model

4   because it was not good for the business; then, knowing they had made that announcement to the

5   market, they secretly restarted the EBA upfront billing model for the purpose of "making their

6   numbers," as the Company admitted, and did so without telling either the market or the Company's

7   own Audit Committee, as discussed above in detail.  As part of the scheme, each of the Individual

8   Defendants made false or materially misleading statements to the market, and each authorized the

9   distribution of the other's materially false or misleading statements to the market, as discussed above

10  in detail.

11          173.    Plaintiff and the Class have suffered damages in that, in reliance on the integrity of

12  the market, they paid artificially inflated prices for the Company's securities.  Plaintiff and the Class

13  would not have purchased the Company's securities at the prices they paid, or at all, if they had been

14  aware that the market prices had been artificially and falsely inflated by Defendants' misleading

15  statements.

16          174.    As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the

17  Class have suffered damages in connection with their respective purchases and sales of Autodesk

18  securities during the Class Period because, in reliance on the integrity of the market, they paid

19  artificially inflated prices for Autodesk securities and experienced losses when the artificial inflation

20  was released from Autodesk securities as a result of the partial revelations and price declines detailed

21  herein.  Plaintiff and the Class would not have purchased Autodesk securities at the prices they paid,

22  or at all, if they had been aware that the market prices had been artificially and falsely inflated by

23  Defendants' misleading statements.

24          175.    By virtue of the foregoing, Autodesk and the Individual Defendants have each

25  violated §10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

26

27

28

**COUNT III**

**For Violation of §20(a) of the Exchange Act**
**(Against the Individual Defendants)**

176.    Plaintiff incorporates ¶¶1-175 by reference.

177.    The Individual Defendants acted as controlling persons of Autodesk within the meaning of §20(a) of the Exchange Act.

178.    By virtue of their high-level positions, participation in and/or awareness of Autodesk's operations, and/or intimate knowledge of Autodesk's disclosures, policies, and financial performance, the Individual Defendants had the power to influence and control, and did influence and control, directly or indirectly, the decision making of Autodesk, including the content and dissemination of the various statements Plaintiff contends are false and misleading.  The Individual Defendants were provided with, or had unlimited access to, copies of the reports, press releases, public filings, and other statements alleged by Plaintiff to be misleading before and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

179.    As set forth above, Autodesk violated §10(b) and Rule 10b-5 promulgated thereunder by its acts and omissions, which made Defendants' statements materially misleading as alleged in this Complaint.  By virtue of their positions as controlling persons, and as a result of their aforementioned conduct, the Individual Defendants are liable pursuant to §20(a) of the Exchange Act for Autodesk's §10(b) violations.  As a direct and proximate result of the Individual Defendants' wrongful conduct, Plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's common stock during the Class Period, as evidenced by, among other things, the common stock price declines discussed above, when the artificial inflation was released from the Company's common stock.

## XV.    PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief and judgment as follows:

1     A.     Declaring this action to be a class action properly maintained pursuant to Rule 23 of

2 the Federal Rules of Civil Procedure and certifying Plaintiff as Class Representative and Robbins

3 Geller Rudman & Dowd LLP as Class Counsel;

4     B.     Awarding compensatory damages in favor of Plaintiff and the other Class members

5 against all Defendants, jointly and severally, for all damages sustained as a result of Defendants'

6 wrongdoing, in an amount to be proven at trial, including interest thereon;

7     C.     Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this

8 action, including counsel fees, expert fees, and other costs and disbursements; and

9     D.     Awarding such equitable, injunctive, or other relief as deemed appropriate by the

10 Court.

## XVI. JURY DEMAND

Lead Plaintiff demands a trial by jury.

DATED: September 16, 2024

ROBBINS GELLER RUDMAN
  & DOWD LLP
SHAWN A. WILLIAMS
JASON C. DAVIS

s/ Jason C. Davis
JASON C. DAVIS

Post Montgomery Center
One Montgomery Street, Suite 1800
San Francisco, CA  94104
Telephone:  415/288-4545
shawnw@rgrdlaw.com
jdavis@rgrdlaw.com

ROBBINS GELLER RUDMAN
  & DOWD LLP
SPENCER A. BURKHOLZ
655 West Broadway, Suite 1900
San Diego, CA  92101
Telephone:  619/231-1058
spenceb@rgrdlaw.com

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

ROBBINS GELLER RUDMAN
  & DOWD LLP
ELIZABETH A. SHONSON
(*pro hac vice* forthcoming)
LUKE GOVEAS
(*pro hac vice* forthcoming)
225 NE Mizner Boulevard, Suite 720
Boca Raton, FL  33432
Telephone:  561/750-3000
561/750-3364 (fax)
eshonson@rgrdlaw.com
lgoveas@rgrdlaw.com

Lead Counsel for Lead Plaintiff