# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

MICHAEL BARKASI, *individually and on behalf of all others similarly situated*,

Plaintiff,

v.

AUTODESK, INC., ET AL.,

Defendants.

Case No. 4:24-cv-02431-YGR

ORDER GRANTING MOTION TO DISMISS AMENDED COMPLAINT WITH LEAVE TO AMEND

Re: Dkt. Nos. 54, 55

Lead plaintiff Canadian Elevator Industry Pension Trust Fund and Canadian Elevator Industry Life and Health Trust Fund brings this securities class action against defendants Autodesk, Inc., Andrew Anagnost, and Deborah Clifford alleging that defendants made fraudulent and misleading statements and omissions about Autodesk's billing practices between February 23, 2023 and April 16, 2024 (the "Class Period"). Plaintiff asserts three causes of action under the Securities Exchange Act: (i) Section 10(b) and Rule 10b-5(b); (ii) Section 10(b) and Rules 10b-5(a) and (c); and (iii) Section 20(a), against Anagnost and Clifford (the "individual defendants").

Defendants move to dismiss plaintiff's amended class action complaint ("ACC") on five grounds, namely that plaintiff: (1) fails to identify any statements that were false or misleading when made; (2) cannot establish a strong inference of scienter; (3) does not allege loss causation; (4) fails to plead the scheme required under Rule 10b-5(a) or (c); and (5) fails to plead a Section 20(a) claim.

Having carefully considered the papers submitted and the pleadings in this action, the hearing held on June 17, 2025, and for the reasons set forth below, the Court GRANTS defendants' motion to dismiss with leave to amend.[1]

---

[1] The Court also grants in part defendants' request for judicial notice. (Dkt. No. 55.) The Court will take judicial notice of Exhibits 1–4, 6–10, 15–17, 23–28, and 30. Those exhibits contain SEC filings, call transcripts, and Autodesk's stock price during the relevant period, which courts routinely judicially notice. Fed. R. Evid. 201(b); *In re Intel Corp. Sec. Litig.*, No. 18-cv-

## I.     BACKGROUND

The ACC alleges as follows:

Defendant Autodesk, Inc. ("Autodesk") is a software design company that sells software products and subscriptions to its customers. (ACC ¶ 2.) This litigation concerns the sale of two of Autodesk's offerings: Enterprise Business Arrangements ("EBAs") and product subscriptions. (*Id.*) EBAs offer customers enterprise-wide access to a broad pool of Autodesk products and are sold directly to large customers. (*Id.*) Product subscriptions, on the other hand, include individual or small groups of software products that Autodesk sells directly or through distributors and resellers. (*Id.*) Autodesk historically sold *some* EBAs and *all* product subscriptions through upfront, multiyear contracts, whereby customers paid Autodesk in full at the start of a three-year contract. (*Id.* ¶¶ 3, 4.) In return for the upfront sum, Autodesk offered its customer a discount. (*Id.*)

Autodesk's upfront business model posed several challenges for Autodesk, including that the model reduced Autodesk's profitability and caused inconsistent cash flow, which was difficult to forecast. (*Id.* ¶ 4.) Autodesk decided to solve for that issue by shifting its customers from upfront, multi-year contracts to annual contracts. (*Id.* ¶ 5.)

### A.     Autodesk's Statements About Its Planned Billing Shift.

#### 1.   2Q22 Earnings Call (August 25, 2021)

On August 25, 2021, Autodesk held earnings call for the second quarter of 2022 (2Q22), where it first announced that Autodesk would begin moving more EBA customers from upfront to annual billing. Defendant Deborah Clifford, the Chief Financial Officer of Autodesk, stated on that call:

> Our strong start to the year means ***we're also shifting more of our EBA customers from multiyear paid upfront to annual billings***, which is good for them and good for Autodesk. Our EBA customers retain price certainty with a multiyear contract term, but annual

---

00507-YGR, 2019 WL 1427660, at *6–7 (N.D. Cal. Mar. 29, 2019). Moreover, those documents were incorporated by reference in plaintiff's complaint. *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 999–1002 (9th Cir. 2018); *see also In re Intel Corp. Sec. Litig.*, 2019 WL 1427660, at *7. The Court overrules plaintiff's objections. (Dkt. No. 57.) At this stage in the proceeding, the Court will not take judicial notice of the submitted analyst reports (Exhibits 5, 11–14, 18–22, and 29).

United States District Court
Northern District of California

> billings give them a more predictable annual cash outlay. For Autodesk, we generate more predictable cash flow and remove the discounts to generate upfront cash collections. ***While we had already assumed this change in fiscal '23***, it has a modest impact on fiscal '22 billings and free cash flow. However, we expect it to drive more predictable free cash flow growth and better price realization over time, which will make Autodesk a more valuable company.

(ACC ¶ 46; Declaration of Stephen Strain (Strain Decl.), Dkt. No. 54-1, Ex. 2 at 4) (emphases supplied). Clifford received a handful of questions from analysts on that topic. In response to a question from a Barclays analyst about the size and impact of the change to EBA billing, Clifford clarified that:

> The key point to take away is this. We're focused on making changes that are good for our customers and good for us, and ***shifting more EBAs to annual billings*** helps us achieve that goal.
>
> . . .
>
> Of course, the change is good for us, too. We generate more predictable annual cash flows, and we remove the discounts we see today to generate cash collections up front. ***Most EBAs are already on annual billing terms***, ***and also we had already assumed that EBAs would all be on annual billing terms starting next year in our fiscal 2023.***
>
> . . .
>
> As a side note, the impact to our billings guidance is also pretty small. ***It's around 1 percentage point of impact to the total billings outlook***.

(*Id*., Ex. 2 at 8; ACC ¶ 48) (emphases supplied).

### 2. Investor Day (September 1, 2021)

The following week, Autodesk held an investor day call where Clifford reiterated that there was an "ongoing shift of more of our enterprise customers to an annual billing cycle." (*Id*., Ex. 3 at 37; ACC ¶ 50). Clifford also announced the same switch for its product subscription offerings:

> Today, we'll discuss our intent to make the same shift for our product subscription multiyear contracts starting in fiscal 2024.
>
> . . .
>
> [T]his shift will result in a predictable initial decline in free cash flow in fiscal 2024 as we transition, but then an accelerated return to growth in fiscal 2025 and 2026.

(*Id*.; ACC ¶¶ 50–55.) When an analyst questioned the rationale behind the timing of the products

3

transition, Clifford answered that Autodesk's timing must consider its channel partners' needs to ensure a smooth transition along with the upgrades that Autodesk would need to make to its back-office systems so that Autodesk could manage a higher volume of billing. (Strain Decl., Ex. 3 at 48–49; ACC ¶ 53.)

At a follow up Investor Conference on September 14, 2021, when asked about the impact of Autodesk's EBA transition to annual billing, Clifford reiterated her earlier message that "a lot of [Autodesk's] EBAs were already on annual billing terms. And at the beginning of our fiscal '23 [starting February 1, 2022], we had already assumed that all of them would be on annual billing terms." (ACC ¶ 56.)

### 3.    3Q22 Earnings Call (November 23, 2021) and Investor Conference (November 30, 2021)

After Autodesk announced its planned transition to annual billing, defendant Andrew Anagnost, Autodesk's Chief Executive Officer, told investors on Autodesk's 3Q22 earnings call that Autodesk was proceeding "full steam ahead" with the shift. (*Id*. ¶ 59.) Anagnost reiterated that point a week later at an investor conference on November 30, 2021 by explaining that he would like to "flush out all of the upfront multiyear [contracts] from [Autodesk] right this very minute" but Autodesk's partners were "cash flow sensitive" and Autodesk itself needed time to set up back-office systems. (*Id.* ¶ 60.)

Autodesk continued to repeat similar messages during its 4Q22, 1Q23, and 3Q23 earnings calls. (*Id.* ¶¶ 62–64.)

### B.    Autodesk's Alleged Misrepresentations and Omissions

#### 1.    Autodesk Announces its 4Q23 and FY23 Results (February 23, 2023)

On February 23, 2023, or the start of the class period, Autodesk filed a Form 8-K with the Securities and Exchange Commission ("SEC") that announced Autodesk's record financial results for the fiscal year. (*Id.* ¶ 66.) Autodesk reported record revenue, with a free cash flow ("FCF") of $2.03 billion, which exceeded Autodesk's expectations. (*Id.* ¶¶ 8, 66, 69; Strain Decl., Exs. 6 at 5 and 10.) In an Autodesk press release announcing its results, Clifford explained:

> Overall, the demand environment in Q4 remained consistent with Q3 with the ***approaching transition from up-front to annual billings for***

4

*multi-year contracts, and a large renewal cohort, providing a tailwind to billings and free cash flow*.

(**Statement 1**, *id*. ¶ 66) (emphasis selectively supplied). FCF, a non-GAAP (generally accepted accounting principle) measure, was important to Autodesk and investors. The metric allowed for "greater transparency" and many investors based their valuation work around Autodesk's ability to meet that target. (**Statement 2**,[2] *id*. ¶¶ 69, 74.)

Autodesk's press release also announced its guidance for the following fiscal year (FY24), which Autodesk predicted to be a trough year with a steep decline in Autodesk's FCF at a range of "$1,150–$1,250" million. (**Statement 3**, *id*. ¶¶ 78–80.) On an earnings call held the same day, Clifford explained:

> We expect free cash flow to be between $1.15 billion and $1.25 billion. The midpoint of that range, $1.2 billion, *implies a 41% reduction in free cash flow* compared to fiscal 2023. As I outlined earlier, the *key drivers of that reduction are changes in long-term deferred revenue as a result of the shift to annual billings for multiyear customers* and a smaller multiyear renewal cohort, FX and our cash tax rate.

(**Statement 4**, Strain Decl., Ex. 25 at 6; ACC ¶ 80) (emphases selectively supplied). Autodesk included those same numbers in an annual report on a Form 10-K filed with the SEC[3] on March 14, 2023, which Anagnost and Clifford certified as true. (**Statements 5 and 7**,[4] *id.* ¶ 83.) The SEC filing also represented that "[p]ayments for product subscriptions, industry collections, cloud

---

[2] **Statement 2** provides: The reported non-GAAP metrics "are useful to investors both because (1) they allow for *greater transparency* with respect to *key metrics used by management in its financial and operational decision-making* and (2) they are used by Autodesk's institutional investors and the analyst community to help them analyze the health of the Company's business. This allows investors and others to better understand and evaluate Autodesk's operating results and future prospects in the same manner as management, compare financial results across accounting periods and to those of peer companies, and to better understand the long-term performance of its core business." (emphasis supplied.)

[3] **Statement 5** provides that "Net cash provided by operating activities" as $2.071 billion, and "capital expenditures" were $40 million.

[4] **Statement 7** includes four statements that Anagnost and Clifford certified in Autodesk's SEC filing that Autodesk's report "does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report" and the like.

United States District Court
Northern District of California

subscriptions, and maintenance subscriptions are typically due up front with payment terms of 30

to 45 days. Payments on EBAs are typically due in annual installments over the contract term,

with payment terms of 30 to 60 days." (**Statement 6**, *id.*)

### 2. Investor Day Conference Call 4Q23 (March 22, 2023)

On a March 22, 2023 Investor Day call, Clifford stated:

> Since then [referring to the Company's previous investor day on
> September 1, 2021], we've been working hard to prepare our back
> office to handle this change in an automated customer-friendly way
> and to work with our channel partners to ensure their readiness for the
> transition. I'm pleased to announce that we're going live next week.
> As we've highlighted before, the switch from upfront to annual
> billings for most multiyear customers creates a significant headwind
> for free cash flow in fiscal '24 and a smaller headwind in fiscal '25.
> Change in deferred revenue increased fiscal '23 free cash flow by
> $790 million, but will reduce fiscal '24 free cash flow by
> approximately $300 million."

(**Statement 8, bullet 1**, ACC ¶¶ 92–95.) Clifford separately assured investors that "the trajectory

remains broadly the same." (**Statement 8, bullet 2**, *id.*)

### 3. Autodesk Announces Record Free Cash Flow for 1Q24 (May 25, 2023)

On May 25, 2023, despite Autodesk's guidance to investors to expect a decline in FCF in

FY24, Autodesk reported a record FCF of $714 million in the first quarter. Clifford explained that:

> Autodesk started the year strongly with rising renewal rates, robust
> free cash flow generation, and revenue toward the top end of our
> guidance range when adjusted for upfront revenue co-termed to later
> in the year. . . . With normal seasonality, peak second quarter currency
> and Russia headwinds, and a strong second-half pipeline of enterprise
> agreements last renewed three years ago in the immediate aftermath
> of the onset of the pandemic, we remain on track to achieve our full-
> year financial goals.

(**Statement 9**, Strain Decl., Ex. 23 at 1; ACC ¶¶ 99, 100.) Autodesk nonetheless doubled down on

its FY24 FCF guidance of $1,150–$1,250 million. (*Id.*) When asked on an earnings call about

what drove the record numbers, Clifford responded:

> So Q1 free cash flow was strong for a couple of reasons. First, ***cash
> collections from the last month of billings in fiscal '23 [January
> 2023] were strong***. Second, we also saw favorable linearity and early
> renewals in Q1 that were driven by the end of multiyear billed
> upfront. And then third, as I mentioned on the call, after the winter

United States District Court
Northern District of California

storms in California, we received a federal tax payment extension for the third quarter.

(**Statement 10**, Strain Decl., Ex. 27 at 10; ACC ¶ 101) (emphasis selectively supplied). In June 2023, Autodesk filed a 10-Q reporting those numbers, and Anagnost and Clifford certified that Autodesk's numbers were accurate. (**Statements 11 and 12**,[5] *id.* ¶ 103.)

### 4. 2Q24 SEC Report on Form 8-K (August 23, 2023)

A few months later, on August 23, 2023, Autodesk filed a report with the SEC on a Form 8-K that disclosed that Autodesk's FCF fell to $128 million for the quarter. (ACC ¶ 104.) Clifford explained that:

> Our sustained momentum in the second quarter, and ***early expansion of some enterprise business agreements expected to renew later in the year***, reduce the likelihood of our more cautious forecast scenarios. . . . Given that, we are raising the lower end of our guidance ranges.

(**Statement 13**, Strain Decl., Ex. 24 at 1; ACC ¶ 104) (emphasis selectively supplied). Once again, Autodesk filed a Form 10-Q containing those numbers, which Clifford and Anagnost certified. (**Statements 14 and 15**,[6] *id.* ¶ 106.)

### 5. 3Q24 SEC Report on Form 8-K and Earnings Call (November 21, 2023)

On November 21, 2023, Autodesk filed a report with the SEC on Form 8-K that revealed Autodesk's FCF for 3Q24 fell to $13 million. (Strain Decl., Ex. 7 at 1.) Clifford responded:

---

[5] **Statement 11** is not a statement from Autodesk, but a summary from plaintiff's lawyers that Autodesk reported its quarterly free cash flow at $714 million. A lawyer's "statement" is not actionable.

**Statement 12** (like statement 5) includes four separate certifications from Anagnost and Clifford that the report "does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report." The pair also certified that the financial statements "fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report."

[6] **Statement 14**, like statement 11, is not a statement from Autodesk, but a summary from plaintiff's lawyers that Autodesk reported free cash flow for the first six months of the year at $842 million. A lawyer's "statement" is not actionable.

**Statement 15** includes the same certifications as statements 5 and 12.

Overall market conditions and the underlying momentum of the business remained similar to the last few quarters. Our financial performance in the third quarter was strong with much of the outperformance coming from larger-than-expected expansions of existing EBAs. . . . Given that, we are raising revenue, earnings per share, and free cash flow guidance.

(*Id.*; ACC ¶ 107.)

On an earnings call later that day, when asked about Autodesk's numbers, Clifford explained that "the ***transition to annual billings*** means that about ***$200 million*** of free cash flow in Q1 fiscal 2024 that came from multiyear contracts build [sic] upfront will not recur in fiscal 2025." (*Id.* ¶ 108.) Clifford advised analysts to "take out the $200 million" in modeling fiscal year 2025 and beyond. (*Id.*) In response to Autodesk's announcement, Autodesk's stock price fell 7% from a close of $217.67 per share to $202.66 per share the next day. (*Id.* ¶ 111.)

On December 4, 2023, Autodesk filed a Form 10-Q with the SEC reporting $855 million in FCF for the first nine months and certifying that they were accurate. (**Statements 16 and 17**,[7] *id.* ¶ 111.)

### 6.  4Q24 SEC Report on Form 8-K and Earnings Call (February 29, 2024)

On February 29, 2024, Autodesk filed a report with the SEC on Form 8-K that announced its results for 4Q24 and the 2024 fiscal year 2024. Like Autodesk had predicted, "[f]ree cash flow decreased to $1.28 billion, compared to $2.03 billion in fiscal 2023." (**Statement 18**, *id.* ¶ 113.) On the accompanying earnings call, Clifford stated that Autodesk's "financial performance in the fourth quarter and for the fiscal year was strong, particularly in our enterprise business." (**Statement 19**, *id.* ¶ 114; Strain Decl., Ex. 9 at 4.) She reminded investors that "the most significant free cash flow headwinds from our transition from upfront to annual billings for multiyear contracts are now behind [Autodesk], which means our free cash flow troughed during fiscal 2024 and will mechanically rebuild over the next few years." (*Id.*) When an analyst asked about FCF and the $200 million benefit from the year prior, Clifford reminded the analyst that

---

[7] **Statement 16**, like statements 11 and 14, is not a statement from Autodesk but a summary from plaintiff's lawyers that Autodesk reported its quarterly free cash flow for the first nine months of the year at $855 million. A lawyer's "statement" is not actionable.

**Statement 17** contains the same certification as statements 5, 12, and 15.

"you have to remove the $200 million in fiscal 2024 *before [Autodesk] stopped selling multiyear contracts up front*." (Strain Decl., Ex. 9 at 15) (emphasis supplied). Clifford's statement was not explicitly limited to EBAs.

### C.    The Audit Committee Investigation

#### 1.    Autodesk Announces a Delay in Filing its Annual Report (April 1, 2024)

On April 1, 2024, Autodesk filed a Form 12b-25, or a notice of late filing an annual report, with the SEC. (ACC ¶ 116.) Autodesk did so because it launched an internal investigation into its FCF and non-GAAP operating margin practices:

> Autodesk, Inc. (the "Company") is unable to file its Annual Report on Form 10-K for the year ended January 31, 2024 (the "Form 10-K") within the prescribed time period, without unreasonable effort or expense. After the Company's earnings release on February 29, 2024, information was brought to the attention of management, which promptly informed the Audit Committee (the "Committee") of the Board of Directors of the Company, that caused the Committee to *commence an internal investigation with the assistance of outside counsel and advisors, regarding the Company's free cash flow and non-GAAP operating margin practices*.

(*Id.* ¶ 117) (emphasis supplied). After Autodesk announced the internal investigation, its stock price dropped 4% from $259.44 to $248.71 the following day. (*Id.* ¶ 118.)

On April 16, 2024, Autodesk filed a report on Form 8-K with the SEC that revealed that Autodesk expected to receive a delinquency notice from Nasdaq about its late Form 10-K. (*Id.* ¶ 119.) In response, Autodesk's stock fell 6%, from $228.24 to a closing price of $214.92. (*Id.* ¶ 120.)

#### 2.    Audit Committee Findings (May 31, 2024)

A few weeks later, on May 31, 2024, Autodesk announced the results of its Audit Committee investigation. Among those findings was that Autodesk pursued multiyear, up-front EBAs to help meet its FY2023 free cash flow goal. Autodesk's management determined that there would be no "restatement or adjustment" to Autodesk's previously reported non-GAAP numbers, including FCF. (ACC ¶ 123.) The Audit Committee found that:

> - The company has historically relied on multiyear contracts with its enterprise and product subscription customers, billed upfront, to help meet its free cash flow targets. *During the relevant period,*

United States District Court
Northern District of California

*the company engaged in programs designed to incentivize customers to accept multiyear upfront billing, renew early, and/or pay before the end of the fiscal year*.

- The Company has **disclosed its practice of incentivizing customers to adopt multiyear upfront billing arrangements**. It has also acknowledged that discounted multiyear upfront contracts reduce revenue and lower billings in out years. Though prior to fiscal year 2024, **the Company did not quantify free cash flow attributable to multiyear upfront billings**, it has noted the contribution of upfront collections to fluctuations in the Company's quarterly reported long-term deferred revenue.

- During fiscal year 2022, the Company announced that it had begun to shift enterprise customers to contracts billed annually, and that it had assumed fiscal 2023 enterprise contracts would be billed annually. **The Company subsequently determined, however, to pursue multiyear upfront contracts with enterprise customers to help meet its fiscal year 2023 free cash flow goal**. Upfront billings of enterprise customers in fiscal year 2023 **substantially exceeded historical levels**, helping the Company to meet its lowered annual free cash flow target.

- In addition, during the relevant period, certain decisions regarding discretionary spending, collections, and accounts payable were informed by their anticipated effects on the company's external free cash flow and/or non-GAAP operating margin targets. The resulting actions generally served to reduce reported free cash flow and/or lower reported margin in the current period. **Though free cash flow was one factor in the company's executive compensation program, these decisions were not calculated to influence compensation outcomes**.

(ACC ¶ 125) (emphases selectively supplied). Autodesk clarified that "multiyear upfront billings of enterprise customers in fiscal year 2024 was substantially lower than fiscal years 2022 and 2023." (*Id.* ¶ 126.) Finally, the report disclosed that Debroah Clifford would transition roles from Chief Financial Officer to Chief Strategy Officer. (*Id.* ¶ 124.)

This litigation ensued.

### D.    Procedural Posture

On July 10, 2024, after many plaintiffs filed similar lawsuits against Autodesk, this Court appointed lead plaintiff. On September 16, 2024, lead plaintiff then filed an amended class action complaint (Dkt. No. 48) which defendants moved to dismiss. That motion is now pending before the Court.

10

1    **II.    LEGAL STANDARD**

2        A motion to dismiss under Rule 12(b)(6) tests the legal sufficiency of the claims alleged in

3    the complaint. *Ileto v. Glock, Inc.*, 349 F.3d 1191, 1199–1200 (9th Cir. 2003). The standard is well

4    known and not in dispute.

5    **III.    SECTION 10(B) OF THE EXCHANGE ACT AND RULE 10(B)-5**

6        **A.    Legal Framework**

7        Section 10(b) of the Securities and Exchange Act, 15 U.S.C. § 78j(b), makes it unlawful

8    for any person to "use or employ, in connection with the purchase or sale of any security . . . any

9    manipulative or deceptive device or contrivance in contravention of such rules and regulations as

10   the Commission may prescribe . . . ." Rule 10b–5 builds upon Section 10(b) by making it unlawful

11   to "make any untrue statement of a material fact or to omit to state a material fact necessary in

12   order to make the statements made, in the light of the circumstances under which they were made,

13   not misleading." 17 C.F.R. § 240.10b–5(b). Moreover, under the Exchange Act, any person who

14   "directly or indirectly, controls any person liable under any provision of [the Exchange Act] or of

15   any rule or regulation thereunder shall also be liable jointly and severally with and to the same

16   extent as such controlled person to any person to whom such controlled person is liable." 15

17   U.S.C. § 78t(a).

18       To state a claim under Section 10(b), a plaintiff must "show that the defendant made a

19   statement which was '*misleading* as to a *material* fact.'" *Matrixx Initiatives, Inc. v. Siracusano*,

20   563 U.S. 27, 38 (2011) (emphasis in original) (quoting *Basic Inc. v. Levinson*, 485 U.S. 224, 238

21   (1988)). Under the Private Securities Litigation Reform Act ("PSLRA's") heightened pleading

22   requirement, to state a Section 10(b) claim, a plaintiff must allege facts sufficient to establish: (i)

23   that the defendant made a material misrepresentation or omission of fact; (ii) that the

24   misrepresentation was made with scienter; (iii) a connection between the misrepresentation or

25   omission and the purchase or sale of a security; (iv) reliance on the misrepresentation or omission;

26   (v) loss causation; and (vi) economic loss. *Metzler Inv. GMBH v. Corinthian Colleges, Inc.*, 540

27   F.3d 1049, 1061 (9th Cir. 2008). In 1995, Congress enacted PSLRA, which includes "exacting

28   pleading requirements," as a check against abusive litigation by private parties. *Tellabs, Inc. v.*

United States District Court
Northern District of California

11

1    *Makor Issues & Rts., Ltd.*, 551 U.S. 308, 313 (2007). The PSLRA requires that the complaint

2    specify each statement alleged to be misleading and the reason or reasons it was misleading. *Id.* at

3    1070. With respect to the scienter requirement, the Court must view the allegations as a whole and

4    determine whether plaintiff have raised an inference of scienter that is "cogent and compelling,

5    thus strong in light of other explanations," to satisfy the PSLRA standard. *S. Ferry LP, No. 2 v.*

6    *Killinger*, 542 F.3d 776, 784 (9th Cir. 2008) (citing *Tellabs*, 551 U.S. at 326).

           **B.    Discussion**

8         Defendants move to dismiss the complaint because plaintiff's allegations do not satisfy the

9    first (materially misleading statements or omissions), second (scienter), and fifth (loss causation)

10   elements of the claim. The Court addresses each.

           **1.    False or Misleading Statements**

12        Plaintiff alleges that defendants made nineteen materially misleading statements or

13   omissions in Autodesk's SEC filings (including Form 8-Ks, incorporated press statements, Form

14   10-Qs, and Form 10-Ks) and in communications with investors (like earnings calls, investor

15   conferences) during the class period. Boiled down, plaintiff alleges that Autodesk's financial

16   reporting was misleading by omission because Autodesk did not disclose that it had entered

17   upfront, multiyear EBAs in FY23 and FY24, so investors who assumed that Autodesk retired

18   those agreements were materially misled by Autodesk's inflated FCF and the associated health of

19   the business.

           *a.  Legal Standard: Misleading Statements and Omissions*

21        In the securities fraud context, statements and omission are false or misleading if they

22   "directly contradict what the defendant knew at that time," *Khoja v. Orexigen Therapeutics, Inc.*,

23   899 F.3d 988, 1008 (9th Cir. 2018), or "create an impression of a state of affairs that differs in a

24   material way from the one that actually exists." *Brody v. Transitional Hosps. Corp.*, 280 F.3d 997,

25   1006 (9th Cir. 2002). A defendant does not have an "affirmative duty to disclose any and all

26   material information." *Matrixx Initiatives, Inc.*, 563 U.S. at 44. Disclosure becomes mandatory

27   only when necessary to ensure that a statement is "not misleading." *Id.* In this way, "[e]ven with

28   respect to information that a reasonable investor might consider material, companies can control

United States District Court
Northern District of California

what they have to disclose . . . by controlling what they say to the market. *Id.* at 45. A misrepresentation or omission is material if "there is a substantial likelihood that a reasonable investor would have acted differently if the misrepresentation had not been made or the truth had been disclosed." *Livid Holdings Ltd. v. Salomon Smith Barney, Inc.*, 416 F.3d 940, 946 (9th Cir. 2005).

                *b.  Categories of Statements*

                    *i.  Explanatory Statements About Autodesk's FY23 and FY24 Results (Statements 1, 2, 9, and 10)*

       The first category of identified statements includes Autodesk's explanatory statements about its financial performance in FY23 and FY24. Statement 1 explains that Autodesk reached its reported $2.03 billion in FCF for FY23 because "the demand environment in Q4 remained consistent with Q3 with the approaching transition from up-front to annual billings for multi-year contracts, and a large renewal cohort, providing a tailwind to billings and free cash flow." **(Statement 1**, ACC ¶¶ 66–68.) Statement 9 discloses that Autodesk's FCF was $714 million in 1Q24 because it "started the year strongly with rising renewal rates, robust free cash flow generation, and revenue toward the top end of our guidance range . . . [w]ith normal seasonality, peak second quarter currency and Russia headwinds, and a strong second-half pipeline of enterprise agreements last renewed three years ago in the immediate aftermath of the onset of the pandemic." (**Statement 9**, *id.* ¶ 99.) Statement 10 explains Autodesk's strong FCF numbers in Q1. (**Statement 10**, *id.* ¶ 101 ("So Q1 free cash flow was strong for a couple of reasons. First, cash collections from the last month of billings in fiscal '23 were strong. Second, we also saw favorable linearity and early renewals in Q1 that were driven by the end of multiyear billed upfront. And then third, as I mentioned on the call, after the winter storms in California, we received a federal tax payment extension for the third quarter."))

        Autodesk contends that its explanatory statements cannot be misleading because they are factually true and Autodesk did not have a duty to disclose the disputed information about EBA billing. Plaintiff argues that Autodesk's statements were misleading by omission because Autodesk explanation did not include a key reason why Autodesk hit its FCF target: multiyear, upfront EBAs. Although Autodesk does not have a duty to disclose all material business

United States District Court
Northern District of California

information, that duty attaches where Autodesk's statements are misleading or create a misimpression amongst investors. *Matrixx Initiatives, Inc.*, 563 U.S. at 44. Plaintiff must explain, then, how Autodesk's prior statements opened the door to create a duty to disclose Autodesk's EBA deals and billing practices. The ACC fails to do so.

Beginning on August 25, 2021, Autodesk informed investors that it would shift *more* EBA customers from multiyear, upfront contracts to annual billing, which Autodesk *assumed* would happen in FY23. According to plaintiff, the (unspecified) proceeds from those deals inflated Autodesk's reported FCF because investors assumed recurring annual, not upfront, multiyear billing. Until Autodesk published the Audit Committee's findings, Autodesk did not disclose that it pursued "historic levels" of upfront billing for enterprise customers in FY23 to "meet its lowered annual free cash flow target." (*Id.* ¶ 125.)

Plaintiff further alleges that Autodesk's omission was material because Autodesk held out FCF as a "key" metric that would help investors "better understand and evaluate Autodesk's operating results." **(Statement 2**, *id.* ¶¶ 73–77.) Other than the supposed omission, plaintiff does not allege that the statements it identifies are false.

The Court finds that Autodesk's explanatory statements were not materially misleading by omission. Autodesk's prior statements did not squarely open the door such that Autodesk was required to disclose *all* changes that it made to EBA billing. Autodesk's prior statements disclosed that it would shift "more" EBA customers to annual billing. Autodesk did not provide a date certain, volume, concrete numbers, or other details of its performance by customer type or deal arrangement. *See In re Alphabet, Inc. Sec. Litig.*, 1 F.4th 687 (9th Cir. 2021) ("Such statements rise to the level of materially misleading statements only if they provide 'concrete description of the past and present' that affirmatively create a plausibly misleading impression . . . .'"). Nor does plaintiff explain how Autodesk's statements about the upcoming billing shift render misleading *any* statement that explains Autodesk's financial position but does mention EBAs. Although Autodesk states that its upfront EBAs "helped meet" its FCF goals, plaintiff do not plead the amount or suggest that those deals would be a major factor worthy of inclusion in the explanatory statements. Elsewhere plaintiff's allegations suggest the opposite—that Autodesk predicted a

1    minor impact (around one percentage point) to its billing guidance.

2        Moreover, plaintiff does not allege facts that suggest a reasonable investor would have

3    acted differently had Autodesk disclosed the EBA billing information. Autodesk consistently

4    disclosed that it expected the following fiscal year to be a "trough" year and had predicted a more

5    cautious (i.e. lower) FCF guidance range for FY24 than reality. Against this backdrop, a slight

6    billing change, coupled with Autodesk's previous disclosure that it expected a trough year, is

7    unlikely to have "significantly altered the total mix of information available." *See In re Intel Corp.*

8    *Sec. Litig.*, 2019 WL 1427660, at *8 (N.D. Cal. Mar. 29, 2019).

9        The ACC does not adequately plead that Autodesk's explanatory statements (**Statements**

10   **1, 2, 9, and 10**) are materially misleading or misleading by omission.

11                    ii.    *Factually True Statements Disclosing Financial Results (Statements 5, 11,*
                            *14, 16, and 18)*
12
     The second category of misleading statements involves Autodesk's reporting of its
13
     financial performance and free cash flow in fiscal years 2023 and 2024.
14
         Defendants argue that Autodesk's statements about FY23 and FY24 are not materially
15
     misleading because those figures are accurate, forward-looking statements protected by the safe
16
     harbor. (**Statements 5, 11, 14, 16, 18**.) Plaintiff contends that Autodesk's guidance was
17
     misleading because those figures included upfront, multiyear EBAs without disclosing those deals.
18
         Plaintiff takes aim at several of Autodesk's FCF figures for FY24. (Statement 5, ACC ¶¶
19
     83–84, FCF at $2.03 billion; Statement 11, *id.* ¶ 103, 1Q24 at $714 million; Statement 14, *id.* ¶
20
     106, FCF at $842 million; Statement 16, *id.* ¶ 112, FCF at $855 million; Statement 18, *id.* ¶ 112,
21
     FCF at $1.28 billion; Statement 19, *id.* ¶ 114, reporting "strong" financial performance.) Plaintiff
22
     argues that Autodesk's FCF numbers reported in Statements 11, 14, 16, 18, and 19 are false and
23
     misleading because Autodesk inflated its FCF to meet its FY23 and FY24 FCF goals to the
24
     detriment of Autodesk's following years. The Court finds that those statements, as alleged, are not
25
     materially misleading for the same reasons the prior statements were not materially misleading.
26
     Plaintiff has not plead sufficient facts under the PSLRA to explain why those numbers are false, so
27
     the statements cannot mislead.
28

United States District Court
Northern District of California

The ACC does not adequately plead that Autodesk's financial statements (**Statements 5, 11, 14, 16, 18**) are not materially misleading by omission.

> iii.    *Statements to Investors About Financial Modeling (Statement 19)*

Plaintiff also takes aim at Autodesk's guidance and financial-modeling statements for FY24. (**Statement 19**, ACC ¶ 114 (investors should "exclu[de] $200 million from fiscal '24 cash flow from multiyear upfront billing, which are now billed annually").) That statement is not materially misleading for the same reasons previously described. Plaintiff does not plead allegations that suggest that the statement is false. It also is not materially misleading because the statement is not limited to billing from EBAs—the number could also include billing from product subscriptions.

The ACC does not adequately plead that that statement 19 is misleading by omission.

> iv.    *Sarbanes-Oxley Act Certifications in SEC Filings (Statements 7,12, 15, and 17)*

Plaintiff also challenges statements found in Autodesk's SEC filings that certify that the information contained in those filings is accurate.

Defendants argue that the Sarbanes-Oxley Act certifications (**Statements 7, 12, 15, and 17**) rise or fall with the underlying allegations. *Intel*, 2023 WL 2767779, at *6 n.3 ("Because . . . Plaintiffs' theory of falsity for the SOX certification is predicated on the falsity of other challenged statements in Intel's . . . 10-K, the certification will rise or fall with those other statements."). As the underlying claims fail, (Statements 5, 11, 14, and 16), so too the Sarbanes-Oxley Act Certifications.

> v.    *Statements about EBA Billing*

Defendants argue that **Statement 6**, from Autodesk's March 14, 2023 Form 10-K which states that "[p]ayments on EBAs are typically due in annual installments over the contract term, with payment terms of 30 to 60 days," is not materially misleading in light of plaintiff's own allegations that *most* EBAs were billed annually. (ACC ¶ 48.) Plaintiff attempts to skirt the argument by vaguely waving at other statements and Autodesk's general trajectory. The Court finds that plaintiff has not plead sufficient facts under the PSLRA to explain why this statement is

United States District Court
Northern District of California

misleading.

### vi.     Statements about Product Subscriptions

Defendants argue that **Statement 8** is not materially misleading because that statement

relates to product subscriptions remaining "broadly on track," *not* EBAs. Plaintiff disagrees and

argues that the context of Clifford's statement indicates that she was referring to both EBAs and

product subscriptions.

**Statement 8** is from a March 22, 2023 Investor Day conference call. Clifford stated:

> Since then [referring to the Company's previous investor day on September 1, 2021], we've been working hard to prepare our back office to handle this change in an automated customer-friendly way and to work with our channel partners to ensure their readiness for the transition. I'm pleased to announce that we're going live next week. As we've highlighted before, the switch from upfront to annual billings for most multiyear customers creates a significant headwind for free cash flow in fiscal '24 and a smaller headwind in fiscal '25. Change in deferred revenue increased fiscal '23 free cash flow by $790 million, but will reduce fiscal '24 free cash flow by approximately $300 million.
> . . .
>
> We set out the net effect of all this at our last Investor Day and the trajectory remains broadly the same.

(ACC ¶¶ 92, 94–95.) Neither party provided the Court with the transcript from this conference.

From the context of this statement, and that the September 1, 2021 investor call announced

Autodesk's product subscription transfer to annual billing, the Court agrees with defendants that on

its face, this statement related to product subscriptions, not EBAs, and thus plaintiff has not

sufficiently alleged that the statement is materially misleading.[8]

### c.     Safe Harbor (Statements 3, 4, 9, 10 and 13)

The final category of Autodesk statements involves forward-looking statements that may

be protected by the PSLRA safe harbor.

Defendants argue that several of the "misleading" statements that plaintiff identifies from

---

[8] The Court also notes that the statement "we're going live next week" refers to product subscriptions, not EBAs. Given the timing of this statement (March 2023) after the close of FY23, suggesting that annual billing EBAs were not yet live would undermine plaintiff's complaint.

17

Autodesk's SEC filings are forward-looking, business-plan statements, which are protected by the safe harbor. Here, "even if a statement is objectively false or misleading, the PSLRA provides a safe harbor for forward-looking statements if such statements are either identified as forward-looking and accompanied by a meaningful cautionary statement, or if the plaintiff fails to show that the statement was made with actual knowledge that it was false or misleading." *Weston Fam. P'ship LLLP v. Twitter, Inc.*, 29 F.4th 611, 620 (9th Cir. 2022).

Defendants proffer that the safe harbor protects the following statements:

> **Statements 3, 4:** February 23, 2023 Form 8-K statement and earnings call for 4Q23 and FY23 projecting that "FY24 Guidance Metrics" included free cash flow (in millions) of "$1,150 - $1,250," (ACC ¶¶ 78–79), because of a projected "shift to annual billings for multiyear customers, and a smaller multiyear renewal cohort, FX and our cash tax rate." (*Id.* ¶ 80).

> **Bullet 3 of Statements 9, 10:** May 25, 2023 Form 8-K and earnings call statements that Autodesk "expects cash flow to be between $1.15 billion and $1.25 billion." (ACC ¶¶ 99, 100.)

> **Statement 13:** August 23, 2023 Form 8-K statement that free cash flow guidance was "$1,170 - $1,250" million, (ACC ¶ 105) and discussion that "early expansion of some enterprise business agreements expected to renew later in the year, reduce the likelihood of our more cautious forecast scenarios." (*Id.* ¶ 104.)

The Court agrees with defendants that the statements identified above are forward-looking and fall squarely within the Exchange Act's safe harbor. *Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.*, 759 F.3d 1051, 1058 (9th Cir. 2014) ("[C]lassic growth and revenue projections . . . are forward-looking on their face."); *Wochos v. Tesla, Inc.*, 985 F.3d 1180, 1191 (9th Cir. 2021) (Forward looking statements expressly includes 'statement[s] of the *plans and objectives* of management for future operations'" and "statement[s] of the *assumptions* underlying or relating to those plans and objectives.")(emphasis in original). Moreover, those statements were accompanied by meaningful cautionary language that identifies "important factors that could cause actual results to differ materially from those in the forward-looking statement[s]" like the safe harbor requires. (*See* Strain Decl., Ex. 10 at 5, 9; Ex. 23 at 4, 8; Ex. 24 at 4, 8 ("This press release contains forward-looking statements that involve risks and uncertainties[.]"); Ex. 25 at 2; Ex. 26 at 2; Ex. 27 at 2 ("we may make forward-looking statements" during the call or presentation); Ex. 28 at 21; Ex. 1 at 20

18

(noting risks, including failure to produce sufficient "cash flow growth").

In sum, the Court finds that the ACC does not adequately plead that **any** of the statements identified are materially misleading or misleading by omission.

### 2. Scienter

To plead scienter, plaintiff's complaint must "state with particularity facts giving rise to a *strong inference* that the defendant acted with the required state of mind." 15 U.S.C. § 78u–4(b)(2)(A) (emphasis supplied). "The inference that the defendant acted with scienter need not be irrefutable, *i.e.*, of the 'smoking gun' genre, or even the 'most plausible of competing inferences.'" *Tellabs*, 551 U.S. at 324 (citation omitted). Rather, a complaint survives if, when "the allegations are accepted as true and taken collectively . . . a reasonable person [would] deem the inference of scienter at least as strong as any opposing inference." *Id.* at 326. In determining whether that requirement is met, the Court must view the allegations as a whole and determine whether plaintiff has raised an inference of scienter that is "cogent and compelling, thus strong in light of other explanations," to satisfy the PSLRA standard. *S. Ferry LP*, 542 F.3d at 784 (quoting *Tellabs*, 551 U.S. at 324).

When analyzing the allegations holistically, the Court views circumstances that are probative of scienter with a practical and common-sense perspective. *Id.* Courts must "compare the malicious and innocent inferences cognizable from the facts pled," and allow the complaint to survive only "if the malicious inference is at least as compelling as any opposing innocent inference." *Nguyen v. Endologix, Inc.*, 962 F.3d 419 (9th Cir. 2020). The inference must be that the defendant "made false or misleading statements either *intentionally* or with *deliberate recklessness*." *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 991 (9th Cir. 2009) (emphases supplied) (internal quotation marks omitted). The PSLRA also demands "particular allegations which strongly imply Defendants' *contemporaneous* knowledge that the statement was false when made." *Berson v. App. Signal Tech., Inc.*, 527 F.3d 982, 989 (9th Cir. 2008) (emphasis in original).

Plaintiff argues that the Court can infer scienter holistically from the following allegations: Anagnost and Clifford announced the annual billing changes in 2021; Anagnost and Clifford held

19

roles at Autodesk that touched FCF; Clifford was responsible for Autodesk's financial statements; a Bloomberg article reported that employees warned "senior executives" about strategic risks in continuing to book upfront deals; Anagnost and Clifford's compensation "heavily weighted revenue and free cash flow"; Autodesk shuffled Clifford from CFO to Chief Strategy Officer shortly after the audit committee investigation; and Anagnost and Clifford both stated on investor calls that the upfront billings shift was a priority for Autodesk. (ACC ¶¶ 134–146.) Defendants respond that those allegations are insufficient for the Court to infer scienter and respond by highlighting what plaintiff has not alleged: no documents or witnesses that corroborate Anagnost or Clifford's state of mind, no clear or identified motive, and no identifying SEC filings, investor statements, news articles, or audit committee findings that reveal Anagnost or Clifford's state of mind. Defendants argue that plaintiff's scienter allegations, considering plausible opposing inferences, are equally consistent with innocent conduct. In light of PSLRA's exacting pleading requirements, the Court finds that plaintiff fails to plead scienter.

*CWs and Internal Documents*. Defendants argue that plaintiff's lack of confidential witnesses (CWs) and internal documents undermines an inference of scienter. Plaintiff correctly responds that CWs are not a requirement to plead scienter. Although allegations from confidential witnesses are not necessary, *see In re Alphabet, Inc. Sec. Litig.*, 1 F.4th 687, 707 (9th Cir. 2021), they are helpful. *Carr v. Zosano Pharma Corp.*, 2021 WL 3913509 (N.D. Cal. Sept. 1, 2021) ("Plaintiffs fail to include any allegations against Defendants from confidential witnesses or former Zosano employees. As a result, their complaint lacks notable features that tend to be hallmarks of a potentially viable securities claim.") (internal quotations omitted). Cases without corroborating witnesses or documents must include stronger allegations elsewhere to satisfy PSLRA. In *In re Alphabet*, for instance, the Ninth Circuit revived a Section 10(b) claim where plaintiffs had alleged with particularity that senior executives received and reviewed a memo disclosing a material security threat before those same executives failed to disclose that security vulnerability in a 10-Q statement they signed afterwards. 1 F.4th at 706. Plaintiff does not include those sort of allegations here.

*Motive.* Defendants next argue that plaintiff's lack of motive undermines scienter. Without

a motive, plaintiff faces "a substantial hurdle in establishing scienter." *Prodanova v. H.C. Wainwright & Co., LLC*, 993 F.3d 1097 (9th Cir. 2021). Plaintiff argues that Anagnost and Clifford were motivated by their stock-based compensation that "heavily weighed FCF." (Oppo. at 15 n. 14; ACC ¶ 140.) Plaintiff does not allege with particularity how Anagnost and Clifford's stock-based compensation was set, or how that contemporaneously influenced their decisions. (*Id.*) Although plaintiff generically cites to the Audit Committee to support its motive allegations, the Committee found that "[t]hough free cash flow was one factor in the company's executive compensation program, these decisions were not calculated to influence compensation outcomes." (ACC ¶ 128) (emphasis supplied). Plaintiff's allegations regarding executive compensation do not support an inference of scienter. *In re Rigel Pharms., Inc. Sec. Litig.*, 697 F.3d 869, 884–85 (9th Cir. 2012) (under the holistic approach, routine executive compensation based on company performance does not support an inference of scienter).

       ***Audit Committee Findings and Access to Facts Argument.*** Plaintiff argues that the Audit Committee findings implicate Anagnost and Clifford because the Committee conceded that Autodesk's "processes around financial communications and disclosures and its internal controls related to [Autodesk's] practices around free cash flow", which Anagnost and Clifford controlled, "were lacking." (ACC ¶ 141.) Plaintiff also alleges that Anagnost and Clifford controlled FCF and other financial targets, making in "implausible that they did not direct, execute, or have knowledge of these significant upfront EBAs." (Oppo. at 15.) Defendants (correctly) respond that the Audit Committee findings mention neither Anagnost and Clifford, nor their state of mind, and do not support an inference of scienter.

       Plaintiff's argument that Anagnost and Clifford, by virtue of their positions as CEO and CFO respectively, must have known about the continued upfront EBAs *and* that investors would be misled if those deals were not disclosed fails to persuade. Plaintiff does not plead facts that show that the transition from upfront to annual billing was central to, or the key component of, Autodesk's business, which is required to presume knowledge. *Okla. Firefighters Pension & Ret. Sys. v. Snap Inc.*, 2024 WL 5182634 (9th Cir. Dec. 20, 2024) (strong inference that the Chief Business Officer knew of contrary information where it related to a majority of the advertising

company's revenue); *Azar v. Yelp, Inc.*, 2018 WL 6182756 (N.D. Cal. Nov. 27, 2018) (strong inference that top management knew of problems with a program that accounted for 70% of advertising revenue). Here, plaintiff does not allege that multi-year, upfront EBAs comprise a large part of Autodesk's business—or even of EBAs generally. (ACC ¶ 48.) On the contrary, plaintiff alleges that Clifford estimated that the EBA transition to annual billing would be "around 1 percentage point of impact to the total billings outlook." (*Id.*) The Court cannot presume from the facts alleged that Anagnost and Clifford knew about upfront EBA deals at the time of the statements, or that those deals posed "a danger of misleading" investors. *Zucco*, 552 F.3d at 991.

**Clifford's New Leadership Role.** Plaintiff next claims that the timing of the Audit Committee's findings, which included an announcement of Clifford's new role as Chief Strategy Officer, is suspicious and supports an inference of scienter. Defendants argue the opposite: that it would be implausible to keep Clifford in a leadership role had she been responsible for, and known about, fraud. *See Rok v. Identiv, Inc.*, 2017 WL 35496 (N.D. Cal. Jan. 4, 2017), *aff'd Cunningham v. Identiv*, Inc., 716 F. App'x 663 (9th Cir. 2018) (holding that a defendant's "transition to another high-level position does not support an inference of scienter."); *In re NVIDIA Corp. Sec. Litig.*, 768 F.3d 1046, 1063 (9th Cir. 2014) (declining to find scienter on the basis of executive departures in part because "two of the three individuals remained at NVIDIA in some type of advisory role"); *City of Westland Police & Fire Ret. Sys. v. Sonic Sols.*, 2009 WL 942182, at *9 (N.D. Cal. Apr. 6, 2009) (rejecting inference of scienter because CFO's role change to COO after investigation did not show that "the Board moved [him] from one top management position to another top management position because he engaged in fraud"). Plaintiff cites *In re Marvell Technology Group Ltd. Securities Litigation* in support of its inference, but there, the Chief Operating Officer was demoted to a director position, ordered to return backpay, and forced to cancel stock options, which *collectively* gave rise to an inference of scienter. 2008 WL 4544439, at *7 (N.D. Cal. Sept. 29, 2008). Plaintiff has not plead any facts of that sort here. The Court agrees with defendants that Clifford's leadership position change does not support an inference of scienter.

**The Bloomberg Article**. Plaintiff cites a Bloomberg Article that in turn cites (but does not

22

1 | disclose) unreported internal documents that reveal that "employees warned executives about the

2 | strategic risk [of EBAs] in early 2022, but the company continued to book such deals at least until

3 | the fiscal year ending in January 2024." (ACC ¶ 82.) Defendants argue that the Bloomberg Article

4 | mentions unnamed senior executives—not Anagnost and Clifford—and does not convey anything

5 | about Anagnost and Clifford's state of mind. The Court again agrees with defendants. Although

6 | the article could refer to Anagnost and Clifford, it is also plausible that the term refers to other

7 | senior executives at Autodesk.

8 |        Taken together, plaintiff's allegations do not support a strong inference of scienter. No

9 | allegation shows defendants' "*contemporaneous* knowledge that the statement was false when

10 | made." *Berson*, 527 F.3d at 989 (emphasis in original). Although plaintiff's allegations are

11 | plausible, those allegations are not "at least as compelling as any opposing inference of non-

12 | fraudulent intent." *Tellabs*, 551 U.S. at 314. A competing (more practical) inference to draw from

13 | the alleged facts is that Clifford and Anagnost were unaware that Autodesk continued to execute

14 | upfront EBAs, or did not know that omitting that information might mislead investors, in part

15 | because upfront EBAs were small in number and comprised a small percentage of Autodesk's

16 | FCF. Had the opposite been the case, the Audit Committee may have released a different report,

17 | Clifford and Anagnost could have faced compensation-based repercussions or been terminated

18 | altogether. Accordingly, the Court finds that plaintiff fails to plead scienter and will **GRANT**

19 | defendants' motion to dismiss with leave to amend.

20 | ### 3. Loss Causation

21 |        To provide the parties a complete analysis, the Court will analyze plaintiff's loss causation

22 | allegations despite granting defendants' motion to dismiss.

23 |        To allege loss causation, plaintiff "must plausibly allege that the defendant's fraud was

24 | '*revealed* to the market and *caused* the resulting losses.'" *Loos v. Immersion Corp.*, 762 F.3d 880,

25 | 887 (9th Cir. 2014). "Loss causation thus focuses on whether a loss can be attributed to "'the very

26 | facts about which the defendant lied.'" *Wochos v. Tesla, Inc.*, 985 F.3d 1180, 1197 (9th Cir. 2021)

27 | (quoting *Mineworkers' Pension Scheme v. First Solar, Inc.*, 881 F.3d 750, 753 (9th Cir. 2018) (per

28 | curiam) (citation omitted).) "A complaint sufficiently alleges loss causation when it contains

*United States District Court*
*Northern District of California*

23

enough fact to raise a reasonable expectation that discovery will reveal evidence of loss causation." *In re Splunk, Inc. Secs. Litig.*, 592 F.Supp.3d 919, 950 (N.D. Cal. 2022) (internal cites omitted).

Plaintiff argues that defendants' fraud caused three separate corrective events: (1) on November 21, 2023 when Autodesk reported the lowest quarterly FCF in five years and informed analysts to remove $200 million from their FY25 models causing Autodesk's stock to drop 6.9%; (2) on April 1, 2024 when Autodesk announced that its 10-K would be delayed because of the Audit Committee investigation causing the stock to decline 4%; and (3) on April 16, 2024 when Autodesk disclosed that its investigation was ongoing and that Autodesk would file its 10-K as soon as possible, causing the stock to drop 6%. Defendants argue that plaintiff has not pled loss causation because Autodesk's stock quickly recovered and related to internal investigations. The Court considers each argument.

*November 21, 2023.* Defendants argue that Autodesk's November 21, 2023 report and announcement cannot form the basis for plaintiff's loss causation argument because Autodesk's stock rebounded within days after the announcement and remained above the November 21 price until Autodesk announced the Audit Committee investigation. "[W]here, for example, a modest drop in the stock price coincides with the disclosure of certain news but then recovers very shortly after, the allegation of loss causation may be insufficient." *Metzler*, 540 F.3d at 1064–65. The Ninth Circuit recently rejected a similar loss causation argument in *Wochocs v. Tesla*, where Tesla's stock rebounded from a modest drop between October 6 and October 10. 985 F.3d at 1198. The Court finds that this event alone is not enough to plead loss causation.

*April 1 and 16, 2024.* Defendants argue that Autodesk's announcement of a delayed 10-K and Audit Committee investigation announcements into "free cash flow and non-GAAP operating margin practices" were not sufficient to plead loss causation. They argue that the investigation could have pertained to any issue and an announcement alone, without subsequent disclosure of actual wrongdoing, is not enough to plead loss causation. *Loos*, 762 F.3d at 890, n. 3. ("We do not mean to suggest that the announcement of an investigation can *never* form the basis of a viable loss causation theory. . . we merely hold that the announcement of an investigation, standing alone

and without any subsequent disclosure of actual wrongdoing, does not reveal to the market the pertinent truth of anything, and therefore does not qualify as a corrective disclosure.") Like in *Lloyd v. CBN Financial Corporation*, plaintiff alleges more than Autodesk's investigation announcement alone. 811 F.3d 1200, 1210 (9th Cir. 2016). Here, plaintiff alleges that a few months prior, Autodesk instructed investors to reduce their FCF expectations and the Audit Committee later disclosed that Autodesk had continued to execute upfront, multiyear EBAs. At this stage, plaintiff need only demonstrate facts evidencing a plausible theory of loss causation.

## IV.   RULE 10B-5(A) OR (C)

To allege a violation of Rule 10b–5(a) and (c), a plaintiff must allege the same elements as a Rule 10b–5(b) claim, but plaintiff's scheme liability claim cannot be based solely on false or misleading statements. Instead, it must instead involve deceptive conduct "beyond those misrepresentations or omissions." *WPP Luxembourg Gamma Three Sarl v. Spot Runner, Inc.*, 655 F.3d 1039, 1057 (9th Cir. 2011).

Plaintiff's claim fails on two grounds. First, plaintiff did not plead the underlying elements of a Rule 10b-5(b) claim. Second, plaintiff did not plead with particularity any sort of scheme liability separate from the misleading statements. *In re Nektar Therapeutics*, 2020 WL 3962004, at *13–14 (N.D. Cal. July 13, 2020).

Accordingly, the Court **GRANTS** defendants' motion to dismiss the scheme liability on this ground.

## V.   SECTION 20(A) OF THE SECURITIES AND EXCHANGE ACT

"Section 20(a) of the Securities Exchange Act of 1934 provides for liability of a 'controlling person.'" *In re NVIDIA*, 768 F.3d at 1052 (quoting 15 U.S.C. § 78t(a)). "To establish a cause of action under this provision, a plaintiff must first prove a primary violation of underlying federal securities laws, such as Section 10(b) or Rule 10b-5, and then show that the defendant exercised actual power over the primary violator." *Id.* (citation omitted). A claim under Section 20(a) can survive only if the underlying predicate Exchange Act violation also survives. *See City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*, 856 F.3d 605, 623 (9th Cir. 2017). "Section 20(a) claims may be dismissed summarily . . . if a plaintiff fails to adequately

United States District Court
Northern District of California

1  plead a primary violation of section 10(b)." *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d

2  981, 990 (9th Cir. 2009).

3          Although, plaintiff alleges that Anagnost and Clifford are control persons, (ACC ¶¶ 158–

4  159), plaintiff's claim rises or falls with its underlying Section 10(b) or Rule 10b-5 claims. The

5  Court thus **GRANTS** defendants' motion to dismiss with leave to amend.

6  **VI.     CONCLUSION**

7          For the reasons stated above, the Court **GRANTS** defendants' motion to dismiss the

8  amended class action complaint. Plaintiff may file an amended complaint within twenty-one (21)

9  days of the date of this Order. Plaintiff shall comply with paragraph 13 of this Court's Standing

10  Order. Defendants shall file their response within 21 days after the filing.

11          Parties shall not re-assert grounds which have been resolved or which could have been

12  brought in the first instance. Fed. R. Civ. P. 12(g), (h).

13          This terminates Dkt. Nos. 54, 55.

14          **IT IS SO ORDERED.**

15  Dated: July 18, 2025

16
17                                              **YVONNE GONZALEZ ROGERS**
                                                **UNITED STATES DISTRICT COURT JUDGE**
18
19
20
21
22
23
24
25
26
27
28