1   ROBBINS GELLER RUDMAN
    & DOWD LLP
2   SHAWN A. WILLIAMS (213113)
    JASON C. DAVIS (253370)
3   Post Montgomery Center
    One Montgomery Street, Suite 1800
4   San Francisco, CA 94104
    Telephone: 415/288-4545
5   shawnw@rgrdlaw.com
    jdavis@rgrdlaw.com
6       – and –
    SPENCER A. BURKHOLZ (147029)
7   655 West Broadway, Suite 1900
    San Diego, CA 92101
8   Telephone: 619/231-1058
    spenceb@rgrdlaw.com

9

Lead Counsel for Lead Plaintiff

10

[Additional counsel appear on signature page.]

11

12            UNITED STATES DISTRICT COURT

13          NORTHERN DISTRICT OF CALIFORNIA

14              OAKLAND DIVISION

15

| | |
|---|---|
| MICHAEL BARKASI, Individually and on Behalf of All Others Similarly Situated, | ) Case No. 4:24-cv-02431-YGR |
| Plaintiff, | ) <u>CLASS ACTION</u> |
| vs. | ) SECOND AMENDED CLASS ACTION<br>) COMPLAINT FOR VIOLATIONS OF THE<br>) FEDERAL SECURITIES LAWS |
| AUTODESK, INC., et al., | ) |
| Defendants. | ) |
| | ) <u>DEMAND FOR JURY TRIAL</u> |

4904-2858-4284.v1

# TABLE OF CONTENTS

Page

I.    INTRODUCTION ...................................................................................................1

II.   JURISDICTION AND VENUE .............................................................................7

III.  PARTIES .................................................................................................................8

      A.    Lead Plaintiff .............................................................................................8

      B.    Defendants .................................................................................................8

IV.   SUBSTANTIVE ALLEGATIONS .........................................................................9

      A.    The Company's Background and Sales Channels ....................................9

            1.    The Direct Sales Channel.................................................................9

            2.    The Indirect Sales Channel ............................................................10

      B.    The Company's Two Billing Models Had Dramatically Different Impacts
            on Its Reported Free Cash Flow – a Critical Metric ...............................11

      C.    The Company Announces the End of Its Upfront Billing Model ...........13

            1.    The Company Says Upfront EBA Deals Are a Thing of the Past .............14

            2.    The Company Announces Ending Upfront Deals in the Indirect
                  Channel but Notes a Longer Timeframe........................................15

            3.    The Company Reassures Investors that *All* EBA Deals Had Annual
                  Payment Terms ...............................................................................17

            4.    The Company Says It Would "Flush Out" Upfront Deals "This
                  Very Minute" if It Could.................................................................17

V.    DEFENDANTS SET, AND RE-SET, FY23 FREE CASH FLOW GUIDANCE ...........19

VI.   THE CLASS PERIOD STARTS: DEFENDANTS REPORT INFLATED CASH
      FLOW FROM SECRET RETURN TO EBA UPFRONT BILLING MODEL
      AND OTHER MANIPULATIVE PRACTICES........................................................22

      A.    February 23, 2023: The Company Announces "Record" Free Cash Flow...........22

            1.    The Company's Record Free Cash Flow Numbers Were
                  Artificially Boosted by the Secret Restart of EBA Upfront Deals ...........22

            2.    The Company's February 23, 2023 Form 8-K Was Materially
                  False and Misleading Because the Company's Manipulated Free
                  Cash Flow Did Not Provide Transparency ......................................24

**Page**

B.    May 25, 2023: The Company Announces Record Free Cash Flow for 1Q24 .................................................................................................26

VII.    THE TRUTH BEGINS TO EMERGE: THE COMPANY ADMITS A $200 MILLION ADJUSTMENT IN FREE CASH FLOW IS NECESSARY .........................27

VIII.    AUTODESK'S AUDIT COMMITTEE DISCOVERS DEFENDANTS ARTIFICIALLY INFLATED FREE CASH FLOW ............................................29

A.    April 1, 2024: The Company Announces It Must Delay the Filing of Its Annual Report to Complete an Internal Investigation into Free Cash Flow .........29

B.    April 16, 2024: The Investigation Continues, Delaying Public Filings ................30

IX.    POST-CLASS PERIOD EVENTS CONFIRM THE AUDIT COMMITTEE'S DISCOVERY THAT MANAGEMENT HAD MANIPULATED FREE CASH FLOW TO ARTIFICIALLY INFLATE ITS NUMBERS ................................................31

X.    INDEPENDENT EXPERT ANALYSIS QUANTIFIES THE UPFRONT EBA DEALS UNDERTAKEN IN FY23 .................................................................35

A.    Key Financial Metrics for Integra's Analysis .......................................................36

1.    Long-Term Deferred Revenue ..................................................................36

2.    Free Cash Flow .........................................................................................38

B.    Integra's Quantification of the Impact of Upfront EBAs on FY23 Free Cash Flow ...............................................................................................................39

C.    Integra's Robustness Check ..................................................................................43

XI.    THE HISTORICAL LEVEL OF UPFRONT EBA DEALS PURSUED TO MAKE THE FY23 FREE CASH FLOW TARGET WAS MATERIAL .........................44

XII.    VIOLATIONS OF SEC RULES AND REGULATIONS ..................................................46

XIII.    ADDITIONAL SCIENTER ALLEGATIONS ..................................................................47

A.    The Audit Committee Indicated the Company's Actions Taken to Artificially Boost Free Cash Flow Were Intentional .............................................48

B.    Defendants' Statements Show They Possessed Facts that Rendered Their Public Statements Materially False and Misleading ..............................................51

C.    Corporate Scienter .................................................................................................53

XIV.    LOSS CAUSATION .........................................................................................................53

1

2                                                                              **Page**

3
XV.    APPLICABILITY OF PRESUMPTION OF RELIANCE: FRAUD-ON-THE-
4         MARKET DOCTRINE ...........................................................................54

5   XVI.   THE INDIVIDUAL DEFENDANTS ARE CONTROL PERSONS ...............................56

6   XVII.  CLASS ACTION ALLEGATIONS ...............................................................56

7   COUNT I ...........................................................................................58

8   COUNT II ..........................................................................................59

9   XVIII. PRAYER FOR RELIEF ...........................................................................59

10  XIX.   JURY DEMAND ...................................................................................60

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1   Lead Plaintiff Canadian Elevator Industry Pension Trust Fund and Canadian Elevator

2   Industry Life and Health Trust Fund (formerly known as Canadian Elevator Industry Welfare Fund)

3   (collectively, "Lead Plaintiff" or "Plaintiff"), by and through Plaintiff's undersigned attorneys, on

4   behalf of itself and all others similarly situated, alleges the following against Defendants Autodesk,

5   Inc. ("Autodesk" or the "Company"), Andrew Anagnost ("Anagnost"), and Deborah L. Clifford

6   ("Clifford")[1] upon personal knowledge as to Plaintiff, and upon information and belief as to all other

7   matters, based on the investigation conducted by Plaintiff's counsel, which included, among other

8   things: (i) review and analysis of public filings made by Autodesk with the U.S. Securities and

9   Exchange Commission ("SEC"); (ii) review and analysis of press releases and other publications

10  disseminated by certain Defendants and other related non-parties; (iii) review of news articles,

11  securities analyst reports, and shareholder communications; (iv) review of other publicly available

12  information concerning Defendants; (v) investigation of factual sources; (vi) information readily

13  obtainable on the internet; and (vii) expert financial analysis.   Plaintiff believes substantial

14  evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for

15  discovery.

16  **I.     INTRODUCTION**

17  1.      This is a securities class action on behalf of all persons who purchased or otherwise

18  acquired Autodesk securities between February 23, 2023 and April 16, 2024, inclusive (the "Class

19  Period"), seeking to pursue remedies and recover damages caused by Defendants' violations of

20  §§10(b) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. §§78j(b) and

21  78t(a), and SEC Rule 10b-5 promulgated thereunder, 17 C.F.R. §240.10b-5.

22  2.      Autodesk is a software design company that generates the vast majority of its revenue

23  through the sale of software subscriptions.  The size and nature of the Company's subscriptions vary

24  to address the specific needs of its customers, which hail from a variety of industries.   The

25  Company's most expansive subscription offerings are its Enterprise Business Arrangements

26  ("EBAs"), which provide "token-based access to a broad pool of Autodesk products."  EBAs are

---

27  [1]   Anagnost and Clifford are collectively referred to herein as the "Individual Defendants" and,

28  together with Autodesk, as "Defendants."

SECOND AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL
SECURITIES LAWS - 4:24-cv-02431-YGR                                          - 1 -
4904-2858-4284.v1

1  sold directly by Autodesk to its largest customers, representing its largest deals.  The Company

2  separately offers customers the ability to purchase subscriptions for individual products or for

3  smaller groups of products, to which it typically refers as its product subscriptions.  The Company's

4  product subscriptions are sold indirectly through distributors and resellers.

5       3.     The Company has historically sold many of its enterprise and product subscriptions

6  through multiyear contracts, with three-year terms, billed on either an annual or upfront basis.  The

7  Company's annual and upfront billing models had very different impacts on the Company's free

8  cash flow (or "FCF") metric – a critical financial metric for Autodesk.[2]  Defendants emphasized and

9  encouraged investors to place great weight on free cash flow in evaluating the Company's

10  performance.  Financial analysts also stressed the importance of the Company's free cash flow, using

11  it in their financial modeling.

12       4.     However, the Company's upfront billing model presented difficulties for Autodesk.

13  First, it required the Company to offer discounts to induce the large upfront payments, reducing

14  overall revenue and profitability.  Second, it created inconsistency in the Company's cash flow on a

15  year-to-year basis, because the Company received free cash flow from a multiyear contract only in

16  the year it was collected.  The upfront billing model thus created more volatility in the Company's

17  cash flow and less clarity in its financial forecasting.

18       5.     Accordingly, prior to the start of the Class Period, the Company told the investing

19  community it would transition almost entirely to the annual billing model, which was better for

20  Autodesk's long-term success.  This transition would be completed in two phases.  First, at the

21  Company's earnings call for the second quarter of fiscal year 2022 ("2Q22") on August 25, 2021,

22  Defendants announced they would transition the small remaining group of EBA customers that still

23  had upfront deals to the annual billing model – a change that would be completed within months –

24  by the start of fiscal year 2023 ("FY23"), beginning February 1, 2022.[3]  Defendants also led

25

26  ─────────────────
   [2]   In its SEC filings, Autodesk defines free cash flow as "[c]ash flow from operating activities
   minus capital expenditures."

27  [3]   Throughout the relevant period, the Company used a financial reporting structure in which each
28  fiscal year ended on January 31 of the corresponding calendar year; for example, FY23 ended on
   January 31, 2023.  Likewise, 1Q23 ended on April 30, 2022, 2Q23 ended on July 31, 2022, and

investors to believe that, after that point, all of its EBA customers would be on annual billing terms, causing no more headwind to free cash flow in future years.

6.    A week later, at the Company's fiscal year 2022 ("FY22") investor day, Defendants announced that, after the EBA transition, they would transition product subscriptions to the annual billing model.  Defendants explained that the product subscription transition would take place on a slower timeline because it would take time to bring reseller partners on board and to develop the back-office functionality needed to handle the increased volume of annual billing.  Defendants later told investors that the go-live date for this transition of product customer billing would be March 28, 2023 (during the first quarter of fiscal year 2024 ("1Q24")), at which point almost all of its customers would be on the annual billing model.

7.    Through the remainder of FY22 and during FY23, Defendants continued to update the market on the progress of its product billing model transition and emphasized the import of this change to its business.  Defendants repeatedly told investors they wanted this transition done as quickly as possible because switching to the annual billing model would provide more predictable cash flow, more profitable pricing, and would make Autodesk a more valuable company.  However, unbeknownst to investors, instead of ending EBA upfront deals and the associated discounting, in FY23 the Company actively "pursue[d]" and incentivized customers to accept upfront EBA deals in quantities that "substantially exceeded historical levels" to help the Company "meet its lowered annual free cash flow target," as the Company's own Audit Committee later found.

8.    While free cash flow was an important metric for Autodesk in any year, FY23 free cash flow was of particular significance to Autodesk investors.  Autodesk had set a target of $2.4 billion for FY23 as part of a five-year plan in 2018 and had reiterated this target at investor days in 2019, 2020, and 2021.  And for years, analysts had focused on the FY23 free cash flow target as central to their valuation of the Company.  As one analyst repeatedly stated, "we believe investors will look to cash flow in FY23 and beyond to base valuation."

---

3Q23 ended on October 31, 2022.  As a result of this structure, most of a given fiscal year occurs in the preceding calendar year: for example, 11 months of FY23 occurred in calendar year 2022.

SECOND AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL
SECURITIES LAWS - 4:24-cv-02431-YGR                                                                    - 3 -
4904-2858-4284.v1

9.     However, in FY23 (which began on February 1, 2022), it became clear that the Company would not meet that target.  Clifford first lowered the FY23 free cash flow target by $200 million in February 2022, and then lowered it again in May 2022, purportedly due to foreign exchange rates and events unfolding in Russia.  In November 2022, Clifford again lowered the target to $1.9-1.98 billion due to, according to Clifford, "less demand for multi-year, up-front and more demand for annual contracts than we expected."   Analysts called this latest target shift "underwhelming" and wrote that "[p]otential misses on numbers" were not "conducive to a constructive view on ADSK shares."  Accordingly, Defendants were desperate to meet the thrice-lowered FY23 free cash flow target that was so critical to Autodesk's valuation.

10.     On February 23, 2023, the first day of the Class Period, Defendants finally reported the Company's financial results for the fourth quarter of 2023 ("4Q23") and FY23, revealing the Company's FY23 free cash flow results that they had hyped to investors for years.  Defendants announced "[r]ecord" free cash flow in FY23 – increasing 37%, from $1.48 billion in FY22 to $2.03 billion in FY23 – purportedly beating the Company's lowered guidance of $1.9-$1.98 billion. But Defendants concealed the real truth: that they would have missed their FY23 free cash flow target (which they had already lowered three times that fiscal year) if not for the historic level of upfront EBA deals that they secretly executed for that purpose.

11.     Instead, Defendants told investors that their record free cash flow was driven by the approaching transition from upfront to annual billing (by products customers) and a large renewal cohort.   But, Defendants' explanation for their record free cash flow results was materially misleading because it failed to disclose that the reported FY23 free cash flow was inflated by historic levels of upfront EBA deals that the Company had told the market were already retired before FY23 started, and which would necessarily cause less predictability in free cash flow and a larger hole in future cash flows than the market had been led to believe.  The explanation was also misleading because, just three months earlier, on November 22, 2022, Clifford had told investors she was lowering the FY23 target due to "less demand" for upfront deals and "more demand" for annual deals – only to do an about-face by incentivizing EBA customers to do more upfront deals just to meet the lowered target.

12.     As fiscal year 2024 ("FY24") progressed, investors remained in the dark.   On May 25, 2023, the Company announced its results for 1Q24, stating it had "record first quarter free cash flow," representing 60% of the cash flow it had told the market to expect for FY24.   But Defendants again provided a misleading explanation of their free cash flow results.   Defendants attributed the Company's "record" 1Q24 results to "cash collections from the last month of billings" in FY23 and early renewals driven by the end of multiyear upfront, but failed to disclose that their 1Q24 free cash flow included $200 million in upfront deals that would not recur, including EBA upfront free cash flow, despite having told investors such deals were retired.   This $200 million masked the material negative impact the FY23 EBA upfront deals had on FY24 free cash flow.

13.     The truth regarding Defendants' fraud began to emerge on November 21, 2023, when the Company announced its results for the third quarter of FY24 ("3Q24"), reporting its lowest quarterly free cash flow in more than five years, and shocked investors by telling them to remove $200 million from free cash flow for fiscal year 2025 ("FY25") caused by upfront deals Autodesk collected cash for in 1Q24 that would not recur.   As a result of this news, analysts and investors lowered their view of the Company's stock value, and Autodesk's stock price plummeted by almost 7% on November 22, 2023.

14.     On April 1, 2024, after the market closed, investors continued to learn the true extent of Defendants' fraud when the Company announced it had to delay the filing of its annual report on Form 10-K – an SEC-mandated filing – due to a previously undisclosed internal investigation by the Company's Audit Committee regarding the Company's free cash flow and non-operating GAAP margins.[4]   This again surprised the market, causing Autodesk's stock price to decline by over 4% the following day.

15.     Thereafter, on April 16, 2024, the Company announced it expected to receive a delinquency notice from Nasdaq regarding the delayed filing of its annual report and needed

---

[4]     Generally Accepted Accounting Principles ("GAAP") are a set of accounting rules, standards, and procedures issued and frequently revised by the Financial Accounting Standards Board and the Governmental Accounting Standards Board.

additional time to complete its investigation, raising further concern about the Company's business and causing the stock price to fall again by almost 6%.

16.     Following the close of the Class Period, on May 31, 2024, the Company's management was forced to admit the findings of the Audit Committee investigation.   The Company's management provided a public "summary" of these findings, which they buttressed with optimistic projected numbers for the future to blunt the impact of the findings.   The Audit Committee's findings included key admissions that made clear Defendants had intentionally engaged in practices to inflate free cash flow in FY23, including, but not limited to:

- "During fiscal year 2022, the Company announced that it had begun to shift enterprise customers to contracts billed annually, and that it had assumed fiscal 2023 enterprise contracts would be billed annually";

- Despite that announcement, "[t]he Company subsequently determined . . . to pursue multiyear upfront contracts with enterprise customers to help meet its fiscal year 2023 free cash flow goal";

- As a result, "[u]pfront billings of enterprise customers in fiscal year 2023 substantially exceeded historical levels, helping the Company to meet its lowered annual free cash flow target"; and

- The Company also made "decisions regarding discretionary spending, collections, and accounts payable [that] were informed by their anticipated effects on the Company's external free cash flow and/or non-GAAP operating margin targets."

17.     In that "summary" of findings, the Company's management failed to disclose the dollar value of the EBA upfront deals in FY23 that had "substantially exceeded" any prior years' upfront deals.  It is reasonable to infer, under the circumstances, however, that if the FY23 upfront EBA deals had been an immaterial, minor figure, then Company management would have reported that figure to assure investors that the Audit Committee's findings were inconsequential. Independent expert analysis of the Company's financial statements – in light of the Audit Committee's findings and related facts – conservatively estimates the dollar value of upfront EBA deals for FY23 to be approximately $570 million, further demonstrating that the dollar value of EBA upfront deals in FY23 was material.

18.     Moreover, in conjunction with these findings, the Company also disclosed that its Chief Financial Officer ("CFO"), Clifford – who had served at the financial helm of Autodesk

during the fraud, and as such was responsible for the Company's cash flow statements and setting free cash flow guidance, had effective immediately, been demoted to a role that had no responsibility for the Company's financial reporting.  The Audit Committee's removal of Clifford from the CFO position in conjunction with its findings was a drastic move that required a director to step down immediately from the Audit Committee so that she could take over the vacant CFO position.  These actions by the Audit Committee further support an inference that the Audit Committee found the dollar value of EBA upfront deals to be material to Autodesk and demonstrate her involvement in and intimate knowledge of the Company's manipulation of FY23 cash flow.

19.     In the wake of these findings, Starboard Value LP ("Starboard") – a well-respected institutional investor with approximately $5.5 billion in reportable assets under management[5] that managed funds that owned approximately $585 million of Autodesk stock – highlighted the misleading nature of Defendants' conduct in a public letter issued on June 17, 2024:

> This was a clear case of a company saying one thing to investors and doing something completely different.  Autodesk had an obligation to not mislead investors with its public commentary, but instead of honoring this obligation, Autodesk did the opposite – the Company told investors it was at the tail-end of a process to move enterprise customers to annual billings . . . .  The Company continued to report these free cash flow results with multi-year, upfront billings while explicitly and implicitly leading shareholders to believe they had moved enterprise customers to annual billings.

20.     Defendants' deceptive statements and omissions had the intended effect of inflating the Company's stock price throughout the Class Period.  The unraveling of Defendants' fraud caused significant declines in the Company's stock price, causing Plaintiff and other members of the Class to suffer substantial losses.  At the same time, Defendants profited from their fraud through incentive compensation tied to the Company's achievement of free cash flow targets.

## II.     JURISDICTION AND VENUE

21.     The claims asserted herein arise under and pursuant to §§10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§78j(b) and 78t(a), and Rule 10b-5 promulgated thereunder, 17 C.F.R. §240.10b-5.

---

[5]    Starboard Value LP, Form 13F, filed May 25, 2025, https://www.sec.gov/Archives/edgar/data/1517137/000092189525001532/xslForm13F_X02/primary_doc.xml.

22.     This Court has jurisdiction over the subject matter of this action pursuant to §27 of the Exchange Act, 15 U.S.C. §78aa, and 28 U.S.C. §§1331 and 1337.

23.     Venue is proper in this District pursuant to §27 of the Exchange Act, 15 U.S.C. §78aa, and 28 U.S.C. §1391(b).  Many of the acts and transactions that constitute the alleged violations of law, including the dissemination to the public of untrue statements of material fact, occurred in this District.  The Company's executive offices and corporate headquarters are located in this District.

24.     In connection with the acts alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

III.     **PARTIES**

A.     **Lead Plaintiff**

25.     Lead Plaintiff Canadian Elevator Industry Pension Trust Fund purchased Autodesk shares (identified in the certification it filed previously in this case and which is incorporated here) at artificially inflated prices during the Class Period and was damaged when the truth was revealed, as detailed herein.

26.     Lead Plaintiff Canadian Elevator Industry Life and Health Trust Fund (formerly known as Canadian Elevator Industry Welfare Fund) purchased Autodesk shares (identified in the certification it filed previously in this case and which is incorporated here) at artificially inflated prices during the Class Period and was damaged when the truth was revealed, as detailed herein.

B.     **Defendants**

27.     Autodesk is incorporated in Delaware, and its principal executive offices are located at One Market Street, Suite 400, San Francisco, California 94105.  The Company's common stock trades on the Nasdaq exchange under the ticker symbol "ADSK."

28.     Anagnost served as the Company's Chief Executive Officer ("CEO") and President throughout the Class Period.  He joined Autodesk in 1997 and became CEO in 2017.  Anagnost was also a member of Autodesk's Board of Directors (the "Board") during the Class Period.

29.     Clifford is a Certified Public Accountant, and served as the Company's CFO and Executive Vice President throughout the Class Period.  Prior to the Class Period, Clifford worked for the accounting firm Ernst & Young; spent 13 years in financial leadership roles at Autodesk; and was the CFO of another public company, SurveyMonkey.  She became Autodesk's CFO on April 19, 2021, approximately four months before announcing the Company's decision to end upfront EBA deals.  Clifford was demoted from CFO to the newly created position of Chief Strategy Officer, effective May 31, 2024, in connection with the Audit Committee's findings in the internal investigation.

## IV.     SUBSTANTIVE ALLEGATIONS

### A.     The Company's Background and Sales Channels

30.     Autodesk provides a wide range of software tools to meet the varied needs of its customers in a host of industries, including architecture, engineering, construction, product design, manufacturing, media, and entertainment.  The Company generates the vast majority of its revenue through its sale of subscriptions to its software products.  The size and nature of the subscriptions the Company offers vary based on the specific needs of its customers.  The Company offers EBAs that provide "token-based access to a broad pool of Autodesk products."  The Company separately offers customers the ability to purchase subscriptions for individual products or for smaller groups of products, to which it typically refers as its product subscriptions.

31.     The Company's subscriptions often have three-year terms, resulting in the formation of groups of deals that renewed at the same time, known as "cohorts."  For example, a group of deals renewed in fiscal year 2020 that would be up for renewal again in FY23 would be a "cohort."

32.     The Company sells its subscriptions through two channels: direct and indirect.

#### 1.     The Direct Sales Channel

33.     The "direct" sales channel consists of large customers that enter into EBAs with the Company.  By way of example, in recent earnings calls, Anagnost referenced EBAs with Ford, BASF (which he referred to as "the largest chemical producer in the world"), and Obayashi Corporation (which Anagnost referred to as "one of the largest construction firms in Japan, which operates in 16 countries worldwide").  EBAs are "direct" because Autodesk personnel communicate

1  directly with EBA customers to make sales, rather than selling through intermediaries.  The

2  Company has stated EBA deals are seasonal: "[H]istorically, we have had increased EBA sales

3  activity in our fourth fiscal quarter . . . ."

4      34.    EBAs were important to Autodesk's success; more than two dozen RBC analyst

5  reports issued between May 23, 2021 and the end of the Class Period stated: "We believe a trend

6  towards outsized deals and a healthy and growing EBA pipeline (historically near-100% renewal)

7  remain key drivers for the business going forward."

8      35.    According to the Company, most EBA customers had been transitioned to an annual

9  billing model – payments due in annual installments over the contract term.  To illustrate, if an EBA

10  customer agreed to pay $300 million in December 2022 to use the Company's software for three

11  years, with annual payments, the Company would receive $100 million in payments in 4Q23 (which

12  ends on January 31, 2023) and two more payments of $100 million – one in the fourth quarter of

13  FY24, and the final one in the fourth quarter of FY25.

14      36.    However, prior to the start of the Class Period, not all of the Company's EBAs were

15  on the annual billing model.  As detailed below, according to the Company, a very small portion of

16  EBA deals had yet to be transitioned away from the Company's "upfront billing model," where EBA

17  customers' payment for their three-year subscription was made upfront (at year one) in return for a

18  discount.

19          **2.    The Indirect Sales Channel**

20      37.    The Company sold its product subscriptions through an "indirect" channel of

21  "partners" consisting of "approximately 1,500 resellers and distributors" that sold them to end users.

22      38.    The Company typically allowed the resellers to use an upfront model, charging the

23  end customers the entire three-year cost of the three years' worth of software at the start of the

24  subscription.  To motivate resellers' end users to pay for three years' worth of software at the

25  inception of the term, the Company reported that it used incentive programs and promotions in its

26  reseller channel, typically consisting of discounts of up to 10%.  The Company would collect the

27  upfront payment from the resellers, minus some amount to compensate the resellers for their

28  services.

SECOND AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL
SECURITIES LAWS - 4:24-cv-02431-YGR                                                    - 10 -
4904-2858-4284.v1

39.    The Company's indirect channel partners preferred an upfront billing model because, the Company reported, its channel partners were typically not highly capitalized, meaning they do not maintain much cash on hand and liked receiving the cash infusion upfront.

**B.    The Company's Two Billing Models Had Dramatically Different Impacts on Its Reported Free Cash Flow – a Critical Metric**

40.    Free cash flow is a critical metric for Autodesk.  It reflects the cash the Company generates after accounting for cash outflow to support its operations and capital expenditures.  As the Company put it in reporting this number publicly, the free cash flow metric, among other non-GAAP metrics, gave investors "greater transparency with respect to key metrics used by management in its financial and operational decision-making."  The Company understood its free cash flow metrics, among other non-GAAP metrics, were "used by Autodesk's institutional investors and the analyst community to help them analyze the health of the Company's business."  *See* ¶¶87-88.  Defendants repeatedly emphasized and encouraged investors to place great weight on free cash flow in evaluating the Company's performance.  As detailed below, financial analysts also stressed the importance of the Company's free cash flow, using it in their financial modeling.

41.    The Company's annual and upfront billing models had very different impacts on the Company's reported free cash flow.  The Company's upfront billing model allowed for an infusion of cash when deals were inked, but typically required the Company to provide a discount to customers of up to 10%, making such deals less profitable.  Additionally, upfront deals created less visibility in forecasting over time.  The Company's annual billing model did not require discounts, making it more profitable, and represented a more predictable stream of payments that allowed the market and securities analysts to better value the Company's stock.

42.    The following example illustrates the impact that "annual" and "upfront" billing models have on the Company's reported free cash flow.  A $300 million upfront deal with a 10% discount (to induce the customer to pay for three years' worth of software at its inception) would thus result in $270 million in cash collected upfront ($300 million minus $30 million discount (10%)) and reported at the time of collection but no additional payments for the next two years.  Under the annual billing model, the Company would collect $300 million in cash (no discount

required) paid in three annual payments of $100 million each year, and the Company would report $100 million in free cash flow for each of the three years.  This illustration shows how the two transactions have dramatically different impacts on the timing and amount of free cash flow.



43.    This illustration demonstrates that an upfront deal would appear to have a dramatically better impact on Autodesk's 4Q23 free cash flow than a corresponding annual deal, but the Company would receive no free cash flow from that deal in FY24 and FY25, to which the Company referred as "out" years.  However, an annual deal provides better cash flow in FY24 and FY25, as well as more predictable cash flow and profitability over the longer term.  Under the upfront billing model, after FY23 ends, the Company needs to find a lot more customers, make

1    bigger deals, or both, just to report the same free cash flow in FY24 and FY25 as reported in FY23.

2    An annual deal also provides more total cash flow because no discount is needed.  In short, as

3    Anagnost put it, "upfront billing is the biggest piece of volatility in our free cash flow."

4        44.    Throughout the Class Period, Defendants repeatedly told the market the annual billing

5    model was better for Autodesk's long-term success.  *See, e.g.*, ¶¶49, 52, 55, 60, 67.

6        **C.    The Company Announces the End of Its Upfront Billing Model**

7        45.    In late 2021, the Company told investors it was transitioning its customers from the

8    upfront billing model to the annual billing model, which, as Clifford explained (*see* ¶49), was "good

9    for [customers] and good for Autodesk," and that, under the annual billing model, "[w]e expect . . .

10   to drive more predictable free cash flow growth and better price realization over time, which will

11   make Autodesk a more valuable company."

12       46.    The Company explained it would undertake this transition in two steps: (a) eliminate

13   remaining upfront deals with EBA customers; and (b) transition all product customers to the annual

14   billing model.

15       47.    First, in August 2021, Defendants told investors that, while it had very few upfront

16   deals with EBA customers left to transition, it had decided to transition "all" remaining EBA

17   customers to the annual billing model within months.  This was easy for the Company to do because,

18   as noted, it sold software directly to EBA customers and simply needed to stop offering any of those

19   customers upfront deals.

20       48.    Second, in September 2021, Defendants announced the Company would also end

21   upfront deals with its indirect sales channel for product subscriptions.  However, Defendants noted

22   this transition would take more time to complete than the transition with EBA customers because the

23   Company's indirect sales partners needed more time to transition and the Company needed to make

24   some back-office changes to manage the scale of moving all its product resellers to annual billing.

25

26

27

28

SECOND AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL
SECURITIES LAWS - 4:24-cv-02431-YGR                                                    - 13 -
4904-2858-4284.v1

1.    **The Company Says Upfront EBA Deals Are a Thing of the Past**

49.    On August 25, 2021, the Company held an earnings call for 2Q22, during which it announced its transition of the remaining EBA customers to the annual billing model.  The Company's CFO, Clifford, stated:

> Our strong start to the year means we're also shifting more of our EBA customers from multiyear paid upfront to annual billings, which is good for them and good for Autodesk.  Our EBA customers retain price certainty with a multiyear contract term, but annual billings give them a more predictable annual cash outlay.  For Autodesk, we generate more predictable cash flow and remove the discounts to generate upfront cash collections.  While we had already assumed this change in fiscal '23, it has a modest impact on fiscal '22 billings and free cash flow.  However, we expect it to drive more predictable free cash flow growth and better price realization over time, which will make Autodesk a more valuable company.

50.    Here, Defendants conveyed to investors that the Company was already ending upfront deals for EBA customers and there would be no more upfront EBA deals as of the start of FY23 (starting February 1, 2022).

51.    Moreover, given that most of the Company's EBA customers were already on the annual billing model, Clifford explained the transition of the last remaining EBA contracts to this model would not have a significant impact on the Company's billings guidance for the remainder of FY22, stating: "[T]he impact to our billings guidance is also pretty small.  It's around 1 percentage point of impact to the total billings outlook."  Clifford's comment did not indicate that upfront EBAs had historically comprised only a small percentage of the Company's free cash flow.  Rather, the impact to Autodesk's FY22 billings guidance was small because (1) Autodesk "had already assumed that EBAs would all be on annual billing terms starting next year in our fiscal '23," meaning the prior guidance had already accounted for the end of upfront EBAs within the next two quarters; and (2) at the time of Clifford's statement, "[m]ost EBAs [were] already on annual billing terms."

52.    Later in the call, Clifford reiterated that:

> The key point to take away is this, we're focused on making changes that are good for our customers and good for us.  And shifting more EBAs to annual billings helps us achieve that goal.
>
> Now it makes sense for customers because they retain price certainty by signing a multiyear contract.  But by moving to annual billings, they get a more predictable annual cash outlay.  Of course, the change is good for us, too.  We

generate more predictable annual cash flows, and we remove the discounts we see today to generate cash collections upfront.

Most EBAs are already on annual billing terms. And also, we had already assumed that EBAs would all be on annual billing terms starting next year in our fiscal '23. We're making the change now because with the strong start to fiscal '22, we decided to get moving earlier to execute on the shift. But the overarching driver is that we're focused on optimizing our business, and the change, as we said, is good for both our customers and for us.

53.     Clifford's statements had special significance – they conveyed to the market that most EBA deals were already on the annual billing model and that by FY23 (February 1, 2022), all EBAs would be on annual billing terms. Thus, EBA upfront deals would no longer result in a headwind to future cash flow.

### 2. The Company Announces Ending Upfront Deals in the Indirect Channel but Notes a Longer Timeframe

54.     The following week, on September 1, 2021, Autodesk held an investor day call, on which it continued to discuss its movement away from the upfront billing model. There, Clifford reiterated Autodesk's continued movement of EBA customers to an annual billing model, stating: "[A]t our earnings call last week we discussed the ongoing shift of more of our [EBA] enterprise customers to an annual billing cycle."

55.     Clifford also made a new announcement that the Company planned to transition its indirect product subscription multiyear contracts to an upfront billing model: "Today, we'll discuss our intent to make the same shift for product subscription multiyear contracts starting in fiscal '24," referring to FY24, beginning February 1, 2023. She acknowledged that "this shift will result in a predictable initial decline in free cash flow in fiscal '24 as we transition" and "drive some short-term volatility" but reassured investors that "these kinds of transitions are worth it in the long run" and would "make Autodesk a more valuable company."

56.     The timing for transitioning product subscriptions differed from the Company's stated timeline for transitioning the remaining EBA customers to an annual model. The EBA transition would be complete by the start of FY23 (February 1, 2022), meaning all EBAs would be on the annual billing model a full year prior to the start of the transition for product subscription customers in FY24 (which began February 1, 2023).

57.    In response to this announcement, a securities analyst asked whether the product subscription transition might start before FY24.  Clifford explained that transitioning multiyear product subscriptions to the annual billing model would take longer than it did for EBA customers because it involved channel partner resellers: "So for our base product subscription multiyear contracts, we have 2 other factors on the table that we have to consider."  The first was that the Company wanted to "ensure a smooth transition with our channel partners," which was "different than our EBAs because it's largely indirect," referring to the fact that sales through channel partners are "indirect" in the sense that the Company does not deal directly with end customers, as it does with EBA customers.  The second factor Clifford referenced was that the Company needed to build "back office" systems to "better manage a high volume of multiyear contracts with annual billings at scale," which would not be ready until "the back half of . . . fiscal '23."

58.    In an accompanying slide presentation, the Company illustrated how moving from upfront to the annual billing model would impact its product subscriptions (emphasis added in red):

59.    Notably, the Company's presentation slide did not refer to its EBA (direct) sales channel.  Less than two weeks later, however, the Company reiterated to investors that all EBA customers would be billed annually as of FY23 (starting February 1, 2022).

### 3.    The Company Reassures Investors that *All* EBA Deals Had Annual Payment Terms

60.    On September 14, 2021, at an investor conference, Clifford ***again*** reassured investors that the Company was going to stop making upfront EBA deals by FY23, emphasizing it would make "Autodesk a more valuable company":

> So a lot of our EBAs were already on annual billing terms.  And at the beginning of our fiscal '23 [starting February 1, 2022], we had already assumed that all of them would be on annual billing terms.  We just decided to expedite that because, again, it's a change that we think is better for our customers and better for Autodesk and will help us make Autodesk a more valuable company over time.

### 4.    The Company Says It Would "Flush Out" Upfront Deals "This Very Minute" if It Could

61.    The Company repeatedly told investors it wanted to get rid of all upfront deals as quickly as possible.  Toward the end of FY22, for example, Anagnost told investors it was "full steam ahead" in ending upfront billing but that the Company could not "rip off the Band-Aid" as to product customers because its partners (who sold to product customers) needed time to make the change.

62.    For example, on November 23, 2021, the Company held its earnings call for the third quarter of FY22, during which Anagnost engaged in the following question and answer with a securities analyst:

> [Analyst:] . . . And maybe just as a quick follow-up.  Obviously, at Analyst Day [on September 1, 2021], we talked about some changes around billing terms, and you referenced it a little bit earlier in the call.  Just curious how kind of early receptivity has been with customers as you kind of explain to them to changes that are coming?
>
> [Anagnost:] Yes.  So look, our moves with regards to changing billing terms and smoothing out our free cash flow trajectory over multiple years are unchanged by any of this.  We believe those are right for the business.  We believe it's right for our customers.  Customers are generally positive around these things because they prefer annual billings for – in most cases, they don't want to have to pay upfront if they don't have to.  Also, a lot of these things we've been talking about with regards to supply chain pressures, our viewed as pretty transient by us.  These are not going to be persistent types of things.  So customers view these fairly well.  Our partners are getting themselves around some of these activities right now.  But those plans are

completely unchanged relative to anything we're seeing right now, and it's all full steam ahead on that transition.

63.    Similarly, at an investor conference on November 30, 2021, a moderator asked Anagnost to address his "favorite topic, billing cycles."  Anagnost responded:

> Yes.  So frankly, if I could do it right now at this moment, I would just – I would flush out all of the upfront multiyear from our business right this very minute, okay, and take whatever free cash flow hit we take next year because it – that upfront billing is the biggest piece of volatility in our free cash flow, all right?  And it's one of the reasons why people discount the free cash flow [as they go out in the year].  I want to eliminate that, clean up the business.  And it's what our customers want too. Everybody wants to – wants the protection of a multiyear contract, but they want to pay for it annually, all right?  Now why don't we just pull off, rip off the Band-Aid and do it, okay?  There's 2 reasons why we don't rip off the Band-Aid.  One is our partners, okay?  Our partners are cash flow sensitive.  They love multiyear billings upfront.  A matter of fact, they – some of them will even add to our discount from – with – from their margins to kind of pull the deal in, all right?  So we need to give our partners a 2-year runway, which is basically what we're giving them.  We told them last year and we're ending – basically ending the discounts next year.  So we're giving them a runway to transition.  So we're going to work with them to make sure that they're paying attention and they have time to adjust their cash flow.  Otherwise, we'd seriously damage some of our partners' business.  The other thing, to be perfectly frank, is that our back-office systems are not set up to do multiyear billed annually at scale.  They will be next year.  It's one of those long-tail things in the digitization transformation that I was doing for the back ends – back office of the company.  That will get completed next summer, so we'll be able to do it, but if I could, I'd pull that lever right now.

64.    Accordingly, Anagnost made clear to investors that Autodesk wanted to end its upfront billing model immediately to end the volatility it caused in Autodesk's cash flow but needed to give its channel partners more time to transition because of the impact of the change on the partners' cash flows and also because the Company needed to make back-office preparations to handle multiyear annual billings at scale, which Anagnost said he expected to complete in summer 2022.

65.    The Company provided updates to the market on its progress in moving its channel partners to its annual billing model over the course of the next year.  For example, on the Company's February 24, 2022 earnings call for the fourth quarter of FY22 ("4Q22") and FY22, Clifford noted the Company was moving "as quickly as possible," but "we have customer, partner and operational constraints that we're working through as we navigate the transition."  Clifford also reiterated: "we are upgrading our systems," and "our partners are . . . very important to our growth, very important

to – in our ability to drive breadth and depth across the globe and engaging with customers," and they needed time to adjust to the elimination of the upfront billing model.

66.     On the Company's first quarter of FY23 ("1Q23") earnings call held on May 26, 2022, Anagnost again reiterated: "[n]one of us want" upfront billing over annualized billing, but "our partners can't get there fast enough."  In addition, on the Company's second quarter of FY23 ("2Q23") earnings call held on August 24, 2022, Clifford updated investors, again explaining the Company was still working on "a partner transition plan [and] back-office system upgrades" but were going "as quickly as possible."

67.     Thereafter, on the Company's third quarter of FY23 ("3Q23") earnings call held on November 22, 2022, analysts questioned the Company's progress in making back-office changes and transitioning Autodesk's partners away from the upfront billing model.  One analyst had questions about the financial impacts for FY24.  Clifford explained: "We continue to be focused on executing on that transition as fast as possible because while the change is good for us, and it's good for our customers, from a financial standpoint, we really want the noise behind us."

## V.  DEFENDANTS SET, AND RE-SET, FY23 FREE CASH FLOW GUIDANCE

68.     Autodesk's FY23 free cash flow was of particular importance to the Company and the investing community.  Critically, during its investor day in March 2018, Autodesk presented "Five years & Five Outcomes," a vision of "what Autodesk looks like in 5 years and the 5 outcomes [it was] going to drive to get there."  The Company set a FY23 free cash flow goal of $2.4 billion.

69.     Following the 2018 investor day, analysts treated the FY23 free cash flow target as key to their valuations of the Company.  As Barclays analysts explained in a report published on March 29, 2018, and repeated verbatim in dozens of Barclays reports published before the Class Period:

> ADSK is in the midst of converting entirely to a subscription model, which long term carries higher lifetime value and potential for TAM expansion into areas like construction. Because of this, we believe investors will look to cash flow in FY23 and beyond to base valuation, which at current levels represent attractive return in our view.

70.     Likewise, a Barclays report dated March 28, 2019, warned that "[w]e see three downside risks to our Overweight rating.  First, if ADSK is unable to reach FY23 goals of $5.6B in ARR, 40% operating margin and $2.4B in FCF, estimates could deteriorate causing the stock to under-perform."[6]

71.     Many analyst reports from before the Class Period (and before the beginning of FY23) similarly viewed the FY23 free cash flow target as key to evaluating Autodesk's financial health.  For example:

- JP Morgan (February 26, 2021): "In addition, the continued return of multi-year agreements/collections has Autodesk on track to deliver the $2.4 billion free cash flow target for fiscal 2023, a key to our bullish stance."

- RBC (February 26, 2021): "The accelerating model into FY/23 provides us confidence in the $2.4B FCF target and around double-digit growth in years beyond, which ultimately should drive the stock.  Maintain Outperform rating and $340 PT."

- Berenberg (April 7, 2021): "Autodesk continues to rank among the highest-quality assets within our Design Software coverage.  We believe that the company's long-term strategy is just starting to play out, even though all eyes are still on its FY23 financial target.  This note is a result of our primary analysis that indicates $2.4bn FCF is achievable and Autodesk is likely to beat its FY25 growth CAGR estimate materially.  We therefore raise our price target to $370 (from $310) and reiterate our Buy rating."

- Berenberg (May 24, 2021): "We value Autodesk on a 3.0% FY23E FCF yield to arrive at our price target of $370.  Our primary research substantiates key growth drivers that would allow Autodesk to grow at mid-teens in the midterm.  We believe most of the upside will be realized once the market gets comfortable around the FCF 2023 $2.4b target."

- Canaccord Genuity (May 28, 2021): "In terms of the stock, we continue to believe Autodesk can deliver on its promise to generate $2.4B in FY23 FCF driven by building traction in the digitization of AEC, the convergence of make-and-design in manufacturing, and ongoing efforts to convert noncompliant users to paying ones.  If that's the case, we think it's reasonable to believe Autodesk can deliver revenue growth in the mid-to-high teens and FCF margins in the mid-to-high 40s next year.  We think 30x forward FCF is a reasonable price to pay for an asset of that caliber, which implies about a ~15% premium from where to stock is trading today.  That's the basis for our continued BUY rating.

---

[6]     Barclays used substantially similar language in approximately two dozen other reports published before the Class Period.

- • Barclays (August 26, 2021): "FY23 FCF target of $2.4B is unchanged, which we think will be in focus because the ramp from FY22 is steeper with the $75M trim to FCF guide."

- • Barclays (September 1, 2021): "With FY23 FCF target of $2.4B unchanged, our PT of $370 is also unchanged."

- • Berenberg Capital (September 2, 2021): "FY23 target is an important metric for investors.  Based on our discussions with investors, we know that many investors have based their valuation work around Autodesk's ability to reach that target."

72.    After setting the $2.4 billion FY23 free cash flow target as a critical business objective in 2018, Autodesk executives held it steady for years, reiterating it at the Company's investor days in 2019, 2020, and 2021 and in other conference calls and presentations.  Beyond simply repeating the target, Autodesk executives also repeatedly emphasized the importance of the FY23 free cash flow target for their business and expressed confidence that Autodesk would hit it.  For example, during an investor day on June 3, 2020, Anagnost stated that they were "confident" in that target and then-CFO Richard Scott Herren told investors that "while we are committed to growing revenues, cash flows will continue to be a primary focus as well and growing our free cash flows to $2.4 billion."

73.    While Clifford was not yet CFO when the FY23 free cash flow target was set, an April 7, 2021 report from Berenberg analysts later observed that "[w]e also believe that the hiring of Debbie Clifford as CFO fully supports this FY23 target. She is familiar with the business model and most importantly was part of the team that set those targets back in 2018."  And, after Clifford assumed the CFO role in March 2021, she was responsible for setting (and then revising) free cash flow guidance.  On September 1, 2021 (five months before the beginning of FY23), Clifford expressed "confidence in our ability to generate $2.4 billion of free cash flow in fiscal '23."

74.    But, as soon as FY23 began, it became clear that the Company would not meet the $2.4 billion free cash flow target.  During an earnings call on February 24, 2022 (the start of FY23), Clifford announced free cash flow guidance of $2.13 billion to $2.21 billion, with a midpoint of $2.17 billion – more than $200 million below the target that Autodesk had been reiterating for nearly four years, and in which Clifford had expressed "confidence" only months prior.

75.    On May 26, 2022, Clifford again lowered the FY23 free cash flow guidance to $2.0-$2.08 billion, attributing this change to the "decision to halt our new and renewal business in Russia" and "the pace of FX volatility."

76.    On November 22, 2022, Clifford again lowered the guidance to $1.9-$1.98 billion, explaining in a press release that "[o]ur lower . . . free cash flow guidance primarily reflects less demand for multi-year, up-front and more demand for annual contracts than we expected." Analysts from SMBC Nikko Securities America, Inc. wrote that the guidance was "underwhelming" and that "[p]otential misses on numbers- even if only near-term – [aren't] conducive to a constructive view on ADSK shares."

77.    Defendants were desperate to meet the thrice-lowered free cash flow target and instill investor confidence.  As the Audit Committee later found, Defendants intentionally returned to the supposedly retired (and less profitable) EBA upfront business model: "[u]pfront billings of enterprise customers in fiscal year 2023 substantially exceeded historical levels, helping the company to meet its lowered annual free cash flow target."

## VI.    THE CLASS PERIOD STARTS: DEFENDANTS REPORT INFLATED CASH FLOW FROM SECRET RETURN TO EBA UPFRONT BILLING MODEL AND OTHER MANIPULATIVE PRACTICES

### A.    February 23, 2023: The Company Announces "Record" Free Cash Flow

#### 1.    The Company's Record Free Cash Flow Numbers Were Artificially Boosted by the Secret Restart of EBA Upfront Deals

78.    At the start of the Class Period, on February 23, 2023, the Company filed a current report on Form 8-K with the SEC, which attached and incorporated by reference a press release reporting results from 4Q23 and FY23, which ended January 31, 2023.  The press release quotes Anagnost and Clifford, showing they were ultimately responsible for the contents of the press release and Form 8-K used to file the press release.

79.    Specifically, the February 23, 2023 press release highlighted "[r]ecord quarterly and full-year revenue, cash flow from operating activities, and free cash flow."  It reported: (1) for 4Q23, "[f]ree cash flow was $903 million, an increase of $187 million compared to the fourth quarter last

1  year"; and (2) for FY23, "[f]ree cash flow increased to $2.03 billion, compared to $1.48 billion in
2  fiscal 2022."

3        80.    Moreover, in the press release, Clifford explained how the Company reached those
4  results: "'Overall, the demand environment in Q4 remained consistent with Q3 with the approaching
5  transition from up-front to annual billings for multi-year contracts, and a large renewal cohort,
6  providing a tailwind to billings and free cash flow.'"  **[False Statement No. 1]**.  Those specific
7  factors supposedly explained how the Company achieved its free cash flow results.

8        81.    Clifford's representations gave a misleading impression about how the Company
9  increased free cash flow and achieved the $2.03 billion free cash flow results for FY23 – beating the
10  $1.90-1.98 billion (lowered) free cash flow guidance the Company had previously reported to the
11  market.  As detailed above, beating this guidance was especially important because, after setting the
12  FY23 free cash flow target at $2.4 billion back in 2018, and holding it steady for multiple years,
13  Defendants had already reduced that target three times over the course of FY23.  *See* ¶¶72-77.

14        82.    In this context, Defendants' statements about the particular factors driving its
15  $2.03 billion FY23 free cash flow results were materially false and misleading and omitted material
16  facts.  When Clifford explained that the Company's achievement of a "record" $2.03 billion free
17  cash flow – beating its lowered guidance – was driven by a consistent demand environment, marked
18  by the "'approaching transition from up-front to annual billings for multi-year contracts, and a large
19  renewal cohort, providing a tailwind to billings and free cash flow,'" she misleadingly led investors
20  to believe that the Company's record FY23 free cash flow was driven by the upcoming transition of
21  products multiyear contracts from upfront to annual billing (set to start on March 28, 2023) and a
22  large renewal cohort.  But, when Clifford made this statement, Defendants knew, but failed to
23  disclose the critical fact that the Company actually achieved the $2.03 billion by incentivizing and
24  pursuing supposedly retired upfront EBA deals in unprecedented amounts to meet its lowered FY23
25  free cash flow target.  Clifford's explanation also was misleading because, just three months earlier,
26  on November 22, 2022, Clifford had told investors she was lowering the FY23 target due to "less
27  demand" for upfront deals and "more demand" for annual deals – only to do a complete about-face
28  by incentivizing EBA customers to do more upfront deals just to meet the lowered target.

83.    As the Company later admitted, despite telling investors that EBA upfront deals had been retired by the start of FY23, "[t]he Company subsequently determined, however, to pursue multiyear upfront contracts with [EBA] customers to help meet its fiscal year 2023 free cash flow goal.  Upfront billings of enterprise customers in fiscal year 2023 substantially exceeded historical levels, helping the Company to meet its lowered annual free cash flow target."  In other words, despite telling investors they had decided to end EBA upfront billings because they required discounts that hurt the Company's profitability, the Company intentionally pursued more of these EBA deals than it ever had before, just to meet its FY23 free cash flow target.

84.    Indeed, as detailed in Section X below, independent expert analysis by Integra FEC ("Integra") demonstrates that the free cash flow from the supposedly retired EBA deals contributed approximately $570 million to FY23.  Without the return to supposedly retired upfront EBA deals the Company would not have achieved lowered guidance of $1.9-$1.98 billion.  Defendants' failure to disclose the historic level of EBA upfront deals used in FY23 to meet the Company's lowered free cash flow target was both quantitatively and qualitatively material.  *See* §XI below.

85.    The Company's reported $2.03 billion free cash flow metric and the factors supposedly driving that result were materially false or misleading for additional reasons.  The Company's Audit Committee admitted that, during FY23, "decisions regarding discretionary spending, collections, and accounts payable were informed by their anticipated effects on the Company's external free cash flow."  These actions rendered the Company's free cash flow statements unreliable because accounts payable (and other expenses) are inputs to the Company's free cash flow calculations.  As further detailed in Section XII below, in concealing from investors the true nature of their FY23 free cash flow and the true factors driving it (upfront EBA deals that substantially exceeded historical levels), Defendants also violated Regulation S-K 10(e) and Regulation G.

> **2.    The Company's February 23, 2023 Form 8-K Was Materially False and Misleading Because the Company's Manipulated Free Cash Flow Did Not Provide Transparency**

86.    The Company gave written assurances to investors about the $2.03 billion free cash flow figure that were also materially false or misleading.  Specifically, the February 23, 2023

Form 8-K (incorporating the press release in ¶¶78-80, above) stated that its incorporated press release included non-GAAP metrics (which included the free cash flow figure of $2.03 billion) to allow "for greater transparency" than just GAAP figures.

87.    The Form 8-K further stated:

> Autodesk uses non-GAAP measures in making operating decisions because Autodesk believes those measures provide meaningful supplemental information for management regarding the Company's earning potential and performance by excluding certain expenses and charges that may not be indicative of the Company's core business operating results. For the reasons set forth below, Autodesk believes that these non-GAAP financial measures are useful to investors both because (1) they allow for greater transparency with respect to key metrics used by management in its financial and operational decision-making and (2) they are used by Autodesk's institutional investors and the analyst community to help them analyze the health of the Company's business. This allows investors and others to better understand and evaluate Autodesk's operating results and future prospects in the same manner as management, compare financial results across accounting periods and to those of peer companies, and to better understand the long-term performance of its core business. **[False Statement No. 2].**

88.    These written assurances demonstrate Defendants' awareness that the Company's reported free cash flow was "used by Autodesk's institutional investors and the analyst community to help them analyze the health of the Company's business."

89.    Unbeknownst to investors, however, the accompanying reported increase in free cash flow from $1.48 billion in FY22 to $2.03 billion (including some of its expense inputs, as well as the explanations about the factors driving the $2.03 billion result) did not "allow[] investors and others to better understand and evaluate Autodesk's operating results and future prospects in the same manner as management" and "compare financial results across accounting periods"; rather, management manipulated underlying operations, accelerating and increasing EBA upfront deals to make its FY23 free cash flow targets. In other words, the Company used its forecasted FY23 free cash flow guidance as the basis to reverse course on its EBA billing model: supposedly retiring the model in order to make Autodesk more valuable, then secretly reverting to the model in FY23 – undertaking EBA upfront deals in amounts that "substantially exceeded historical levels" to help the Company "meet its lowered annual free cash flow target." Far from allowing investors to understand and compare financial results in FY22 to FY23 in the same manner as management, the

concealment of upfront EBA deals in FY23 provided a materially misleading comparison of FY22 and FY23 free cash flow.

    **B.**    **May 25, 2023: The Company Announces Record Free Cash Flow for 1Q24**

    90.    On May 25, 2023, the Company filed a current report with the SEC on Form 8-K attaching and incorporating a press release announcing the Company's 1Q24 financial results. Later that same day, the Company held its 1Q24 earnings call. After Anagnost had touted the Company's "record first quarter free cash flow," Clifford stated: "Free cash flow was $714 million in the first quarter, up 69% year-over-year." The Company somehow collected almost 60% of the cash flow it expected to collect for the entire fiscal year in the first three months alone. This raised questions among market participants.

    91.    For example, an analyst from Barclays Bank noted that the first quarter free cash flow results were well ahead of expected results. The analyst asked Clifford what accounted for these results, in the context of FY24 being a low cash flow year, due to the supposed transition of product customers to the annual billing model. As the analyst put it:

> Great to see the cash flow strength this quarter, well ahead of what we were expecting. I was just wondering if you could just zoom into what drove that, and maybe just looking forward, how you're sort of thinking about the shape of cash flow this year, particularly where we trough here in fiscal '24. Does that make sense?

    92.    Clifford responded in relevant part:

> Yes, yes. So Q1 free cash flow was strong for a couple of reasons. First, cash collections from the last month of billings in fiscal '23 [i.e., January 1-31, 2023] were strong. Second, we also saw favorable linearity and early renewals in Q1 that were driven by the end of multiyear billed upfront. And then third, as I mentioned on the call, after the winter storms in California, we received a federal tax payment extension for the third quarter. **[False Statement No. 3]**

    93.    These explanatory statements were materially false or misleading because, unbeknownst to investors, the 1Q24 free cash flow results included a one-time bump of $200 million in upfront deals that would not recur in FY25 that still included some additional EBA upfront free cash flow. Indeed: (1) as the Company later disclosed during the 3Q24 earnings call, the FY24 free

1    cash flow included $200 million collected in 1Q24 from upfront deals;[7] (2) next, after the end of

2    FY24, the Company reiterated that it had made $200 million in upfront deals in FY24;[8] (3) after the

3    Company's Audit Committee completed its investigation, the Company admitted it had continued to

4    make EBA upfront deals in FY24;[9] and, finally, (4) *Bloomberg* reported that "previously unreported

5    internal documents" showed "[e]mployees warned executives about the strategic risk in early 2022,

6    but the company continued to book such deals at least until the fiscal year ending in January 2024

7    [FY24]."[10]  In combination, these facts permit an inference that the $200 million in upfront deals in

8    1Q24 included EBA deals the Company had supposedly retired well before FY24.

9            94.    Attributing the Company's "record" first quarter free cash flow (in response to an

10   analyst question as to what drove it) to factors such as "cash collections from the last month of

11   billings" and early renewals driven by the end of multiyear upfront billing for products deals that

12   started on March 28, 2023, and failing to disclose that it included upfront free cash flow from EBA

13   customers was materially misleading because the corresponding EBA upfront billing model (which

14   generated some of the $714 million free cash flow in 1Q24) had supposedly been retired a full year

15   prior.

16   **VII.    THE TRUTH BEGINS TO EMERGE: THE COMPANY ADMITS A $200**
             **MILLION ADJUSTMENT IN FREE CASH FLOW IS NECESSARY**

17           95.    On the evening of November 21, 2023, the truth about Defendants' fraud began to

18   emerge.  On that day, the Company filed a current report with the SEC on Form 8-K attaching and

19   _____

20   [7]    For example, on a November 21, 2023 conference call, Clifford stated: "And second, the
       transition to annual billings means that about $200 million of free cash flow in Q1 fiscal '24 that
21     came from multiyear contracts built [sic] upfront will not recur in fiscal '25."

22   [8]    For example, on a February 24, 2024 conference call, Clifford stated: "Excluding $200 million
       from fiscal '24 free cash flow from multiyear upfront billings, which are now billed annually, in
23     fiscal '25, we expect free cash flow growth of about 35% at the midpoint of our guidance.  We
       expect faster free cash flow growth in fiscal '26 because of the return of our largest multiyear
24     renewal cohort, the mechanical stacking of multiyear contracts billed annually and a larger EBA
       cohort."

25   [9]    On May 31, 2024, the Company issued a press release that included this information: "The
       Company separately notes that multiyear upfront billings of enterprise customers in fiscal year 2024
26     was substantially lower than fiscal years 2022 and 2023."

27   [10]   Brody Ford, *Autodesk Executives Ignored Accounting Risks, Documents Show*, *Bloomberg*
       (Aug. 16, 2024).

28

incorporating by reference a press release announcing results for 3Q24.  The press release quoted both Anagnost and Clifford.  The press release's quote of Clifford discussing 3Q24 results stated, among other things: "'Overall market conditions and the underlying momentum of the business remained similar to the last few quarters.  Our financial performance in the third quarter was strong with much of the outperformance coming from larger-than-expected expansions of existing EBAs.'" The press release further reported: "free cash flow was $13 million" for the quarter.  This was the lowest quarterly free cash flow the Company had reported in more than five years.

96.    The Company held an earnings conference call with investors the same evening. During the call, Clifford revealed that the Company's situation was even worse and would negatively impact free cash flow in the upcoming years: the "transition to annual billings means that about $200 million of free cash flow in Q1 fiscal '24 that came from multiyear contracts built [sic] upfront will not recur in fiscal '25," she said.  Later in the call, Clifford responded to analysts' questions about how to model free cash flow into the following year, stating: "So take out the $200 million and then it should have a more reasonable – that will give you more reasonable modeling expectations as you think about modeling fiscal '25 and beyond."

97.    The $200 million in upfront free cash flow referenced by Clifford is the same $200 million in free cash flow that Defendants included in 1Q24 free cash flow results but failed to disclose in False Statement No. 3.  As particularized above, the $200 million in free cash flow the Company told investors to "take out" on November 23, 2023 also included some FY24 free cash flow attributable to EBA upfront deals, which, of course, investors did not know was a part of the FY24 free cash flow because the Company had supposedly eliminated all of those deals by the beginning of FY23.  *See* ¶¶49-53, 60.

98.    Analysts responded negatively to this news in reports issued on November 22, 2023. For example, Barclays analysts wrote: "~$200M of multi-year billings in FY24 . . . needs to come out of our FY25 base," and "[w]e also take this out of FY26."  Similarly, J.P. Morgan analysts noted: "On cash, management reminded investors that about $200 million of free cash flow in 1Q24 that came from multi-year contracts billed upfront tied to the transition to annual billings will not recur in fiscal '25, making the '24 base closer to $1 B, though '24 is still expected to be the trough."

1   Piper Sandler & Co. analysts wrote that while they had hoped FY24 would be a "trough year" with

2   regard to free cash flow and other metrics, they were now "substantially less optimistic" about the

3   stock's value due to the "$200M of [free cash flow] benefit from multiyear billings that still hit in

4   FY24."  Oppenheimer & Co. Inc. likewise reported it had "encountered mostly pushback [from

5   investors] in our conversations and inbox."

6        99.    On November 22, 2023, the first trading day after the Company's earnings

7   announcement and conference call, the Company's stock price fell by almost 7%, from a close of

8   $217.67 per share on November 21, 2023, to a close of $202.66 per share on November 22, 2023.

9   The stock price remained at approximately this level for the next two trading days, closing at

10  $203.42 on November 24, 2023, and at $202.26 on November 27, 2023.[11]

11       100.    On November 28, 2023, Anagnost attempted to diffuse investor concern from the

12  prior week's November 21, 2023 earnings announcement and prop up Autodesk's stock.  During the

13  UBS Technology, Media & Telecom Conference, Anagnost responded to the very first analyst

14  question about a "hot topic" – the Company's reported earnings from last week – by reassuring

15  investors that "even though there was some kind of worry and concern that we were signaling

16  something around macro, we were not."  After Anagnost's comments, Autodesk's stock price closed

17  at $207.37 per share on November 28, 2023, and continued to increase over the next three trading

18  days to approximately $225 per share.  The market continued to be misled about Defendants' use of

19  upfront EBA deals and manipulation of Autodesk's FY23 free cash flow.

20  **VIII.   AUTODESK'S AUDIT COMMITTEE DISCOVERS DEFENDANTS
         ARTIFICIALLY INFLATED FREE CASH FLOW**

21
     **A.   April 1, 2024: The Company Announces It Must Delay the Filing of
22         Its Annual Report to Complete an Internal Investigation into Free
         Cash Flow**
23
24       101.    After the market closed on April 1, 2024, the Company filed Form 12b-25 with the

25  SEC – a notice of late filing of the Company's FY24 annual report.  Rule 12b-25 permits companies,

26  in certain circumstances, to file their annual reports up to 15 days late.

27  ────────────────────
    [11]   The markets were closed on November 23, 2023 (Thanksgiving) and November 25-26, 2023
28  (weekends).

102.    The Company attributed its inability to timely file the report to a previously undisclosed investigation into the Company's free cash flow and non-GAAP operating practices:

> Autodesk, Inc. (the "Company") is unable to file its Annual Report on Form 10-K for the year ended January 31, 2024 (the "Form 10-K") within the prescribed time period, without unreasonable effort or expense.    After the Company's earnings release on February 29, 2024, information was brought to the attention of management, which promptly informed the Audit Committee (the "Committee") of the Board of Directors of the Company, that caused the Committee to commence an internal investigation with the assistance of outside counsel and advisors, regarding the Company's free cash flow and non-GAAP operating margin practices.  The Committee is comprised entirely of outside "independent directors" as defined by the Nasdaq Stock Market listing standards.  The investigation is ongoing and all parties are working diligently to complete the investigation.  The Company has voluntarily contacted the Securities and Exchange Commission (the "Commission") to advise it that an internal investigation is ongoing, and the Committee intends to provide additional information to the Commission as the investigation proceeds.  The Company needs further time to assist the Committee in its investigation and to review its practices in this regard.

103.    This caused the Company's stock price to decline over 4%, from a close of $259.44 on April 1, 2024 to a close of $248.71 on April 2, 2024.  Analysts from Barclays commented that while the delayed filing on account of an investigation was a headline that "is never good to see," they were optimistic to "hear this is expected to be resolved within 15 days."  The investigation took longer than 15 days.

### B.    April 16, 2024: The Investigation Continues, Delaying Public Filings

104.    On April 16, 2024, the Company filed with the SEC a current report on Form 8-K, stating the Company expected to receive a delinquency notice from Nasdaq regarding the Company's late Form 10-K:

> As previously disclosed, the filing of the Form 10-K was delayed due to the matters described in the Form 12b-25 and the Prior Press Release.  As of today, the internal investigation described in the Form 12b-25 and the Prior Press Release is ongoing and all parties continue to work diligently to complete the investigation and to file the Form 10-K as soon as practicable.  The subject of the internal investigation remains the same as previously disclosed, and the Company currently does not believe that any of the matters under investigation affect any previously issued financial statements or the information in the Company's earnings release on February 29, 2024.

105.    This caused the Company's stock price to fall almost 6% from a closing price of $228.24 per share on April 16, 2024, to a close of $214.92 per share on April 17, 2024.  As one market commentator noted at the time:

Shares of design software company Autodesk (NASDAQ:ADSK) fell 7.8% in the morning session after the company provided an update on an ongoing internal investigation, which will delay filing its annual report for the year ended January 31, 2024 within the grace period provided by the SEC (Securities and Exchange Commission).[12]

The commentator further noted that, in "a report filed with the SEC on April 1, 2024, the company revealed it was working with outside counsel and advisors regarding its free cash flow and non-GAAP operating margin practices." The article explained: "this update is likely to raise concerns about the business."

## IX.    POST-CLASS PERIOD EVENTS CONFIRM THE AUDIT COMMITTEE'S DISCOVERY THAT MANAGEMENT HAD MANIPULATED FREE CASH FLOW TO ARTIFICIALLY INFLATE ITS NUMBERS

106.    On May 31, 2024, Defendants issued a press release finally detailing the principal findings of the Audit Committee's investigation, which they buttressed with rosy statements about the Company's prospects and growth for the upcoming year. In the press release, Anagnost made this mixed statement discussing, simultaneously, the Audit Committee's free cash flow investigation and the Company's optimistic projected numbers for the future: "We appreciate your patience as we work through this important process. We take situations like this very seriously and are grateful to put the investigation behind us," said Andrew Anagnost, Autodesk president and CEO. "In the first quarter of fiscal 2025, we generated broad-based growth . . . in AEC and manufacturing across products and regions. . . . The new transaction model implementation is on track. . . . Our strong start sets us up well to achieve our goals for the year."

107.    The press release also touted the Company's projected double-digit billings growth of 12%-15% and projected revenue growth of 9%-11% for FY25, which exceeded analysts' expectations. Curiously, contrary to every other press release announcing quarterly results for years, the press release said nothing about free cash flow in 1Q25.

---

[12]   Max Juang, *Why Autodesk (ADSK) Stock Is Trading Lower Today*, yahoo!finance (Apr. 17, 2024), https://finance.yahoo.com/news/why-autodesk-adsk-stock-trading-151454911.html.

108.     The press release announced that "management" (which included at least Anagnost, as the CEO) had decided not to make any "restatement or adjustment" to the Company's previously reported non-GAAP numbers, which, of course, included free cash flow.

109.     The Company also announced that Clifford would be immediately replaced by an interim CFO and had been shifted to a role that had nothing to do with financial reporting – a clear demotion.

> Elizabeth "Betsy" Rafael has been appointed by the Board as Interim Chief Financial Officer (Principal Financial Officer), effective May 31, 2024.  As Interim Chief Financial Officer, she is not currently an "independent director" for purposes of the Nasdaq Stock Market and has stepped down from the Audit Committee.  She remains a director of the company.

> Deborah L. Clifford has been appointed as the company's Chief Strategy Officer, reporting to the Chief Executive Officer, effective May 31, 2024.  Her responsibilities will include, among other things, corporate development, new vertical businesses that are outside Autodesk's existing product groups, and the company's Social Impact and Sustainability efforts.

110.     The same press release included a "summary" of the Audit Committee's "principal findings" for the investigation of FY22-FY24, which included:

> •     The Company has historically relied on multiyear contracts with its enterprise and product subscription customers, billed upfront, to help meet its free cash flow targets.  During the relevant period, the Company engaged in programs designed to incentivize customers to accept multiyear upfront billing, renew early, and/or pay before the end of the fiscal year.

> •     The Company has disclosed its practice of incentivizing customers to adopt multiyear upfront billing arrangements.  It has also acknowledged that discounted multiyear upfront contracts reduce revenue and lower billings in out years.  Though prior to fiscal year 2024, the Company did not quantify free cash flow attributable to multiyear upfront billings, it has noted the contribution of upfront collections to fluctuations in the Company's quarterly reported long-term deferred revenue.

> •     During fiscal year 2022, the Company announced that it had begun to shift enterprise customers to contracts billed annually, and that it had assumed fiscal 2023 enterprise contracts would be billed annually.  The Company subsequently determined, however, to pursue multiyear upfront contracts with enterprise customers to help meet its fiscal year 2023 free cash flow goal.  Upfront billings of enterprise customers in fiscal year 2023 substantially exceeded historical levels, helping the Company to meet its lowered annual free cash flow target.

> •     In addition, during the relevant period, certain decisions regarding discretionary spending, collections, and accounts payable were informed by their anticipated effects on the Company's external free cash flow and/or non-GAAP

operating margin targets.  The resulting actions generally served to reduce reported free cash flow and/or lower reported margin in the current period.  [FY24].[13]

111.    The press release further stated: "The company notes that multiyear upfront billings of enterprise customers in fiscal year 2024 was substantially lower than fiscal years 2022 and 2023."

112.    Moreover, the Company explained its Audit Committee "proposed certain remedial measures including: reviewing certain processes around financial communications and disclosures; assessing certain Company organizational functions and responsibilities; and adopting and enhancing policies, processes, and controls related to the matters investigated."

113.    However, the press release sought to neutralize the impact of the Audit Committee's findings.  In addition to the announcement that "management has determined that there will be no restatement," it included the finding that "[t]hough free cash flow was one factor in the Company's executive compensation program, these decisions were not calculated to influence compensation outcomes."  However, as detailed below, this finding is directly contradicted by the Company's own compensation policies, which were designed so that Anagnost's and Clifford's decisions were heavily influenced by their impact on the Company's reported free cash flow.  The Audit Committee's assertion that free cash flow was "one factor" in Anagnost's and Clifford's compensation is literally true: free cash flow was one of the key elements, as discussed below.

114.    On June 10, 2024, the Company filed its FY24 annual report on Form 10-K.  On the first substantive page of the report, the Company provided an "EXPLANATORY NOTE" regarding the investigation explaining that, as "previously announced on April 1, 2024," the Company's Audit Committee launched an investigation into the Company's reported free cash flow.  The Audit Committee had investigated FY22, FY23, and FY24, and the Audit Committee's "principal findings" included the same points set forth in the Company's May 31, 2024 press release, discussed above.

---

[13]    The "current period" refers to FY24, as analyst reports noted in reviewing the Audit Committee's principal findings.

115. Moreover, the Form 10-K further revealed the Company had been contacted by the U.S. Attorney's Office for the Northern District of California in connection with the internal investigation.

116. On June 17, 2024, Starboard, an Autodesk investor that managed funds that owned approximately $585 million in Autodesk stock, published a letter discussing the Audit Committee's discovery that the Company "intentionally misled investors on its billings practices as it manipulated free cash flow":

> This was a clear case of a company saying one thing to investors and doing something completely different. Autodesk had an obligation to not mislead investors with its public commentary, but instead of honoring this obligation, Autodesk did the opposite – the Company told investors it was at the tail-end of a process to move enterprise customers to annual billings. The Company went to great lengths to discuss that it was better for the Company to move to annual billings to reduce discounts and to have more consistent cash flow, among other reasons. Instead, when the Company realized it would struggle to reach its free cash flow targets (which were set expecting annual billings), the Company reverted to discounts for multi-year, upfront billings, as well as other actions, to accelerate free cash flow. The Company continued to report these free cash flow results with multi-year, upfront billings while explicitly and implicitly leading shareholders to believe they had moved enterprise customers to annual billings.

117. The same day Starboard published its letter, it commenced litigation in the Chancery Court of Delaware to force a proper election of Board directors and, consequently, to ensure better oversight of the Company's executives.[14]

118. Starboard is a well-respected institutional investor with approximately $5.5 billion in assets under management.[15] Starboard describes its investment approach as "invest[ing] in deeply undervalued companies and actively engag[ing] with management teams and boards of directors to

---

[14] *See* Verified Complaint, *Starboard Value, LP v. Autodesk, Inc.*, No. 2024-0659 (Del. Ch. June 17, 2024). While Starboard's lawsuit in the Delaware Court of Chancery (announced on June 17, 2024) was not successful in reopening Autodesk's nomination window (which had closed on March 23, 2024) and delaying the 2024 Annual Meeting, it proposed its own slate of directors the following year. That slate attracted support from outside Starboard (including Autodesk's 14th largest investor, T. Rowe Price), before Autodesk agreed to add two directors and Starboard withdrew its nominations.

[15] Starboard Value LP, Form 13F, filed May 25, 2025, https://www.sec.gov/Archives/edgar/data/1517137/000092189525001532/xslForm13F_X02/primary_doc.xml.

1  identify and execute on opportunities to unlock value for the benefit of all shareholders."[16]  The fact

2  that Starboard found that Autodesk "intentionally misled investors on its billings practices as it

3  manipulated free cash flow" is significant.  That Autodesk's misrepresentations and omissions were

4  material to Starboard, such that it took the above actions, demonstrates that they would be material

5  to any reasonable investor.

6          119.    Thereafter, on August 16, 2024, Bloomberg published an article titled, "Autodesk

7  Executives Ignored Accounting Risks, Documents Show."  The article reported that, "according to

8  previously unreported internal documents," the Company continued to pursue upfront EBA deals "in

9  an effort to meet financial targets" and "counted on the upfront payments to boost cash flow."

10  Moreover, "[e]mployees warned executives about the strategic risk in early 2022, but the company

11  continued to book such deals at least until the fiscal year ending in January 2024."  The documents

12  also showed "[e]mployees considered the practice risky because the discounts and other concessions

13  reduced long-term revenue, boosted the chance of mistakes in financial modeling and made it harder

14  for salespeople to do their jobs[.]"  Finally, the article reported that, according to the documents:

15  "Some of the deals were approved by Chief Operating Officer Steve Blum[.]"

16  **X.    INDEPENDENT EXPERT ANALYSIS QUANTIFIES THE UPFRONT**
    **EBA DEALS UNDERTAKEN IN FY23**

17

18          120.    Lead Plaintiff retained Integra FEC, an economic consulting firm with expertise in

19  forensic finance, to quantify the impact of upfront EBA deals on Autodesk's FY23 FCF.  Integra's

20  independent analysis concludes that Autodesk's FY23 FCF was boosted by approximately $570

21  million as a result of its undisclosed reliance on upfront billing of multiyear EBAs.

22          121.    Integra is a financial and economic consulting firm that has advised and consulted for

23  public and private sector clients including the U.S. Department of Justice, the SEC, the Commodity

24  Futures Trading Commission, state-level enforcement entities, and law firms.  Integra is led by Dr.

25  John M. Griffin, who is aided by a team of data, economic, and accounting analysts and consulting

26  staff.

27  _____

    [16]  Overview, Starboard Value, https://www.starboardvalue.com/overview/ (last visited Aug. 4,
28  2025).

122.    Professor Griffin is a Professor of Finance and the James A. Elkins Centennial Chair in Finance at the University of Texas, McCombs School of Business.  He has also served on the faculty at Arizona State University, Yale University, Hong Kong University of Science and Technology, and Harvard Business School.  He received a B.A. in Economics from Baylor University in 1992, an M.S. in Finance from Texas A&M University in 1993, and his Ph.D. in Finance from Ohio State University in 1997.

123.    Professor Griffin is a recognized expert in the field of forensic finance, and his academic research has been profiled hundreds of times in leading news outlets including Bloomberg, CNN, CNBC, Forbes, the Financial Times, the New York Times, USA Today, and the Wall Street Journal.

124.    To quantify Autodesk's FY23 free cash flow attributable to billing EBAs upfront, Integra calculated the FCF impact for Q3 and Q4 though a counterfactual cash flow model. Specifically, Integra analyzed Autodesk's reported financial metrics, including long-term deferred revenue, to model what Autodesk's FY23 free cash flow would have been under the counterfactual that Autodesk performed annual billing of its multiyear EBAs in FY23, instead of engaging in upfront billing to meet its free cash flow target.

125.    Integra's analysis relied upon Autodesk's financial statements, press releases, call and conference transcripts, independent financial analyst reports, and Bloomberg.[17]

### A.    Key Financial Metrics for Integra's Analysis

#### 1.    Long-Term Deferred Revenue

126.    Integra analyzed Autodesk's reported FY23 long-term deferred revenue, which is indicative of Autodesk taking in cash upfront from multiyear deals.[18]  If a multiyear contract is billed

---

[17]    Integra's analysis was based on information available from these various sources, and Integra reserved the right to update its calculations if more detailed internal Autodesk information becomes available.

[18]    Autodesk has acknowledged the link between long-term deferred revenue and FCF.  For example, Autodesk's Explanatory Note in its FY24 10-K states that the upfront billings contributed to fluctuations in its reported long-term deferred revenue:

The Company has disclosed its practice of incentivizing customers to adopt multiyear upfront billing arrangements.  It has also acknowledged that discounted multiyear upfront contracts reduce revenue

1    annually, there is no long-term deferred revenue associated with it.  As such, long-term deferred

2    revenue should decrease when switching from billing multiyear contracts upfront to annually.

3        127.    Integra examined Autodesk's FY23 balance sheet, which showed that long-term

4    deferred revenue increased year-over-year from FY22 to FY23 by $450 million, or 49%.  Integra

5    depicted the large increase in this account balance in **Figure 1**, below.  In comparison, from FY18 to

6    FY22, the annual increase in long-term deferred revenue averaged only $131 million.

7        128.    On a quarterly basis, FY23 long-term deferred revenue increases from 2Q23 to 3Q23

8    by $58 million to $1,052 million, and from 3Q23 to 4Q23 by $325 million to $1,377 million.  In

9    FY22, the increase from Q2 to Q4 was only $147 million.  Long-term deferred revenue peaked by

10   the end of FY23 at $1,377 million before declining in FY24 to $764 million and in FY25 to $341

11   million.   Integra's **Figure 1** illustrates how Autodesk's FY23 long-term deferred revenue is

12   unusually high – especially since all else equal, long-term deferred revenue should decrease as a

13   company transitions from billing upfront to billing annually.

14

15

16

17

18

19

20

21

22

23

24   and lower billings in out years.  Though prior to fiscal year 2024, the Company did not quantify free
     cash flow attributable to multiyear upfront billings, it has noted the contribution of upfront
25   collections to fluctuations in the Company's quarterly reported long-term deferred revenue.

26   *See also* Page 5, 4Q23 Autodesk Earnings Call (Feb. 23, 2023) (Debbie Clifford, CFO: "We expect
     free cash flow to be between $1.15 billion and $1.25 billion.  The midpoint of that range, $1.2
27   billion, implies a 41% reduction in free cash flow compared to fiscal '23.  As I outlined earlier, the
     key drivers of that reduction are changes in long-term deferred revenue as a result of the shift to
28   annual billings for multiyear customers . . .").

**Figure 1. Autodesk Long-Term Deferred Revenue**
This chart shows Autodesk's year-end long-term deferred revenue and the increase from FY22 to FY23 of $450 million.



### 2.     Free Cash Flow

129.     Integra also examined Autodesk's reported free cash flow.  Autodesk's FY23 FCF of $2,031 million is $556 million higher than FY22 FCF of $1,475 million.  Integra depicted this increase in **Figure 2**, below.  This FCF is also $749 million higher than FY24 FCF of $1,282.

**Figure 2. Autodesk Free Cash Flow**
This chart shows Autodesk's annual FCF and the year-over-year $556 million increase from FY22 to FY23.



130.    Autodesk's 4Q22 FCF is $716 million, compared to 4Q23 FCF of $903 million, an increase of $187 million, or 26%.  The noteworthy FCF result is mirrored in higher billings in FY23, where 4Q23 billings increased by $457 million, or 28%, from 4Q22, from $1,659 million to $2,115 million.

**B.    Integra's Quantification of the Impact of Upfront EBAs on FY23 Free Cash Flow**

131.    Integra modeled 3Q23 and 4Q23 long-term deferred revenue under the counterfactual that Autodesk had billed EBAs annually, and then used this counterfactual long-term deferred revenue to arrive at counterfactual FCF for 3Q23 and 4Q23.[19]

---

[19]    Integra's counterfactual modeling commences with 3Q23 since that was when the company lowered its FCF outlook from $2,000 million–$2,080 million to $1,900 million–$1,980 million, in

132.    Integra's model calculated the counterfactual FCF for billing EBAs annually by starting with long-term deferred revenue.  This analysis assumed that, if Autodesk billed EBAs annually, the long-term deferred revenue would grow at the same pace year-over-year as recognized revenue.  Integra considered this to be a likely conservative assumption, since the year-over-year change in long-term deferred revenue for EBAs should have been strongly negative with the complete removal of upfront multiyear billing for enterprise customers by the start of FY23, as previously disclosed by Autodesk.  Using this assumption yields increases for 3Q23 and 4Q23 long-term deferred revenue of 14% and 9% from their respective third and fourth quarter FY22 counterparts.[20]

133.    Integra then used the counterfactual value for 3Q23 and 4Q23 long-term deferred revenue to derive the counterfactual for 3Q23 and 4Q23 FCF, assuming that billings arrive midway through a quarter and that EBAs have a length of three years.[21]

134.    Applying this conversion from long-term deferred revenue to FCF, and attributing those differences to billing EBAs upfront, Integra calculated Autodesk's FY23 Q3 and Q4 FCF

---

contrast to 2Q23 where the outlook held steady from Q1.  It can be inferred that at some point in 3Q23, the company realized that its FCF was falling increasingly short of expectations and began pursuing upfront EBA contracts to meet its FY FCF goals.  The company's efforts in 3Q23 and 4Q23 subsequently led to the company overshooting the $1,900–1,980 million outlook and attaining a record year for FCF.

[20]    Integra considered this approach arguably conservative because, if Autodesk converts billing from upfront to annual – all else equal – long-term deferred revenue should decrease.  Yet, this method allows for growth in long-term deferred revenue in line with recognized revenue.

[21]    Consider a new upfront three-year $1,200 contract for a given reference quarter, where the contract begins and is billed midway through the quarter.  It would provide $1,200 in billings and free cash flow for that quarter.  If revenue is recognized at a uniform pace through the life of the contract, $50 of revenue would be recognized in that quarter, leaving $400 in short-term deferred revenue and $750 in long-term deferred revenue at quarter-end.

Now consider if instead that same contract was billed annually.  It would provide $400 in billings and cash flow for that quarter.  With the same $50 of recognized revenue, now that contract leaves $350 of short-term deferred revenue and no long-term deferred revenue at quarter-end.

Thus, switching the contract from upfront to annual billing would result in a $1200 - $400 = $800 difference in cash flows and a $750 - $0 = $750 difference in long-term deferred revenue for that reference quarter.  The ratio 800/750 can be applied with no loss of generality as a scaler to convert a difference between reported and counterfactual long-term deferred revenue into a difference between reported and counterfactual free cash flow.

under the counterfactual to be approximately $570 million lower than reported, as shown in **Figure 3** below.[22, 23]



---

[22]    Counterfactual FY23 FCF of $1,461 (in millions) = Q1 $422 (reported) + Q2 $246 (reported) + Q3 $284 + Q4 $509 using counterfactual long-term deferred revenue; FCF are assumed to arrive midway between quarters from three-year EBAs.

[23]    Instead of the $556 million growth in FCF from FY22 to FY23, as shown in **Figure 2** using reported figures, Autodesk would have seen a $14 million decline in FCF from FY22 to FY23 under the counterfactual. A decline in free cash flow from FY22 to FY23 would be expected, all else equal, with a company converting from upfront to annual billing. This is also consistent with the change in reported FY23 to FY24 values – or even FY22 to FY24 values – where free cash flow saw a noticeable decline.

Counterfactual FCF can decrease even when there is year-over-year growth in long-term deferred revenue by quarter. For example, for 4Q23, reported long-term deferred revenue grew 49% from 4Q22, when growth in reported total revenue was 9%. This results in a $369 million difference between reported and counterfactual long-term deferred revenue for 4Q23, and thus a $394 million difference between reported and counterfactual FCF from Q4 alone.

**Figure 3. Counterfactual FCF if Billing EBAs Annually as Previously Reported**

This chart shows Autodesk's reported FY23 quarterly FCF in gray bars alongside the counterfactual FCF depicted by red bars for Q3 and Q4. For Q3 and Q4, the total difference between Autodesk's reported FCF in gray of $1,363 million and the Q3 and Q4 counterfactual FCF in red of $793 million (where instead Autodesk fully converted to billing EBAs annually, as stated by previous company guidance) represents a difference in FCF of approximately $570 million. The reported and counterfactual FCF for FY23 as a whole are $2,031 and $1,461, respectively.



135.    Integra attributed this counterfactual difference in free cash flow to EBAs because the Audit Committee's explanation of how it met its FY23 FCF target only identifies "[u]pfront billings of enterprise customers," without any mention of other types of customers, such as Indirect Sales customers or Online Sales customers.

1

### C.    Integra's Robustness Check

2        136.    Integra also performed a robustness check to provide additional assurance as to the

3    reasonableness of the model's results.[24]  Specifically, Integra calculated a separate counterfactual for

4    FY23 Q3 and Q4 long-term deferred revenue.  Instead of using the FY23 Q3 and Q4 year-over-year

5    recognized revenue growth rates (as done in the main model), Integra's robustness check used the

6    average long-term deferred revenue growth rate year-over-year for Q1 and Q2 for FY22 to FY23

7    (22.2%)[25] to calculate counterfactual long-term deferred revenue for Q3 ($953 million) and Q4

8    ($1,132 million).  Integra then used this counterfactual value for Q3 and Q4 long-term deferred

9    revenue to derive the counterfactual free cash flow for Q3 ($354 million) and Q4 ($642 million),

10    assuming that billings arrive midway through a quarter and that EBAs have a length of three years,

11    as in the main model.  *See* **Figure 4** below.

12        137.    Applying this conversion from difference in long-term deferred revenue to difference

13    in FCF and attributing those differences to billing EBAs upfront, Integra's robustness check

14    calculated Autodesk's counterfactual FY23 Q3 and Q4 FCF to be approximately $367 million lower

15    than reported, as shown in **Figure 4** below.[26]

16

17

18

19

20

21

22

_____

[24]    The goal of a robustness check is not to reproduce the exact same result of the model but to see if
the main finding remains consistent.  The model finds a material difference in the reported FCF and
the counterfactual FCF, and so does the robustness check.

[25]    $22.2\% = (27.5\% + 16.9\%) / 2$, where 27.5% and 16.9% are the FY23 Q1 and Q2 long-term
deferred revenue growth rates, respectively.

[26]    Counterfactual FY23 FCF of $1,664 (in millions) = Q1 $422 (reported) + Q2 $246 (reported) +
Q3 $354 + Q4 $642 using counterfactual long-term deferred revenue; FCF are assumed to arrive
midway between quarters from three-year EBAs.

**Figure 4. Robustness Check**
This chart shows Autodesk's quarterly reported FY23 FCF in gray bars alongside counterfactual free cash flows depicted by red bars for Q3 and Q4. For Q3 and Q4, the total difference between Autodesk's reported FCF in gray of $1,363 million and the Q3 and Q4 counterfactual FCF in red of $996 million (where instead Autodesk fully converted to billing EBAs annually, as stated by previous company guidance) represents a difference in FCF of approximately $367 million. The reported and counterfactual FCF for FY23 as a whole are $2,031 and $1,664, respectively.



138.    In summary, Integra's counterfactual cash flow modeling, supported by a robustness check, calculated the impact of multiyear upfront contracts for Autodesk's EBA customers on its FY23 free cash flow as approximately $570 million.

## XI.    THE HISTORICAL LEVEL OF UPFRONT EBA DEALS PURSUED TO MAKE THE FY23 FREE CASH FLOW TARGET WAS MATERIAL

139.    Autodesk's undisclosed decision to bill EBAs upfront to provide approximately $570 million (*see* §X) to the Company's FY23 free cash flow was material both quantitatively and qualitatively.  On a quantitative basis, the counterfactual $570 million represented 28.1% of total

1    reported FY23 free cash flow of $2,031 million.  Without this additional cash, Autodesk's FY23 free

2    cash flow would have been 23.1% below the low end of its guidance of $1,900 million to $1,980

3    million.  These percentages are well above the 5% "rule of thumb" often cited as an initial step for

4    assessing materiality.  *See* SEC Staff Accounting Bulletin: No. 99 – Materiality.

5        140.    In addition to being quantitatively material, Defendants' failure to disclose their

6    return to retired upfront deals to achieve lowered free cash flow guidance for FY23 was also

7    qualitatively material.  *See* SEC Staff Accounting Bulletin: No. 99 – Materiality.  The SEC has

8    explained that "a matter is 'material' if there is a substantial likelihood that a reasonable person

9    would consider it important."  Moreover, "[q]ualitative factors may cause misstatements of

10   quantitatively small amounts to be material."  For example, such factors include, but are not limited

11   to, "whether the misstatement that masks a change in earnings or other trends," is used to "'manage'

12   earnings," "concerns a segment or other portion of the registrant's business that has been identified

13   as playing a significant role in the registrant's operations or profitability," and "has the effect of

14   increasing management's compensation – for example, by satisfying requirements for the award of

15   bonuses or other forms of incentive compensation."

16       141.    Here, Defendants relied on a historically unprecedented level of EBA deals billed

17   upfront which were "pursue[d]" by the Company to "manage" free cash flow to meet lowered FY23

18   free cash flow guidance.  Free cash flow (and in particular, FY23 free cash flow) was a key metric to

19   which investors looked for valuation purposes.  The Company had also encouraged investors to

20   focus on that number to understand the business in a transparent way.  Without the benefit of its

21   undisclosed upfront EBAs, the Company would have missed the FY23 free cash flow target that it

22   had communicated to the market.  Defendants emphasized the import of its billing model transition

23   from upfront to annual as better for Autodesk and its customers, emphasizing that it would make it

24   more profitable and more valuable for the Company.  Yet, they returned to this retired less profitable

25   model to achieve free cash flow FY23 guidance.  That the Individual Defendants profited through

26   incentive compensation tied to manipulated FY23 free cash flow also demonstrates its materiality.

27   The material nature of Defendants' FY23 free cash flow manipulations is also evident from the

28

1  Audit Committee's immediate removal of Clifford (responsible for the cash flow statement and free

2  cash flow guidance) in conjunction with its findings.

3  **XII.    VIOLATIONS OF SEC RULES AND REGULATIONS**

4          142.    As alleged herein, Defendants engaged in an undisclosed scheme to boost free cash

5  flow – a key non-GAAP financial measure and a significant component of Defendants'

6  compensation – to "help meet [their] free cash flow targets."  Prior to the start of the Class Period,

7  Autodesk announced that it had revised its billing methodology from an upfront billing model to an

8  annual billing model.  For example, at the Company's earnings call for 2Q22 on August 25, 2021,

9  Defendants announced they would transition the small remaining group of EBA customers that still

10  had upfront deals to the annual billing model with the assumption that FY23 (starting February 1,

11  2022) contracts would be billed annually.  Prior to and throughout the Class Period, Defendants

12  continued to disclose to investors that "[p]ayments on EBAs are typically due in annual installments

13  over the contract term."[27]  The transition from upfront payments to annual billings for multi-year

14  contracts would impact the timing of cash collections – and therefore, free cash flow – because

15  rather than collecting the entire payment up front, there would be smaller payments spread out over

16  time.  This effect was acknowledged by Defendants in their SEC filings leading up to and throughout

17  the Class Period: "We also expect our transition to annual billings for multi-year contracts to impact

18  the timing of our billings and cash collections."[28]

19          143.    The SEC has promulgated rules and guidance for public companies that report and

20  disclose non-GAAP financial measures.  Regulation S-K 10(e) and Regulation G state that non-

21  GAAP financial measures (*e.g.*, Autodesk's free cash flow) cannot be untrue or misleading when

22  read in context of the information provided by the company:

23

24  ───────────────
    [27]  *See, e.g.*, 1Q19 10-Q at p. 12; 2Q19 10-Q at p. 12; 3Q19 10-Q at p. 13; FY19 10-K at p. 79;
25  1Q20 10-Q at p. 11; 2Q20 10-Q at p. 12; 3Q20 10-Q at p. 12; FY20 10-K at p. 78; 1Q21 10-Q at p.
    10; 2Q21 10-Q at p. 10; 3Q21 10-Q at p. 10; FY21 10-K at p. 81; 1Q22 10-Q at p. 10; 2Q22 10-Q at
26  p. 10; 3Q22 10-Q at p. 10; FY22 10-K at p. 83; 1Q23 10-Q at p. 10; 2Q23 10-Q at p. 10; 3Q23 10-Q
    at p. 10; FY23 10-K at p. 82; 1Q24 10-Q at p. 9; 2Q24 10-Q at p. 9, 3Q24 10-Q at p. 9).

27  [28]  *E.g.*, 3Q23 10-Q at p. 38; FY23 10-K at pp. 8, 39, 46; 1Q24 10-Q at pp. 32, 36; 2Q24 10-Q at pp.
28  34, 38; 3Q24 10-Q at pp. 35, 39.

A registrant, or a person acting on its behalf, shall not make public a non-GAAP financial measure that, taken together with the information accompanying that measure and any other accompanying discussion of that measure, contains an untrue statement of a material fact or omits to state a material fact necessary in order to make the presentation of the non-GAAP financial measure, in light of the circumstances under which it is presented, not misleading.

144.    Moreover, the Sarbanes-Oxley Act requires that any public disclosure of a non-GAAP financial measure not contain an untrue statement of a material fact or omit to state a material fact necessary in order to make the non-GAAP financial measure, in light of circumstances under which it is presented, not misleading.[29]

145.    The Company's fiscal 2023 free cash flow disclosures concealed from investors the true nature of their key non-GAAP financial metric.  Although Defendants told investors that they were no longer booking multi-year upfront EBA contracts in FY23, they discreetly did so in order to meet their FY23 free cash flow guidance of $1.9-1.98 billion: "Upfront billings of enterprise customers in fiscal year 2023 substantially exceeded historical levels, helping the company to meet its lowered annual free cash flow target."  This practice deviated substantially from the Company's internal controls and remedial measures were proposed by the Audit Committee to "review[] certain processes around financial communication and disclosures."

146.    The market understood, based on Defendants' disclosures and statements, that Autodesk had transitioned to annual billing for EBAs by the beginning of FY23.  But investors were kept in the dark regarding the Company's decision to pursue the practice of entering into upfront EBA contracts to boost their free cash flow.  Defendants' undisclosed change from annual billing back to upfront billing for EBA deals resulted in a misleading boost to free cash flow.  Failure to disclose the true nature of the FY23 free cash flow violated Regulation G, Regulation S-K 10(e), and the Sarbanes-Oxley Act.

## XIII.    ADDITIONAL SCIENTER ALLEGATIONS

147.    At all relevant times, the Defendants acted with scienter in making materially false and misleading statements during the Class Period, as well as making material omissions of fact that made Defendants' statements misleading during the Class Period.  Defendants had knowledge that

---

[29]    Reg G (emphasis added).

1   the statements made were false and misleading when made, or acted with reckless disregard for the

2   truth or falsity of those statements when made, as demonstrated by the allegations above.  The

3   additional facts alleged below further support a strong inference of scienter.

### A. The Audit Committee Indicated the Company's Actions Taken to Artificially Boost Free Cash Flow Were Intentional

148.   The Audit Committee's findings indicate Defendants intentionally undertook actions in FY23 for the purpose of inflating free cash flow to meet lowered targets.

149.   First, the Audit Committee admits: "[d]uring fiscal year 2022, the [C]ompany announced that it had begun to shift enterprise customers to contracts billed annually, and that it had assumed fiscal 2023 enterprise contracts would be billed annually."  The reference to the "company" clearly implicates Anagnost and Clifford, the Company's most senior officers, who actually made these announcements regarding the end of EBA upfront deals "[d]uring fiscal year 2022" that ended on January 31, 2022.  Specifically, Clifford made such announcements on August 25, 2021, September 1, 2021, and September 14, 2021, as noted above. *See, e.g.*, ¶¶49-55, 60.  Anagnost made a similar announcement on November 23, 2021, as noted above.  *See, e.g.*, ¶62.

150.   The Audit Committee's other findings regarding the "company's" intentional manipulation of free cash flow and other financial metrics also point to Anagnost and Clifford, such as:

- "subsequently determined . . . to pursue multiyear upfront contracts with enterprise customers to help meet its fiscal year 2023 free cash flow goal";

- "engaged in programs designed to incentivize customers to accept multiyear upfront billing, renew early, and/or pay before the end of the fiscal year"; and

- "certain decisions regarding discretionary spending, collections, and accounts payable were informed by their anticipated effects on the Company's external free cash flow and/or non-GAAP operating margin targets."

151.   Clifford's and Anagnost's connection to these admitted manipulations – including decisions around specific inputs, such as accounts payable, that influenced free cash flow – is particularly clear where Clifford, as CFO, had responsibility for the Company's financial statements, which included its cash flow statement.  As the most senior officers of the Company, the Individual Defendants were solely required to and did certify that the Company's FY23 cash flow statement (as

1  part of the Company's financial statements) was accurate, that it "fairly presented the cash flows of

2  the registrant," and that the Company's FY23 annual report "does not contain any untrue statement

3  of a material fact or omit to state a material fact necessary to make the statements made, in light of

4  the circumstances under which such statements were made, not misleading with respect to the period

5  covered by this report."  In other words, Anagnost and Clifford certified that they were responsible

6  for the FY23 free cash flow statement that the Audit Committee subsequently demonstrated was, in

7  fact, misleading.  As detailed above, Clifford was part of the team that set the FY23 free cash flow

8  target and after assuming the role of CFO, was responsible for the free cash flow statement and the

9  Company's free cash flow guidance.  These facts further support an inference that Anagnost and

10  Clifford either directed or, at a minimum, knew of these intentional actions to inflate free cash flow.

11      152.    Moreover, Defendants' scienter is further supported by the Bloomberg article,

12  detailed above, which reported that, based on internal documents it reviewed, Autodesk "employees

13  considered the practice risky because the discounts and other concessions reduced long-term

14  revenue, boosted the chances of mistakes in financial modeling, and made it harder for salespeople

15  to do their jobs, the documents said."  Moreover, the article stated: "[e]mployees warned executives

16  about the strategic risk in early 2022, but the company continued to book such deals at least until the

17  fiscal year ending in January 2024, according to the documents."  According to Bloomberg, the same

18  documents showed some of the deals "were approved by Chief Operating Officer Steve Blum."

19      153.    As detailed above, Clifford was responsible for the Company's "guidance" – i.e., the

20  public targets based on "financial modeling."

21      154.    In addition, the Audit Committee's findings with regard to executive compensation

22  implicate Anagnost and Clifford because they noted that "certain decisions . . . were informed by

23  their anticipated effects on the company's external free cash flow" and noted that "free cash flow

24  was one factor in the company's executive compensation program."  Anagnost and Clifford were

25  executives whose compensation was influenced by free cash flow.  For example, under the

26  Company's Long-Term Incentives program for FY23, the number of Performance Stock Units

27  ("PSUs") awarded was determined by Autodesk's "Performance Results," the formula for which was

28  based on revenue (weighted 60%) and free cash flow (weighted 40%).  Under this program,

Anagnost received PSUs valued at $8,524,475, and Clifford received PSUs valued at $1,459,737. Thus, their compensation rested heavily on the Company's FY23 free cash flow results reported to the market that were boosted by the undisclosed change to upfront billings.

155. Further, as part of its findings, the Audit Committee "proposed certain remedial measures, including: reviewing certain processes around financial communications and disclosures; assessing certain Company organizational functions and responsibilities; and adopting and enhancing policies, processes, and controls related to the matters investigated." This disclosure revealed the Company's processes around financial communications and disclosures and its internal controls related to the Company's practices around free cash flow were lacking, despite the Individual Defendants' certifications (in SEC filings dated March 14, 2023, June 1, 2023, August 29, 2023, and December 4, 2023) attesting they were "responsible for establishing and maintaining disclosure controls and procedures . . . and internal control over financial reporting" and that they had disclosed to the Company's auditors and Audit Committee "[a]ll significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information." In other words, either the Individual Defendants signed certificates they knew to be false, or they failed to undertake the investigation required of them, indicating they acted with scienter.

156. In addition, the Audit Committee's findings resulted in Clifford's immediate replacement by an interim CFO and her demotion to a newly created role that had nothing to do with the Company's financial statements and public reporting. That fact strongly supports an inference of her scienter. Clifford rejoined Autodesk as CFO in March 2021, shortly after the start of the investigation period (spanning February 2021 through January 2024, or FY22-FY24). In this role, she had responsibility for the Company's financial reporting, including its free cash flow statement, during the period the Audit Committee found the Company had engaged in manipulation of free cash flow and other accounting items, such as discretionary spending, collections, and accounts payable. Clifford's sudden demotion to a non-financial role in connection with the Audit Committee's

findings further demonstrates her responsibility for these manipulations.  As reported by a June 3, 2024 Bloomberg article titled "Autodesk CFO Replaced by Board After Accounting Investigation":

> The decision to replace Clifford as CFO was made by the board of directors' audit committee, which led the investigation, executives told employees during a call Friday afternoon, according to a person familiar with the discussion who asked not to be identified. Autodesk management appointed Clifford to her new post following the decision.

157.    The Audit Committee's immediate decision to remove Clifford from the CFO role as part of its investigation without a replacement shows that it believed the need to be urgent; they were willing to accept a more complicated, difficult transition in exchange for Clifford's prompt exit. Removing Clifford without taking the time to search for a replacement, made it necessary to find an interim CFO who could serve while the Company conducted its search for a long-term candidate.  A member of the Audit Committee had to step into the CFO role, which in turn disqualified her as in "independent" director and forced her to step down from the Audit Committee.  It ultimately took Autodesk six months to find a new CFO; Janesh Moorjani's appointment was announced on November 26, 2024.

**B.      Defendants' Statements Show They Possessed Facts that Rendered Their Public Statements Materially False and Misleading**

158.    As detailed above, the Company's free cash flow metric was one of its critical non-GAAP metrics, which, as the Company acknowledged, "allow[ed] for greater transparency with respect to key metrics used by management in its financial and operational decision-making" and "are used by Autodesk's institutional investors and the analyst community to help them analyze the health of the Company's business."  *See* ¶¶87-88.

159.    Moreover, the impact of the Company's billing model change on free cash flow was of critical importance to the Company, investors, and analysts.  Indeed, the Individual Defendants frequently spoke about this transition and the impact on the Company's free cash flow and responded to analyst questions on these matters during quarterly earnings calls both before and throughout the Class Period.  In particular, Defendants characterized the transition as "good for Autodesk" and provided detailed updates on the progress of the transition.  *See, e.g.*, ¶¶45-47, 49, 52, 65-67.

160.     Additionally, the Individual Defendants repeatedly made clear that the upfront to annual transition was important and that they were personally involved in executing it.  For example:

- **February 24, 2022**: During the 4Q22 earnings call, in response to an analyst question about how the Company would "be phasing out the multiyear product subscriptions in fiscal '24" and "the shape of that impact on cash flow," Clifford admitted: "it's a big area of focus for us," and "in terms of the decline for free cash flow, specifically in fiscal '24, I know there's a lot of interest in both the magnitude of it and the slope of it."

- **May 26, 2022**: During the 1Q23 earnings call, an analyst asked about what Autodesk was doing to "work with the channel to get through" the trough in "fiscal '24 cash flow."  Anagnost responded, in part: "[o]ne of the core programs here right now is we're encouraging them [*i.e.*, channel partners] to work with us on conserving some of that upfront cash[.]"

- **August 24, 2022**: During the 2Q23 earnings call, an analyst asked Clifford to elaborate on multiyear subscriptions and how the Company "plan[ned] on phasing that option out."  Clifford responded: "we continue to track the multiyear cohort closely" before explaining, "the transition is going to start in early fiscal '24, and we continue to work through the programmatic and operational details to get there, things like a partner transition plan, back-office system upgrades.  But I'll say again, it's our bias to go as quickly as possible."

- **November 22, 2022**: During the 3Q23 earnings call, an analyst asked Clifford whether there was "anything that you want us to know high level on . . . how you're thinking about fiscal '24[.]"  Clifford responded, in part: "on free cash flow, FactSet consensus right now is a range of $1.2 billion to $1.7 billion.  There's a couple of important things to consider.  The first is the rate at which our customers transition to annual billings.  And the second is the overall macroeconomic environment.  We continue to be focused on executing on that transition as fast as possible because while the change is good for us, and it's good for our customers, from a financial standpoint, we really want the noise behind us."

- **March 22, 2023**: During an investor day call, Clifford announced that the upfront-to-annual transition for product subscriptions would go live the following week, noting: "[s]ince [the previous investor day on September 1, 2021], we've been working hard to prepare our back office to handle this change . . . and to work with our channel partners to ensure their readiness for the transition."

161.     The facts enumerated above, among many others detailed herein, establish the Individual Defendants orchestrated, directed, executed, and were otherwise aware of the scheme to manipulate the Company's free cash flow as described herein.

162.     The fact the Company's billing model transition was "core" to the business and its strategic importance further reinforces the scienter inference.  As detailed above, the Company had

1 spent years on this billing model transition, which it touted as better for Autodesk and which would
2 make it a more valuable company. The billing model transition also had significant impacts for the
3 Company's free cash flow – one of the most important metrics for its valuation. Anagnost's and
4 Clifford's admitted involvement in the billing model transition, a core business strategy the
5 Defendants provided regular updates on, impacting one of the Company's most critical non-GAAP
6 metrics – free cash flow – supports a strong inference of their knowledge of the return to supposedly
7 retired upfront EBA deals at historic levels to meet the Company's critical FY23 free cash flow
8 target.

9         **C.**    **Corporate Scienter**

10      163.    The allegations above also establish a strong inference that Autodesk acted with
11 corporate scienter throughout the Class Period as Defendants and Autodesk's officers, management,
12 and agents had actual knowledge of the misrepresentations and omissions of material facts set forth
13 herein or acted with reckless disregard for the truth because they failed to ascertain and to disclose
14 such facts, even though such facts were known or available to them. For example, the Audit
15 Committee findings show that the "[C]ompany subsequently determined . . . to pursue multiyear
16 upfront contracts with enterprise customers to help meet its fiscal year 2023 free cash flow goal" and
17 "engaged in programs designed to incentivize customers to accept multiyear upfront billing, renew
18 early, and/or pay before the end of the fiscal year." Thus, the Company's material
19 misrepresentations and/or omissions were made knowingly or recklessly, and without a reasonable
20 basis.

21 **XIV.  LOSS CAUSATION**

22      164.    Like other members of the Class of purchasers of the Company's securities who
23 purchased at artificially inflated prices during the Class Period, Plaintiff suffered an economic loss,
24 *i.e.*, damages, when the Company's securities prices declined upon the disclosures correcting the
25 alleged misrepresentations or omissions and/or revealed the materialization of a risk that the alleged
26 misrepresentations or omissions had previously concealed, in whole or part.

27

28

SECOND AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL
SECURITIES LAWS - 4:24-cv-02431-YGR                             - 53 -

165.    The facts and circumstances particularizing loss causation are detailed above in connection with the declines of the Company's stock price on November 22, 2023; April 2, 2024; and April 17, 2024.  *See* ¶¶95-99, 101-105.

166.    The timing and magnitude of the Company's securities price decline negates any inference that the loss suffered by Plaintiff and other Class members was caused by changed market conditions, macroeconomic or industry factors, or Company-specific facts unrelated to Defendants' fraudulent conduct.  The economic loss, *i.e.*, damages, suffered by Plaintiff and other members of the Class was a direct result of: (a) Defendants' fraudulent scheme and misrepresentations or omissions that served to artificially inflate the Company's securities price; and (b) the subsequent significant decline in the value of the Company's securities when the true state of the Company's operations was revealed to the market, correcting the misrepresentations or omissions and/or revealing the materialization of risks that the Company's scheme or misstatements or omissions had concealed previously, in whole or part.

## XV.    APPLICABILITY OF PRESUMPTION OF RELIANCE: FRAUD-ON-THE-MARKET DOCTRINE

167.    Lead Plaintiff will rely upon the presumption of reliance established by the fraud-on-the-market doctrine in that, among other things:

(a)    Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

(b)    the omissions and misrepresentations were material;

(c)    the Company's common stock traded in an efficient market;

(d)    the misrepresentations alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and

(e)    Lead Plaintiff and other members of the Class purchased Autodesk securities between the time Defendants misrepresented or failed to disclose material facts and the time the truth was disclosed, without knowledge of the misrepresented or omitted facts.

168.    At all relevant times, the market for Autodesk securities was an efficient market for the following reasons, among others:

1    (a)    Autodesk securities met the requirements for listing and were listed and

2 actively traded on Nasdaq, a highly efficient and automated market;

3    (b)    as a regulated issuer, Autodesk filed periodic public reports with the SEC;

4    (c)    Autodesk regularly communicated with public investors via established

5 market communication mechanisms, including the regular dissemination of press releases on the

6 national circuits of major newswire services and other wide-ranging public disclosures, such as

7 communications with the financial press and other similar reporting services; and

8    (d)    Autodesk was followed by several securities analysts employed by major

9 brokerage firms, who wrote reports that were distributed to the sales force and certain customers of

10 their respective brokerage firms.  Each of these reports was publicly available and entered the public

11 marketplace.

12    169.    As a result of the foregoing, the market for Autodesk securities promptly digested

13 current information regarding Autodesk from all publicly available sources and reflected such

14 information in the price of the securities.  Under these circumstances, all purchasers of Autodesk

15 securities during the Class Period suffered similar injury through their purchase of Autodesk

16 securities at artificially inflated prices, and a presumption of reliance applies.

17    170.    A Class-wide presumption of reliance is also appropriate in this action under the

18 Supreme Court's holding in *Affiliated Ute Citizens v. United States*, 406 U.S. 128 (1972), because

19 the Class' claims are, in large part, grounded on Defendants' material misstatements and/or material

20 omissions that made Defendants' statements misleading.  Because this action involves Defendants'

21 scheme and failure to disclose material adverse information regarding the Company's business

22 operations and financial prospects – information Defendants were obligated to disclose – positive

23 proof of reliance is not a prerequisite to recovery.  All that is necessary is that the facts withheld be

24 material in the sense a reasonable investor might have considered them important in making

25 investment decisions.  Given the importance of the Class Period material misstatements and material

26 omissions that made Defendants' statements misleading set forth above, that requirement is satisfied

27 here.

28

SECOND AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL
SECURITIES LAWS - 4:24-cv-02431-YGR                                                    - 55 -
4904-2858-4284.v1

## XVI.    THE INDIVIDUAL DEFENDANTS ARE CONTROL PERSONS

171.    Each of the Individual Defendants acted and/or made the statements detailed herein in his or her capacity as an officer and/or director of Autodesk.  Each of the Individual Defendants was directly involved in the management and day-to-day operations of the Company at the highest levels and was privy to confidential proprietary information concerning the Company and its business, operations, services, and present and future business prospects.  In addition, the Individual Defendants were involved in drafting, producing, reviewing, and/or disseminating the false and misleading statements and information alleged herein; were aware of or recklessly disregarded the false and misleading statements being issued regarding the Company; and approved or ratified these statements, all in violation of the federal securities laws.  Each of the Individual Defendants was directly or indirectly involved in the oversight or implementation of the Company's internal controls.

172.    The Individual Defendants, because of their positions of control and authority as officers and/or directors of the Company, were able to, and did, control the content of the various SEC filings, press releases, and other public statements pertaining to the Company during the Class Period.  Each Individual Defendant was provided with copies of the documents alleged herein to be misleading before or shortly after their issuance, participated in conference calls with investors during which false and misleading statements were made, and/or had the ability and/or opportunity to prevent their issuance or cause them to be corrected.  Accordingly, each of the Individual Defendants approved or ratified these statements and is responsible for the accuracy of the public statements detailed herein and is, therefore, primarily liable for the representations and/or omissions contained therein.

## XVII.   CLASS ACTION ALLEGATIONS

173.    Plaintiff brings this action as a class action pursuant to Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure on behalf of a class consisting of all persons who purchased or otherwise acquired Autodesk's securities during the Class Period and who were damaged thereby as alleged herein (the "Class").  Excluded from the Class are Defendants, the officers and directors of the Company, members of the Individual Defendants' immediate families and their legal

1    representatives, heirs, successors, or assigns and any entity in which Defendants have or had a

2    controlling interest.

3        174.    The members of the Class are so numerous that joinder of all members is

4    impracticable.  The disposition of their claims in a class action will provide substantial benefits to

5    the parties and the Court.  Throughout the Class Period, the Company's securities were actively

6    traded on Nasdaq.  According to the Company's Form 10-Q for the period ending October 31, 2023,

7    filed on December 4, 2023, Autodesk had 213,915,325 shares of common stock outstanding as of

8    November 27, 2023.  While the exact number of Class members can only be determined by

9    appropriate discovery, Plaintiff believes that members of the Class number at least in the hundreds, if

10   not the thousands, and that they are geographically dispersed.

11       175.    There is a well-defined community of interest in the questions of law and fact

12   involved in this case.  Questions of law and fact common to the members of the Class that

13   predominate over questions that may affect individual Class members include:

14               (a)    whether Defendants violated the Exchange Act;

15               (b)    whether statements made by Defendants to the investing public

16   misrepresented material facts about Autodesk;

17               (c)    whether Defendants' statements omitted material facts necessary to make the

18   statements made, in light of the circumstances under which they were made, not misleading;

19               (d)    whether Defendants knew or recklessly disregarded that their statements were

20   false and misleading;

21               (e)    whether the prices of Autodesk securities were artificially inflated; and

22               (f)    the extent of damages sustained by Class members and the appropriate

23   measure of damages.

24       176.    Plaintiff's claims are typical of those of the Class because Plaintiff and the Class

25   sustained damages arising out of Defendants' wrongful conduct complained of herein.

26       177.    Plaintiff will adequately protect the interests of the Class and has retained counsel

27   experienced in class action securities litigation.  Plaintiff has no interests that conflict with those of

28   the Class.

178.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all Class members is impracticable.  Further, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a Class action.

## COUNT I

**For Violation of §10(b) of the Exchange Act and Rule 10b-5(b)**
**(Against Defendants Autodesk and Clifford)**

179.    Plaintiff incorporates ¶¶1-178 by reference.

180.    During the Class Period, Autodesk and Clifford disseminated or approved the false statements specified above, which they knew or recklessly disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

181.    Autodesk and Clifford violated §10(b) of the Exchange Act and Rule 10b-5(b) during the Class Period in that they made untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

182.    As a direct and proximate result of Autodesk's and Clifford's wrongful conduct, Plaintiff and the Class have suffered damages in connection with their respective purchases and sales of Autodesk securities during the Class Period, because, in reliance on the integrity of the market, they paid artificially inflated prices for Autodesk securities and experienced losses when the artificial inflation was released from Autodesk securities as a result of the partial revelations and price declines detailed herein.  Plaintiff and the Class would not have purchased Autodesk securities at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by Defendants' misleading statements.

183.    By virtue of the foregoing, Autodesk and Clifford have each violated §10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

## COUNT II

### For Violation of §20(a) of the Exchange Act
### (Against the Individual Defendants)

184.    Plaintiff incorporates ¶¶1-183 by reference.

185.    The Individual Defendants acted as controlling persons of Autodesk within the meaning of §20(a) of the Exchange Act.

186.    By virtue of their high-level positions, participation in and/or awareness of Autodesk's operations, and/or intimate knowledge of Autodesk's disclosures, policies, and financial performance, the Individual Defendants had the power to influence and control, and did influence and control, directly or indirectly, the decision making of Autodesk, including the content and dissemination of the various statements Plaintiff contends are false and misleading.  The Individual Defendants were provided with, or had unlimited access to, copies of the reports, press releases, public filings, and other statements alleged by Plaintiff to be misleading before and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

187.    As set forth above, Autodesk violated §10(b) and Rule 10b-5 promulgated thereunder by its acts and omissions, which made Defendants' statements materially misleading as alleged in this Complaint.  By virtue of their positions as controlling persons, and as a result of their aforementioned conduct, the Individual Defendants are liable pursuant to §20(a) of the Exchange Act for Autodesk's §10(b) violations.  As a direct and proximate result of the Individual Defendants' wrongful conduct, Plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's common stock during the Class Period, as evidenced by, among other things, the common stock price declines discussed above, when the artificial inflation was released from the Company's common stock.

## XVIII. PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief and judgment as follows:

1        A.     Declaring this action to be a class action properly maintained pursuant to Rule 23 of

2  the Federal Rules of Civil Procedure and certifying Plaintiff as Class Representative and Robbins

3  Geller Rudman & Dowd LLP as Class Counsel;

4        B.     Awarding compensatory damages in favor of Plaintiff and the other Class members

5  against all Defendants, jointly and severally, for all damages sustained as a result of Defendants'

6  wrongdoing, in an amount to be proven at trial, including interest thereon;

7        C.     Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this

8  action, including counsel fees, expert fees, and other costs and disbursements; and

9        D.     Awarding such equitable, injunctive, or other relief as deemed appropriate by the

10  Court.

11  **XIX.  JURY DEMAND**

12        Lead Plaintiff demands a trial by jury.

13  DATED: August 8, 2025              ROBBINS GELLER RUDMAN
                                          & DOWD LLP
14                                  SHAWN A. WILLIAMS
                                  JASON C. DAVIS

15

16                                        s/ Jason C. Davis
17                                   JASON C. DAVIS

18                              Post Montgomery Center
                                One Montgomery Street, Suite 1800
19                              San Francisco, CA  94104
                                Telephone:  415/288-4545
20                              shawnw@rgrdlaw.com
                                jdavis@rgrdlaw.com
21

22                              ROBBINS GELLER RUDMAN
                                 & DOWD LLP
23                              SPENCER A. BURKHOLZ
                                655 West Broadway, Suite 1900
24                              San Diego, CA  92101
                                Telephone:  619/231-1058
25                              spenceb@rgrdlaw.com

26

27

28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

ROBBINS GELLER RUDMAN
  & DOWD LLP
ELIZABETH A. SHONSON
(admitted *pro hac vice*)
LUKE GOVEAS
(admitted *pro hac vice*)
225 NE Mizner Boulevard, Suite 720
Boca Raton, FL 33432
Telephone: 561/750-3000
561/750-3364 (fax)
eshonson@rgrdlaw.com
lgoveas@rgrdlaw.com

Lead Counsel for Lead Plaintiff