# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **MICHAEL BARKASI,** *individually and on behalf of all others similarly situated*, <br><br> Plaintiffs, <br><br> v. <br><br> **AUTODESK, INC., ET AL.,** <br><br> Defendants. | Case No. 4:24-cv-02431-YGR <br><br> **ORDER GRANTING MOTION TO DISMISS SECOND AMENDED COMPLAINT WITH PREJUDICE** <br><br> Re: Dkt. Nos. 67, 68 |

Defendants Autodesk, Inc., Andrew Anagnost, and Deborah Clifford move to dismiss plaintiffs' Second Amended Class Action Complaint. ("SACAC"; Dkt. No. 65.) The Court previously dismissed plaintiffs' securities class action with leave to amend because plaintiffs failed to identify a false or misleading statement and establish an inference of scienter. (Dkt. No. 64.) Plaintiffs' SACAC attempts to address those pleading deficiencies. Having considered the papers submitted and pleadings in this action, and for the reasons set forth below, the Court **GRANTS** defendants' motion to dismiss without leave to amend.[1]

## I.      BACKGROUND

The Court presumes that the parties are familiar with the allegations in this case and the Court's prior order, which it incorporates here. (Dkt. No. 64.) The Court recounts only plaintiffs'

---

[1]  Pursuant to Federal Rule of Civil Procedure 78(b) and Civil Local Rule 7-1(b), the Court finds this motion appropriate for decision without oral argument.

The Court, consistent with its prior order, **GRANTS IN PART** defendants' requests for judicial notice and incorporation by reference. (Dkt. No. 68.) The Court will take judicial notice of Exhibits 1–10, 13–15, 19, 20, 24, and 25. Those exhibits contain SEC filings, call transcripts, and Autodesk's stock price during the relevant period, which courts routinely judicially notice. Fed. R. Evid. 201(b); *In re Intel Corp. Sec. Litig.*, No. 18-cv 00507-YGR, 2019 WL 1427660, at *6–7 (N.D. Cal. Mar. 29, 2019). Moreover, those documents were incorporated by reference in plaintiffs' complaint. *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 999–1002 (9th Cir. 2018); *see also In re Intel Corp. Sec. Litig.*, 2019 WL 1427660, at *7. The Court overrules plaintiff's objections. (Dkt. No. 71.) At this stage, the Court will not take judicial notice of defendants' submitted analyst reports. (Exs. 11, 12, 16–18, and 21–23.)

United States District Court
Northern District of California

allegations that are new and otherwise relevant to this order.

The SACAC alleges as follows:

Defendant Autodesk and its corporate officers, Andrew Anagnost (CEO) and Deborah Clifford (CFO), misled consumers by secretly reversing Autodesk's plan to transition billing for certain software offerings ("Enterprise Business Agreements" or "EBAs") from upfront, multiyear billing offered at a discount to annual billing without a discount. Clifford announced Autodesk's EBA billing transition on an August 25, 2021 earnings call:

> Our strong start to the year means *we're also shifting more of our EBA customers from multiyear paid upfront to annual billings*, which is good for them and good for Autodesk. Our EBA customers retain price certainty with a multiyear contract term, but annual billings give them a more predictable annual cash outlay. For Autodesk, we generate more predictable cash flow and remove the discounts to generate upfront cash collections. *While we had already assumed this change in fiscal '23*, it has a modest impact on fiscal '22 billings and free cash flow. However, we expect it to drive more predictable free cash flow growth and better price realization over time, which will make Autodesk a more valuable company.

(SACAC ¶ 49; emphases supplied.) In response to a question from an analyst about the size and impact of the change to EBA billing, Clifford clarified that:

> The key point to take away is this. We're focused on making changes that are good for our customers and good for us, and *shifting more EBAs to annual billings* helps us achieve that goal.
>
> . . .
>
> Of course, the change is good for us, too. We generate more predictable annual cash flows, and we remove the discounts we see today to generate cash collections up front. *Most EBAs are already on annual billing terms*, *and also we had already assumed that EBAs would all be on annual billing terms starting next year in our fiscal 2023.*

(*Id.* ¶ 51; emphases supplied.) Despite that announcement, plaintiffs maintain that Autodesk executed "historical levels" of upfront EBAs in the last two quarters of FY23 so that Autodesk could meet a particular financial target—Free Cash Flow ("FCF"). (*Id.* ¶¶ 5, 7–11.) The FCF target for FY23 was "of particular significance to Autodesk investors" because "analysts had focused on the FY23 free cash flow target as central to their valuation of the Company" as part of a five-year plan. (*Id.* ¶¶ 8, 72–77.)

United States District Court
Northern District of California

Once Autodesk understood that it would not reach its FCF target in FY23, Autodesk lowered its FCF target on three separate occasions. (*Id.* ¶¶ 9, 72–77.) Clifford stated that Autodesk lowered its target for a third time because there was "less demand for multi-year, up-front and more demand for annual contracts than [Autodesk] expected." (*Id.* ¶ 9.) When Autodesk later exceeded its lowered FCF target, Autodesk explained that its success was driven by "the approaching transition from up-front to annual billings for multi-year contracts, and a large renewal cohort, providing a tailwind to billings and free cash flow." (**Statement 1**; *Id.* ¶ 11; Declaration of Stephen B. Strain ("Strain Decl."), Dkt. No. 67-2, Ex. 7.)  Autodesk held out FCF, a non-GAAP measure, as "useful to investors" and a financial metric that would "allow for greater transparency." (**Statement 2**; *Id.* ¶ 87; Strain Decl., Ex. 6.)

Autodesk's alleged FCF padding continued into the first quarter of the next fiscal year, where Autodesk collected $714 million in FCF, a "record first quarter free cash flow" that accounted for "60% of the cash flow [Autodesk] expected to collect for the entire fiscal year." (*Id.* ¶ 90.) When Autodesk was asked to explain its results, Clifford stated that "cash collections from the last months of billings in fiscal '23 were strong," that there was "favorable linearity and early renewals in Q1 that were driven by the end of multiyear billed upfront," and that Autodesk received "a federal tax payment extension." (**Statement 3**; *Id.* ¶ 92.)

In April 2024, Autodesk announced that it was investigating "the Company's free cash flow and non-GAAP operating margin practices." (*Id.* ¶ 102.) Autodesk's Audit Committee concluded that:

- The company has historically relied on multiyear contracts with its enterprise and product subscription customers, billed upfront, to help meet its free cash flow targets. ***During the relevant period, the company engaged in programs designed to incentivize customers to accept multiyear upfront billing, renew early, and/or pay before the end of the fiscal year***.

- The Company has ***disclosed its practice of incentivizing customers to adopt multiyear upfront billing arrangements***. It has also acknowledged that discounted multiyear upfront contracts reduce revenue and lower billings in out years. Though prior to fiscal year 2024, ***the Company did not quantify free cash flow attributable to multiyear upfront billings***, it has noted the contribution of upfront collections to fluctuations in the Company's quarterly reported long-term deferred revenue.

- During fiscal year 2022, the Company announced that it had begun to shift enterprise customers to contracts billed annually, and that it had assumed fiscal 2023 enterprise contracts would be billed annually. ***The Company subsequently determined, however, to pursue multiyear upfront contracts with enterprise customers to help meet its fiscal year 2023 free cash flow goal***. Upfront billings of enterprise customers in fiscal year 2023 ***substantially exceeded historical levels***, helping the Company to meet its lowered annual free cash flow target.

- In addition, during the relevant period, certain decisions regarding discretionary spending, collections, and accounts payable were informed by their anticipated effects on the company's external free cash flow and/or non-GAAP operating margin targets. The resulting actions generally served to reduce reported free cash flow and/or lower reported margin in the current period. ***Though free cash flow was one factor in the company's executive compensation program, these decisions were not calculated to influence compensation outcomes***.

(*Id.* ¶ 110; emphases supplied.)

Plaintiffs retained an economic consulting firm, Integra FEC, "to quantify the impact of upfront EBA deals on Autodesk's FY23 FCF." (*Id.* ¶ 120.) Integra "calculated the FCF impact for Q3 and Q4 through a counterfactual cash flow model" by analyzing "Autodesk's reported financial metrics, including long-term deferred revenue." (*Id.* ¶ 124.) Integra concluded that Autodesk's FCF would have been approximately $570 million lower than Autodesk reported but for executing upfront EBAs near the end of FY23. (*Id.* ¶ 134.)

In its prior order, the Court dismissed plaintiffs' claims because plaintiffs failed to identify statements that were materially misleading or misleading by omission and plead facts that support a strong inference of scienter. (Dkt. No. 64 at 19.)

## II.    LEGAL STANDARD

A motion to dismiss under Rule 12(b)(6) tests the legal sufficiency of the claims alleged in the complaint. *Ileto v. Glock, Inc.*, 349 F.3d 1191, 1199–1200 (9th Cir. 2003). The standard is well known and not in dispute.

## III.    SECTION 10(B) OF THE EXCHANGE ACT AND RULE 10(B)-5

### A.    LEGAL FRAMEWORK

Section 10(b) of the Securities and Exchange Act, 15 U.S.C. § 78j(b), makes it unlawful for any person to "use or employ, in connection with the purchase or sale of any security . . . any

4

manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe . . . ." Rule 10b–5 builds upon Section 10(b) by making it unlawful to "make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading." 17 C.F.R. § 240.10b–5(b). Moreover, under the Exchange Act, any person who "directly or indirectly, controls any person liable under any provision of [the Exchange Act] or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable." 15 U.S.C. § 78t(a).

To state a claim under Section 10(b), a plaintiff must "show that the defendant made a statement that was '*misleading* as to a *material* fact.'" *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 38 (2011) (emphasis in original) (quoting *Basic Inc. v. Levinson*, 485 U.S. 224, 238 (1988)). "Falsity is alleged when a plaintiff points to defendant's statements that directly contradict what the defendant knew at that time." *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 1008 (9th Cir. 2018). "A statement is misleading if it would give a reasonable investor the impression of a state of affairs that differs in a material way from the one that actually exists." *Retail Wholesale & Dep't Store Union Local 338 Ret. Fund v. Hewlett-Packard Co.*, 845 F.3d 1268, 1275 (9th Cir. 2017) (cleaned up).

Under the Private Securities Litigation Reform Act ("PSLRA's") heightened pleading requirement, to state a Section 10(b) claim, a plaintiff must allege facts sufficient to establish: (i) that the defendant made a material misrepresentation or omission of fact; (ii) that the misrepresentation was made with scienter; (iii) a connection between the misrepresentation or omission and the purchase or sale of a security; (iv) reliance on the misrepresentation or omission; (v) loss causation; and (vi) economic loss. *Metzler Inv. GMBH v. Corinthian Colleges, Inc.*, 540 F.3d 1049, 1061 (9th Cir. 2008). In 1995, Congress enacted PSLRA, which includes "exacting pleading requirements," as a check against abusive litigation by private parties. *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 313 (2007). The PSLRA requires that the complaint specify each statement alleged to be misleading and the reason or reasons it was misleading. *Id.* at

United States District Court
Northern District of California

1070. With respect to the scienter requirement, a court must view the allegations as a whole and determine whether a plaintiff has raised an inference of scienter that is "cogent and compelling, thus strong in light of other explanations," to satisfy the PSLRA standard. *S. Ferry LP, No. 2 v. Killinger*, 542 F.3d 776, 784 (9th Cir. 2008) (citing *Tellabs*, 551 U.S. at 326).

### B.    AUTODESK DID NOT MAKE FALSE OR MISLEADING STATEMENTS

In the SACAC, plaintiffs narrow their focus from seventeen (excluding subparts) to three supposed false statements or omissions. The Court previously analyzed each statement in its prior order and will analyze each again in line with plaintiffs' amended allegations.

#### 1.    Statement 1

The first allegedly false or misleading statement is Clifford's February 23, 2023 statement from an Autodesk press release explaining Autodesk's fourth quarter fiscal 2023 financial highlights. Clifford stated:

> Overall, the demand environment in Q4 remained consistent with Q3 with the approaching transition from up-front to annual billings for multi-year contracts, and a large renewal cohort, providing a tailwind to billings and free cash flow.

(**Statement 1**, SACAC ¶ 80.) Plaintiffs argue that Clifford's statement is misleading by omission because Autodesk did not disclose, and should have disclosed, that Autodesk was able to meet its FCF target because it reversed course as to its EBA billing strategy, which brought in an alleged $570 million in additional FCF. (SACAC ¶ 138.) Plaintiffs contend that Clifford's statement that "Q4 remained consistent with Q3" helped create that misimpression because Clifford previously stated, with respect to Q3 and when lowering Autodesk's FCF target for a second time, that "[o]ur lower . . . free cash flow guidance primarily reflects less demand for multi-year, up-front and more demand for annual contracts than we expected." (*Id.* ¶ 76.) Clifford had also assured investors that Autodesk remained "focused on executing on that transition as fast as possible." (*Id.* ¶ 67.)

As the Court previously explained, plaintiffs identified this same statement as misleading by omission in their first amended complaint, which the Court dismissed. The Court held that this explanatory statement was not misleading for at least three reasons summarized here. *First*, Autodesk's prior statements "did not squarely open the door such that Autodesk was required to

disclose all changes that it made to EBA billing" in part because "Autodesk did not provide a date certain, volume, concrete numbers, or other details of its performance by customer type or deal arrangement" in announcing its intent to shift away from upfront EBAs. (Dkt. No. 64 at 14.) *Second*, the Court found that plaintiffs did not allege facts that explained whether the upfront EBAs that Autodesk executed had a material impact such that EBA billing would be included in an explanatory statement. (*Id.* at 14–15.) *Third*, the Court held that plaintiffs did not allege facts that suggested that a reasonable investor would have acted differently because Autodesk consistently predicted that the following fiscal year would be a "trough" year. (*Id.* at 15.)

Plaintiffs' new allegations do not resolve the gating issue that the Court previously identified: Autodesk's prior statements about the forthcoming billings transition were not definite or specific enough to require Autodesk to disclose the information that plaintiffs now claim Autodesk omitted. *Brody v. Transitional Hosps. Corp.*, 280 F.3d 997, 1006 (9th Cir. 2002) (Defendant must "affirmatively create an impression of a state of affairs that differs in a material way from the one that actually exists."); *In re Alphabet, Inc. Sec. Litig.*, 1 F.4th 687 (9th Cir. 2021) ("Such statements rise to the level of materially misleading statements only if they provide 'concrete description of the past and present' that affirmatively create a plausibly misleading impression . . . .'"); *In re Quality Sys., Inc. Sec. Litig.*, 865 F.3d 1130 (9th Cir. 2017) ("The non-forward-looking statements . . . provided a concrete description of the past and present state of the pipeline.") Instead, plaintiffs overread Autodesk's vague prior statements and leap to conclusions about the volume and timing of the EBA billings shift, including as to a "consistent demand environment" and the "speed" at which Autodesk transitioned.

Plaintiffs skip that foundational step and do not grapple with whether Autodesk provided a concrete and specific statement. Autodesk announced that it planned to shift "more" EBAs to annual billing, and that Autodesk "had already assumed this change in fiscal '23." Plaintiffs' identified false statements depend on whether that statement was sufficiently concrete to require Autodesk to disclose additional—allegedly omitted or misleading—information. The Court previously held that it did not. (Dkt. No. at 14.) Without that connection, Autodesk cannot be required to list *all* factors to explain why the company did (or did not) meet a certain target when

electing to list some explanatory factors.

Here, plaintiffs attempt to manufacture a concrete statement from Autodesk. Plaintiffs allege that "[d]efendants told investors that, while it had very few upfront deals with EBA customers left to transition, it had decided to transition '*all*' remaining EBA customers to the annual billing model *within months*." (SACAC ¶ 47; emphases supplied.) Autodesk said no such thing. Plaintiffs' allegation blatantly misrepresents the statement Autodesk's made on its August 25, 2021 earnings call, which provides assumptions and discusses its effort to transition "more" EBAs to annual billing. It does not mention a volume or timeframe, let alone a timeframe "within months." Moreover, like before, the statement that plaintiffs identify is not specific to EBAs and instead relates to *all* upfront deals and annual product subscriptions.

Plaintiffs next argue that Autodesk's failure to disclose was material because a newly commissioned analysis (based on publicly available data) from plaintiffs' expert Integra estimates that "Autodesk's FCF would have been approximately 23.1% below the low end of the guidance" without the additional $570 million from upfront EBAs. (Oppo. at 6, 9–10.) The Court need not determine whether Integra's analysis is material because plaintiffs have not identified a misleading statement or omission in the first instance. Regardless, the Court finds that Integra's analysis is not sufficiently reliable. Integra's analysis was based on publicly available information (meaning that this information was also available to Autodesk's investors) and was not corroborated by Autodesk's employees, an independent analysis, or internal data. *E. Ohman J:or Fonder AB v. NVIDIA Corp.*, 81 F.4th 918, 932 (9th Cir. 2023) (holding that on balance, an independent analysis was sufficiently reliable because, in part, its conclusion was corroborated by a second independent analysis and Nvidia employees, was based on certain nonpublic information, like internal studies on market share, and was consistent with market events.)

Nothing in plaintiffs' second amended complaint warrants a different outcome. The Court again finds that Statement 1 is not actionable.

### 2. Statement 2

The second statement plaintiffs identify is from Autodesk's February 23, 2023 Form 8-K which states that:

> Autodesk uses non-GAAP measures in making operating decisions because Autodesk believes those measures provide meaningful supplemental information for management regarding the Company's earning potential and performance by excluding certain expenses and charges that may not be indicative of the Company's core business operating results. For the reasons set forth below, Autodesk believes that these non-GAAP financial measures are useful to investors both because (1) they allow for greater transparency with respect to key metrics used by management in its financial and operational decision-making and (2) they are used by Autodesk's institutional investors and the analyst community to help them analyze the health of the Company's business. This allows investors and others to better understand and evaluate Autodesk's operating results and future prospects in the same manner as management, compare financial results across accounting periods and to those of peer companies, and to better understand the long-term performance of its core business.

(**Statement 2**, SACAC ¶ 87.) Plaintiffs argue that this statement is misleading because Autodesk encouraged investors to use non-GAAP financial measures, including FCF, to better understand Autodesk's business while Autodesk simultaneously manipulated its operations to meet its FY23 FCF target. (SACAC ¶¶ 86–89.) Plaintiffs do not raise new arguments.

The Court previously held that this statement was not materially misleading for the same reasons explained as to Statement 1. For a second time, the Court rejects the argument that this statement was misleading. Statement 2 is innocuous and refers to *all* non-GAAP measures and is not limited to FCF. Here, plaintiffs once again read this statement for more than it is worth. Autodesk's statements that non-GAAP measures may "be useful to investors" and "increase transparency" do not require what plaintiffs seek here—complete transparency as to Autodesk's FCF.

Moreover, Autodesk's statement is an expression of opinion. (*Id.* ¶ 87 ("Autodesk believes that these non-GAAP financial measures are useful to investors . . .").) Plaintiffs counter that Autodesk's statements contain embedded facts, which can be misleading under *Omnicare, Inc. v. Laborers District Council Construction Industry Pension Fund*, 575 U.S. 175, 185 (2015). Plaintiffs cite to a hypothetical discussed in *Omnicare*, where the Supreme Court considered the statement "I believe our TVs have the highest resolution available because we use a patented technology." *Id.* There, the Court found that a statement of fact, i.e. "we use a patented technology," may be embedded in an opinion statement and may be actionable. *Id.* Setting aside

United States District Court
Northern District of California

that hypothetical, *Omnicare* itself undermines plaintiffs' argument. *Omnicare* found that the following statements were "pure statements of opinion" that did not contain embedded facts:

- We believe our contract arrangements with other healthcare providers, our pharmaceutical suppliers and our pharmacy practices are in compliance with applicable federal and state laws.

- We believe that our contracts with pharmaceutical manufacturers are legally and economically valid arrangements that bring value to the healthcare system and the patients that we serve.

(*Id.* at 179–180, 186, 189–190.) The statement plaintiffs identify in this case is closer to the at-issue statements in *Omnicare*, not *Omnicare*'s hypothetical. The phrases to which plaintiffs object—that non-GAAP financial measures "increased transparency" and are "useful" tools for investors—are statements of opinion.[2] Nor have plaintiffs argued that Clifford and Autodesk did not sincerely hold that belief at the time the statement was made. "What [plaintiffs] instead claim is that [Autodesk's] belief turned out to be wrong." *Id.* at 186. Even under an omission-based theory, a statement is not necessarily misleading when "an issuer knows, but fails to disclose, some fact cutting the other way. Reasonable investors understand that opinions sometimes rest on a weighing of competing facts." *Id.* at 189–190. *Omnicare* does not support plaintiffs' argument.

Accordingly, the Court again holds that Statement 2 is not materially misleading or misleading by omission.

### 3. Statement 3

The final statement plaintiffs identify is a statement Clifford made on a May 25, 2023 earnings call. When asked about what drove the first quarter's record FCF, Clifford stated:

> So Q1 free cash flow was strong for a couple of reasons. First, cash collections from the last month of billings in fiscal '23 were strong. Second, we also saw favorable linearity and early renewals in Q1 that were driven by the end of multiyear billed upfront. And then third, as I mentioned on the call, after the winter storms in California, we received a federal tax payment extension for the third quarter.

(**Statement 3**, SACAC ¶ 92.) Plaintiffs argue that Clifford's statement is materially false or

---

[2] Statement 2 does include embedded facts—that management uses non-GAAP metrics in its financial and operational decision making. Plaintiffs do not challenge that fact as misleading.

10

misleading because Clifford did not explain that the reported FCF was "strong" because it included a "one-time bump" of $200 million in upfront deals that would not recur. (SACAC ¶ 93.) Plaintiffs again argue that this statement misdirected investors because Autodesk did not disclose that it had continued to execute upfront, multi-year EBAs.

In its prior order, the Court found that this statement was not materially false or misleading for the same reasons provided for explanatory statements 1 and 2. (Dkt. No. 64 at 6–7, 13–15.) The Court again incorporates that analysis here.

Plaintiffs next argue that Autodesk's "intentional misdirection" is misleading under *Glazer* and *Seagate*. The Court disagrees. In *Glazer*, the plaintiffs affirmatively provided concrete assurances to investors that were false (e.g. that sales pipeline remained unchanged when it had changed) based on the information available. 63 F.4th 747, 770–71. Here, Autodesk allegedly did not provide a complete explanation—which it was *not* required to do—as to all factors contributing to its FCF. The same is true for *Seagate*. There, the central issue was whether Seagate made false statements about its purportedly illegal sales to a single customer, and at what point Seagate knew or suspected that its sales to that customer were illegal. *In re Seagate Tech. Holdings PLC Sec. Litig.*, 2025 WL 1744505, at *8 (N.D. Cal. May 12, 2025). Seagate explicitly informed investors that it did not see "any particular restriction" in continuing to sell to the identified customer. *Id.* at *6. After Seagate "was aware that there were reasons for concern," Seagate was required to follow up and could not state, without misleading investors, that there were "no material changes" and attribute its financial performance from its unlawful sales to other innocuous factors. *Id.* at *8. Here, plaintiffs have not identified a risk known to Autodesk or a "concrete statement" that required Autodesk to disclose additional information to avoid leaving a misleading impression. Without either, *Seagate* does not counsel a different result.

Accordingly, the Court again holds that Statement 3 is not materially misleading or misleading by omission.

\* \* \*

The Court finds that plaintiffs failed to allege that Autodesk made a material misrepresentation or omission of fact. The Court previously allowed plaintiffs an opportunity to

11

amend and does not find that any further amendment would be likely to cure the deficiencies that the Court has again identified.

### IV.   SECTION 20(A) OF THE SECURITIES AND EXCHANGE ACT

"Section 20(a) of the Securities Exchange Act of 1934 provides for liability of a 'controlling person.'" *In re NVIDIA*, 768 F.3d at 1052 (quoting 15 U.S.C. § 78t(a)). "To establish a cause of action under this provision, a plaintiff must first prove a primary violation of underlying federal securities laws, such as Section 10(b) or Rule 10b-5, and then show that the defendant exercised actual power over the primary violator." *Id.* (citation omitted). A claim under Section 20(a) can survive only if the underlying predicate Exchange Act violation also survives. *See City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*, 856 F.3d 605, 623 (9th Cir. 2017). "Section 20(a) claims may be dismissed summarily . . . if a plaintiff fails to adequately plead a primary violation of section 10(b)." *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 990 (9th Cir. 2009). Plaintiffs' claims rise or fall with the underlying Section 10(b) or Rule 10b-5 claims. The Court thus **GRANTS** defendants' motion to dismiss without leave to amend.

### V.   CONCLUSION

For the reasons stated above, the Court **GRANTS** defendants' motion to dismiss the SACAC with prejudice.

The Clerk of Court is ordered to close this case.

This terminates Dkt. Nos. 67, 68.

**IT IS SO ORDERED.**

Dated: January 26, 2026

_____
**YVONNE GONZALEZ ROGERS**
**UNITED STATES DISTRICT COURT JUDGE**

12